**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **NUKOTE INTERNATIONAL, INC., et al.,** | ) | **Case No. 09 06240** |
| | ) | **Chapter 11** |
| | ) | **Judge Keith M. Lundin** |
| | ) | |
| Debtors. | ) | **Jointly Administered** |

### DEBTORS' EXPEDITED MOTION FOR AUTHORITY TO OBTAIN CREDIT SECURED BY SENIOR LIENS AND WITH SUPERPRIORITY ADMINISTRATIVE CLAIM STATUS PURSUANT TO 11 U.S.C. §364 (c) AND (d)

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Nukote International, Inc., et al, the debtors and debtors-in-possession in the above-referenced case (collectively, "Nukote" and/or the "Debtors"), file this Expedited Motion for Authority to Obtain Credit Secured by Senior Liens and with Superpriority Administrative Claim Status Pursuant to §364(c) and (d) (the "Financing Motion") and in support thereof would respectfully show the Court the following:

### I. *EXPEDITED RELIEF*

1.      Debtors respectfully request an expedited interim hearing on this Financing Motion pursuant to Fed. R. Bankr. R. 4001(c)(2) and LBR 9075-1, and that at such expedited hearing the Court approve the relief requested herein on an interim basis.

2.      As explained in more detail below, Debtors are need of an expedited hearing to prevent immediate and irreparable harm to the estate and to creditors pending a final hearing. Without immediate access to the proposed credit, Debtors will be unable to purchase raw materials,

1

manufacture product, or otherwise operate their business to maximize the value of their assets and further their reorganization efforts.

3.      Notice of this Financing Motion was given to the Limited Service List (pursuant to the Court's Amended Order of June 8, 2009) either through the Court's CM/ECF system to those parties requesting electronic service, including, specifically, counsel for the Committee, counsel for CIT Group/Business Credit, Inc., a New York Corporation ("CIT"), and counsel for the U.S. Trustee, or by first class mail postage prepaid to those parties for which electronic service is not available.

4.      Debtors respectfully request that the Court set an expedited interim hearing on this Financing Motion **on September 9, 2009**.[1]

## II. *JURISDICTION*

5.      Pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A),(D), (M) and (O), 11 U.S.C. §363, Federal Rule of Bankruptcy Procedure 4001, and the Standing Order of Reference of the United States District Court for the Middle District of Tennessee, the Court has jurisdiction to hear this Motion.

## III. *FACTUAL AND PROCEDURAL BACKGROUND*

6.      On June 3, 2009 (the "Petition Date"), Debtors each filed a voluntary petition in this Court for relief under Chapter 11. By order entered on June 5, 2009, Debtors' cases are being jointly administered.

7.      Debtors continue to manage and operate their business as debtors in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

---

[1]     Debtors respectfully request that this matter be set for preliminary hearing on September 9 if convenient for the Court, as Debtor's lead counsel is unavailable on September 8.

8.      An official committee of unsecured creditors (the "Committee") was appointed by the U.S. Trustee on June 12, 2009.

### A. The Debtors' Business Operations

9.      Debtors, together with their non-debtor affiliates (collectively, the "Company"), are independent manufacturers and distributors of supplies for office and home printing devices. The Company manufactures and/or distributes products including ink jet and laser toner cartridges; cartridge refill kits; ribbons, ink-rollers, and lift-off tapes; copier toner; and thermal fax ribbons for use in a variety of models of impact and non-impact printing mechanisms. More specifically, the Debtors' remanufactured ink jet and laser toner cartridge operations are centered in Mexico; toner manufacturing is centered in Connellsville, PA; and coated media/fax ribbon/correctible ribbon/OEM ink jet operations are centered in Rochester, NY. Debtors employ, directly or indirectly, approximately 1100 persons worldwide, and Debtors sell their products primarily in the United States, Canada, Mexico and Europe.

10.     Debtor Nukote International, Inc., through its subsidiaries and affiliates, has multiple locations in several states in the United States and also in Mexico. Debtors operate their collective businesses from the following locations: executive and corporate headquarters located in Plano, Texas; administrative offices and coating operations located in Rochester, New York; a distribution center located in Franklin, Tennessee; accounting and customer service operations in Bardstown, Kentucky; toner manufacturing in Connellsville, PA; a maquiladora manufacturing operation in Monterrey, Mexico; a third party distribution center in Ventura, CA; and distribution/sales/customer service office for European operations in Membury, UK.

Case 3:09-bk-06240    Doc 236    Filed 09/01/09    Entered 09/01/09 16:11:10    Desc Main
Document    Page 3 of 39

11.     Over the last several years, Nukote had, in an effort to reduce costs and remain competitive in a changing marketplace, shifted a substantial portion of its manufacturing operations to China. However, based upon proclamations issued by the Chinese government in 2007 and 2008, it became apparent to Nukote that the Company would no longer be able to import empty ink jet and laser toner cartridges, thus forcing Nukote's operations in China to cease. The Chinese manufacturing operations were shut down in April, 2009. Due to the impending cessation of operations in China, in 2008 and 2009, Nukote moved the bulk of its manufacturing operations to Monterrey, Mexico. These positive business moves have allowed Nukote to remain well-positioned in the industry. Generally speaking, Nukote enjoys excellent relationships with its customer base. The success and continued viability of the Debtors' business is dependent upon the patronage and loyalty of its customers and its relationships with manufacturing partners. Although it may sound, theoretically, like a good problem to have, the Debtors have more business than they can handle.

**B. The Debtors' Current Emergency Cash Needs, Overall Positive Business Outlook and the Need for Additional Financing**

12.     In addition to the shift of its manufacturing operation to Mexico, prepetition, Nukote's executive team made significant other progress in reducing the Company's costs. Ironically, however, the very actions that were taken to improve the Company's balance sheet, such as reducing inventory levels and accelerating receivables, had the unfavorable effect of eroding Nukote's borrowing base and reducing operating cash. The result was that Nukote's cash flow was severely impacted and, in turn, became increasingly difficult for Nukote to purchase adequate raw materials and components necessary to manufacture products and properly serve its customers.

13.     At this time, the Debtors have in excess of $12 million in purchase orders (what the

4

Debtors internally refer to as "backfill opportunities") from customers "waiting in the wings," so to speak. If the Debtors have the cash to manufacture the product to fill those orders, then those purchase orders are the Debtors' to fill. If, however, the Debtors cannot commit the capital and the manufacturing capacity necessary to fill those orders within the timeframe requested by the customers, the Debtors will not get the business. Nukote suffers not from a lack of business, but from a lack of available cash to fund that business.

14. If the backfill opportunities were the only issue, perhaps debtor-in-possession financing (sometimes referred to herein simply as "a DIP") would not be as critical. However, the Company's current cash situation has, with the passage of the last few weeks, reached a critical state. Over the last few weeks, the Debtors have managed customer relationships, filled as many orders as possible, and generally kept the business operations going on a "shoe-string" budget while (as discussed in detail below) negotiations with CIT for a DIP have continued.

15. The Debtors are satisfied that the deal negotiated with CIT is a very positive one for the Company. The Debtors and CIT have agreed (subject to CIT's internal credit committee approval) not only to terms upon which CIT will provide a DIP, but also the terms under which CIT will provide exit financing under a plan of reorganization. The Debtors' efforts have produced a solid, prudent and workable business proposal under which these Debtors will successfully reorganize. However, the Debtors' business operations have not stood still in the interim. The Debtors' current situation is no longer manageable without cash. The Debtors' customers need product now, and the DIP financing from CIT must be made available immediately or it will be too late and all the Debtors efforts will be for naught.

### C. The Pre-Petition Credit Facility With CIT; Cash Collateral Orders

16.      By way of background, Nukote International, Inc., Nukote Imperial, Ltd., International Communication Materials Inc., Creative Imaging Technologies, Inc., and Envirosmart, Inc. as Borrowers, and Nu-kote Holding, Inc. and Nu-Kote Acquisition Corporation, as Guarantors, are parties to a certain Amended and Restated Financing Agreement dated as of October 31, 2003, as subsequently amended (the "Financing Agreement"). The lender on the Financing Agreement is CIT. The current amount outstanding on the Financing Agreement is approximately $30 million. Of that $30 million, approximately $6.3 million is a term loan and $23 million is a revolving line of credit (including letters of credit) against which the Debtors' collateral borrowing base is calculated and funds advanced.

17.      In connection with the Financing Agreement, Debtors executed various notes, guaranties, security agreements, and stock pledge agreements. Pursuant to these agreements, CIT asserts a security interest and lien upon all or substantially all of the assets of the Debtors, including Debtors' inventory, accounts receivable, equipment, general intangibles, stock of some of the Debtors and certain non-debtor affiliates, and "cash collateral" as defined in section 363(a) of the Bankruptcy Code. To the best of the Debtors' knowledge, no other creditor asserts an interest in Debtors' cash collateral. Under the operative interim cash collateral order,[2] as one piece of its adequate protection package, CIT was additionally granted, among other considerations not relevant here, a replacement lien on post-petition accounts receivable.

### IV. *REQUEST FOR FINANCING UNDER §364(d)*

---

[2]      *See* Fifth Amended Expedited Interim Order Granting Debtors Authority to Use Cash Collateral, Docket No. 204.

6

18.     The Debtors require immediate access to a post-petition credit facility in order to finance continued business operations. Recognizing that this reality was looming, the Debtors have engaged in discussions with CIT, literally since the inception of these bankruptcy cases, in an effort to reach an agreement on terms under which CIT would provide debtor-in-possession financing (sometimes referred to herein simply as "a DIP"). The Debtors, CIT and their respective counsel have entered now five interim cash collateral orders, drafted and revised term sheets, held conference calls and exchanged numerous emails in an effort to come to terms on a DIP. Subject only to CIT's internal credit committee approval, these efforts have now yielded a proposal between CIT and the Debtors for not only a DIP, but for exit financing under a plan of reorganization which will allow the Debtors to successfully reorganize and thrive.

19.     The material terms under which CIT will provide DIP and exit financing to the Debtors are set forth in the term sheet attached hereto as Exhibit "A" (the "Term Sheet") and the definitive documentation will be consistent with the terms described in the Term Sheet (the "DIP Financing Agreement"). The money loaned under the DIP Financing Agreement will be used for ordinary course business expenses, administrative expenses of these Chapter 11 cases and, overall, to keep the businesses of the Debtors functioning uninterrupted and maintain and enhance their value as a going concern. Funds will be spent in accordance with a budget to be agreed to by CIT and the Debtors. The first few weeks of a long term agreed budget are attached hereto as Exhibit "B" (the "Budget"). The remainder of the longer term budget will be filed as a supplement to this Motion prior to the interim hearing set by the Court.

20.     Pursuant to this Motion, the Debtors seek authority from this Court to obtain a post-

petition secured and superpriority credit facility pursuant to Bankruptcy Code §364(c) and (d) from

CIT (the "DIP Facility"), in accordance with the terms and conditions as set forth in the Term Sheet,

to be spent as set forth in the Budget. A summary of certain material provisions of the Term Sheet

is as follows:

***THE DIP FACILITY***:  The DIP Facility would be used by Borrowers to (i) pay $22,000,000 of Pre-Petition Debt; (ii) pay related transaction costs, fees and expenses of the DIP Facility as set forth in this Term Sheet; (iii) finance ongoing working capital needs of Borrowers in connection with the Cases; and (iv) pay administrative costs associated with the Cases consistent with the Budget (as defined below). Subject to the terms and conditions set forth herein, it is the parties' expectation that the Borrowers shall have approximately $4,000,000 of Availability to fund items (ii), (iii) and (iv) above. For the avoidance of doubt, the Post-Petition Lender will not be obligated to fund any amounts under the DIP Facility unless and until the DIP Order permits the DIP Facility Amount to be used to repay $22,000,000 of Pre-Petition Debt (except on an emergency interim basis as described below)..

***SECURITY FOR***
***THE DIP FACILITY***:  All Obligations under the DIP Facility shall be, pursuant to Section 364(d) of the Bankruptcy Code, secured by a first priority, security interest in and lien on all now owned or hereafter acquired assets and property of the estate, including the proceeds of avoidance actions under Chapter 5 of the Bankruptcy Code, (the "Collateral" as defined in the Term Sheet) with the exception that the Post-Petition Lender's liens on Collateral shall be junior to any liens that may be granted to Grupo American Industries, S.A. De C.V. in Obligor's interest in furniture, fixtures and equipment located in Mexico. For the avoidence of doubt, Post-Petition Lender shall have a first priority, security interest in and lien on all insurance proceeds relating to any theft of assets that occurred in Mexico.

***SUPERPRIORITY***
***ADMINISTRATIVE***
***CLAIM***:  All obligations under the DIP Facility shall be: (a) entitled to

superpriority administrative expense claim status pursuant to Section 364(c)(1) of the Bankruptcy Code superior to any and all administrative expenses.

**_TERM_**:  The DIP Facility will have a term of the earliest to occur of (i) stated maturity which shall be December 31, 2009, (ii) the effective date of an approved Plan of Reorganization, (iii) the entry of an order pursuant to Section 363 of the Bankruptcy Code approving sale of substantially all of Obligors' assets or sale of a controlling interest in the Equity Interests of any Borrower or any Guarantor, (iv) conversion of the Cases to a Chapter 7 Proceeding or (v) any other termination of the DIP Agreement in accordance with the Final Order or the loan documents evidencing the DIP Facility.

**_EMERGENCY, INTERIM FUNDING_**:  Interim funding under the DIP Facility will be up to $1,250,000 subject to (and will not occur until) the entry of an order entered after an interim hearing (the "Interim DIP Order").

**_INTEREST RATE_**:  The DIP Facility will bear interest at the Prime rate plus 500 basis points and be payable monthly.

**_UP FRONT FEE_**:  $150,000, fully earned upon the entry of the Interim Order and payable upon the entry of the Final Order.

**_EXIT FEE_**:  $150,000, fully earned upon closing of the DIP Facility and due and payable upon confirmation by the Bankruptcy Court of the Borrowers' plan of reorganization or upon an Event of Default under the DIP Facility.

**_DIP ORDER_**:  Interim funding under the DIP Facility up to $11,250,000 (the "Interim DIP Facility Amount") will be subject to (and will not occur until) the entry of an order in form and substance satisfactory to the Post-Petition Lender entered after an interim hearing (the "Interim DIP Order"). The Interim Order shall include the same terms, conditions and protections as the Final Order but shall provide that the purpose of the Interim DIP Facility Amount shall be used by Borrowers to (i) pay $10,000,000 of Pre-Petition Debt; (ii) pay related transaction costs, fees and expenses of the DIP Facility; (iii) finance ongoing working capital needs of Borrowers in connection with the Cases; and (iv) pay administrative costs associated with the Cases consistent with the Budget. For the avoidance of doubt, the Post-Petition Lender will not be obligated to fund any amounts on an

9

interim basis unless and until the Interim DIP Order permits the Interim DIP Facility Amount to be used to repay $10,000,000 of Pre-Petition Debt.

***EXIT FACILITY UNDER A PLAN***:

A senior secured super-priority credit facility (the "Exit Facility") evidenced by a Financing Agreement (the "Exit Agreement") and consisting of (i) a revolving credit facility of up to $10,000,000 (the "Credit Line"); (ii) a Term Loan in the original principal amount as calculated below (estimated to equal approximately $25,000,000) (the "Term Loan"), which consist of two tranches of equal amounts, Tranche A and Tranche B. The original principal amount of Term Loan will be (A) the sum of (i) Post-Petition Indebtedness, plus (ii) any amount of Pre-Petition Debt not included in the calculation of Post-Petition Indebtedness, minus (B) the sum of (i) any cash on hand, and (ii) the contractual amount of Availability on the closing date of the Exit Facility. The Exit Facility would be used by Borrowers to (i) pay Pre-Petition and Post-Petition Indebtedness; (ii) pay related transaction costs, fees and expenses of the Exit Facility; and (iii) finance ongoing working capital needs of Borrowers.

***EXIT FACILITY TERM***:

The Exit Facility will have a term of five (5) years from the effective date of the Exit Facility

***INTEREST, FEES AND EXPENSES UNDER THE EXIT FACILITY***:

Credit Line:   Prime plus 400 basis points, payable monthly.

Term Loan Tranche A:   Prime plus 400 basis points, payable monthly.

Term Loan Tranche B:   Prime plus 400 basis points for the first 3 years and prime plus 600 basis points for the next two years, paid in kind and not in cash, and shall have the effect of increasing the principal amount of Term Loan B on a monthly basis by the amount of interest paid in kind.

***MANDATORY PREPAYMENTS UNDER THE EXIT FACILITY***:

Subject to exceptions to be further negotiated, the following mandatory prepayments of the Exit Facility shall be required:

10

i.      75% of Excess Cash Flow

ii.     70% of the net cash proceeds from any settlement, recovery or amount paid to Borrowers relating to the claims Borrowers have against Office Depot.

**_PLAN SUPPORT_**
**_OBLIGATION_**:     Pre-Petition Lender and Post-Petition Lender agree to cooperate with Borrowers during the pendency of the Cases and to vote to accept any plan of reorganization proposed by Borrowers that complies with the terms outlined herein. Post-Petition Lender agrees not to sell the Pre-Petition Debt or otherwise transfer control of the Pre-Petition Debt to any other party. Pre-Petition Lender and Post-Petition Lender agree that the treatment of the Pre-Petition Debt and Post-Petition Debt under any plan of reorganization proposed by Obligors will be to repay such amounts pursuant to the Exit Facility as set forth in the Term Sheet.

## V. _REQUEST FOR EXPEDITED INTERIM HEARING_

21.     Obtaining secured credit as set forth in the Term Sheet is essential to the Debtors' continued business operations and to the Debtors' ability to successfully reorganize under Chapter 11. By this Motion, the Debtors request entry, first of an emergency interim order, and, subsequently, a final order, all pursuant to 11 U.S.C. § 364(d) and Bankruptcy Rule 4001.

22.     The simple fact is that weeks have been consumed by negotiations with CIT. The Debtors, in the exercise of their business judgment, believe that a deal with CIT which not only provides urgently needed cash under a DIP, but which also provides the agreed upon terms of exit financing from CIT under a plan of reorganization, is in the best interests of these estates. The negotiations for these terms, however, have proven time-consuming. The good faith efforts of the Debtors and CIT to reach agreement on a DIP and exit financing, have ultimately proven to be time well spent as the Debtors maintain that the Term Sheet is in the best interests of these estates. However, the Debtors are now at a crucial juncture with their customers. Use of cash collateral has

11

proven to be insufficient to enable the Debtors to operate their businesses successfully, and post-petition financing is essential to maintain the value of the Debtors as a going concern. Nukote representatives have now been advised that customers are seeking alternate sources for product and are "putting Nukote's contract out for bid." Although the Debtors have been acting in a reasonable and prudent manner, and as expeditiously as possible, to reach a deal with CIT, precious time has been lost and the Debtors need cash now or operations will be immediately and irreparably harmed.

23.     The Debtors cannot continue to operate without additional financing. If the Debtors cannot fill customer orders, those customers will simply take their business elsewhere. If the operations of the Debtors abruptly cease or are further decreased due to continued cash constrictions, the domino effect on customers, suppliers, employees will escalate, the Debtors' businesses will be irreparably harmed, and the value of the interests of CIT in the Collateral will drastically decrease. With the proposed financing in the Term Sheet, the Debtors will be able to purchase raw materials, manufacture product, fill orders, mollify their customers, repair customer relationships that have become strained, and continue to operate their businesses. As set forth in the Term Sheet and above, CIT stands ready to fund up to $11,250,000 immediately following entry of an interim order on this Motion with $10,000,000 of such loan being used to pay Pre-petition Debt of CIT and $1,250,000 available for working capital needs of the Debtors. The Debtors ask that this Court set an emergency hearing on this Motion *on **Wednesday, September 9, 2009***.

## VI.  *ARGUMENT AND AUTHORITIES*

24.     Section 364(d) of the Bankruptcy Code provides that this Court may authorize the obtaining of credit secured by a senior or equal lien on property of the estate only if the trustee, or

as in this case, the Debtors-in-Possession, are unable to obtain such credit any where else and the holder of the lien on the property of the estate on which that senior or equal lien is being proposed is adequately protected. Specifically, §364(d)(1) provides:

> The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if --
>
> > (A)     the trustee is unable to obtain such credit otherwise; and
> >
> > (B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

Stated another way, the Bankruptcy Code specifically contemplates, under certain circumstances and upon proper showing, the "priming" of the lien of a pre-petition secured creditor in favor of a senior lien granted a provider of post-petition financing.

### A. The Debtors are Otherwise Unable to Obtain Financing

25.     The financial condition of the Debtors and the tenuous condition of the financial markets generally, coupled with existing liens of CIT on virtually all assets of each Debtor, make it a practical impossibility for the Debtors to obtain financing on any basis other than priming liens. A grant of credit on an unsecured basis to the Debtors at the present time defies common sense. Simultaneous with the negotiations with CIT, the Debtors also engaged in discussions with several other prospective DIP lenders including PNC, EFO Holdings, and Gibraltar Financial Corporation. None of those lenders, however, has indicated a willingness to loan money to the Debtors on an unsecured or junior secured basis.

26.     As stated above, the Debtors have contacted several financial institutions in their efforts to seek DIP financing, but the Debtors have been unable to obtain financing on any basis or terms more favorable than those being offered by CIT. Financial institutions generally lend money

13

only in return for a senior lien on assets of sufficient value to provide security for the loan made. The Debtors' present financial condition speaks for itself; the unavailability of financing on an unsecured or junior priority basis is not a mere opinion of the Debtors, it is the reality.

27.     As the Debtors are unable to obtain financing on an unsecured basis, in the ordinary course of business or otherwise, allowable on par with administrative expense claims as contemplated by §364(a) and (b), on a priority basis over administrative expenses as contemplated by §364(c), or solely upon the grant of a junior lien or a lien on encumbered property of the estate as also contemplated in §364(c), Debtors are left with no alternative but to seek financing and to obtain credit from CIT by offering to CIT the additional protections afforded by, in part § 364(c) and also § 364(d). Without such financing, maintenance of the Debtors' business operations will be a challenge, and those operations certainly cannot reach their full growth potential. Without the DIP Facility, these estates and the prospect of a successful reorganization will be impaired.

28.     Further, the agreement for the DIP facility with CIT provides an additional benefit to the Debtors. The Term Sheet and the DIP Facility provide for CIT's support for a plan of reorganization and the terms under which CIT will provide the exit financing critical to the implementation of that plan. Legal issues aside, the reality is that a plan of reorganization, with the support of the senior secured lender, with agreed exit financing terms spelled out, will significantly reduce the odds of a protracted, contested confirmation hearing and/or a cramdown fight. While these cases may seem to have been relatively quiet to date, outward appearances can be deceiving. The negotiations to date have been extensive, protracted, and often contentious. The Debtors are satisfied that the Term Sheet and the DIP Facility will infuse greatly needed operating capital into these estates immediately and serve to reduce future administrative expenses.

14

**B. *The Debtors Need and Will Have Immediate Access to Cash Under the Term Sheet***

29.    First of all, the Debtors must obtain immediate financing in order to meet their on-going cash requirements during these Chapter 11 cases. The DIP Facility provides those funds. The funds borrowed from CIT will be used first to pay ordinary course business expenses to keep the businesses of the Debtors functioning uninterrupted and maintain their value as a going concern and, second, to grow and enhance the Debtors' business operations. Under current cash constraints, the Debtors do not have enough cash available to purchase the raw materials necessary to create the inventory to fill all customer orders and requirements.

30.    Secondly, the outlook for these Debtors materially changes once the Debtors have access to additional cash under a DIP. The beginnings of this growth potential are illustrated on the Budget attached hereto as Exhibit "B," and will be even more evident on the long term budget. With the DIP Facility from CIT, the Debtors business grows and prospers; without the DIP Facility, the Debtors' growth efforts are stymied. The additional cash available under the DIP Facility will enable the Debtors to purchase the raw materials (and thus create the product to fill the orders) which are essential to maximizing the Debtors' business potential.

31.    The Debtors are cash strapped. As stated above, Nukote suffers not from a lack of business, but from a lack of available cash to fund that business. The Debtors need cash to grow their business which is, of course, for the benefit of CIT due to an increase, and the prevention of a sharp decrease, in the value of CIT's collateral, as well as to the benefit of the bankruptcy estates as a whole.

32.    The Debtors believe that debtor-in-possession financing, along with other positive business measures, will allow their business to thrive. The proposed DIP Facility yields positive

15

prospects for a successful reorganization and is in the best interests of the creditor body as a whole. The Debtors propose, with authorization from this Court, to enter into the DIP Facility based upon and in accordance with the terms of the Term Sheet with CIT.

## VII. *CONCLUSION*

33.     The Debtors have immediate cash needs pending a final hearing on this Motion. The Debtors' reorganization efforts require cash; the Debtors need that cash now in order to avoid immediate and irreparable harm to these estates, which will occur if this Motion is not granted and DIP financing requested herein not approved. Without the immediate access to cash under the Term Sheet, Debtors will be unable to continue to operate their business, purchase raw materials, manufacture product, maintain their assets, attempt to reorganize their affairs, or perform any of the tasks which are necessary to maximize the value of their assets. The nature of this immediate need compels the request for an expedited hearing on this Motion, which the Debtors request that this Court set on ***Wednesday, September 9, 2009***. At that expedited preliminary hearing, the Debtors request that the Court enter an expedited  Order approving the Term Sheet for the DIP Facility on an interim basis until a final hearing may be conducted on this Motion pursuant to Fed.R.Bankr.P. 4001, which the Debtors respectfully request be set for September 22, 2009. As stated above, upon the entry of an interim order approving this Motion CIT will fund up to $11,250,000.


WHEREFORE, PREMISES CONSIDERED the Debtors pray that an expedited hearing be set to consider this Motion on an emergency, interim basis not later than ***Wednesday, September 9, 2009*** and, at that emergency interim hearing, this Court grant this Motion on an interim basis and set a date and time for a final hearing on this Motion pursuant to Fed.R.Bankr.P. 4001, and at such

final hearing that this Court grant this Motion on a final basis, and for such other and further relief as to which they may be justly entitled.

DATED: September 1, 2009         Respectfully submitted,

**WRIGHT GINSBERG BRUSILOW P.C.**

By:   */s/ Frank J. Wright*
         Frank J. Wright
         Texas Bar No. 22028800
         C. Ashley Ellis
         Texas Bar No. 00794824
600 Signature Place
14755 Preston Road
Dallas, TX 75254
(972) 788-1600
(972) 239-0138 (fax)
Email: fwright or aellis@wgblwfirm.com

         and

**HARWELL HOWARD HYNE
GABBERT & MANNER, P.C.**

By:    /s/ Barbara D. Holmes
         Craig V. Gabbert, Jr.
         Barbara D. Holmes
315 Deaderick Street, Suite 1800
Nashville, TN 37238-1800
(615) 256-0500
(615) 251-1059 (fax)
Email: cvg or bdh@h3gm.com

**ATTORNEYS FOR DEBTORS**

C:\Documents and Settings\CBD\Local Settings\Temporary Internet Files\OLK9C\DIP Financing - motion - CIT02.wpd

## TERM SHEET

## SUMMARY OF PROPOSED TERMS AND CONDITIONS AS TO SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT FACILITY

**This Term Sheet is not a commitment, obligation or understanding on the part of any present or potential future lender to provide financing to or for the benefit of Borrowers or any other person or entity. Any commitment, obligation or understanding to provide financing shall only arise pursuant to definitive documentation that is hereafter negotiated, executed and delivered by all parties thereto and with respect to which all conditions precedent are satisfied or waived in writing and CIT has received internal credit approval for. The definitive documentation will be consistent with the terms described herein.**

Capitalized terms used herein are defined in the Pre-Petition Loan Agreement (as defined below), unless otherwise stated.

| | |
|---|---|
| BORROWERS: | Nukote International, Inc., Nukote Imperial, Inc., International Communication Materials, Inc., Envirosmart, Inc. and Black Creek Holdings, Ltd. (collectively, the "Borrowers") which entities filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") and are jointly being administered under Case No. 09-06240 (the "Cases") pending in the United States Bankruptcy Court for the Middle District of Tennessee (the "Bankruptcy Court"). |
| GUARANTORS: | Black Creek Holdings Ltd., Nukote Holdings, Inc. and all Domestic Subsidiaries of a Borrower (together with the Borrowers, collectively, the "Obligors"). |
| POST-PETITION LENDER: | The CIT Group/Business Credit, Inc. ("CIT" or "Post-Petition Lender"). |
| DIP CREDIT FACILITY: | A senior secured super-priority debtor-in-possession credit facility (the "DIP Facility") evidenced by a DIP Financing Agreement ("DIP Agreement") and consisting of a revolving credit facility of up to $26,000,000 (the "Credit Line"). All indebtedness incurred under the DIP Facility is hereinafter referred to as the "Post-Petition Indebtedness." |
| PRE-PETITION CREDIT FACILITY: | Obligors are presently indebted to CIT (in such capacity, the "Pre-Petition Lender") on account of the indebtedness and other obligations (collectively, the "Pre-Petition Debt") arising under that certain Amended and Restated Financing Agreement effective as of October 31, 2003, as amended modified, supplemented, restated, extended, renewed, increased and/or replaced from time |

to time, by and among the Obligors and CIT (as further amended, the "Pre-Petition Loan Agreement" and together with all other loan and security documents related to or executed in connection with the Pre-Petition Loan Agreement, being collectively the "Pre-Petition Credit Documents"). Pursuant to the Pre-Petition Credit Documents, the Pre-Petition Debt is secured by certain of Obligors' assets (collectively, the "Pre-Petition Collateral"). Pursuant to the DIP Agreement and DIP Order, all proceeds of the Pre-Petition Collateral and any Collateral arising on or after the filing date of the Cases, or not otherwise securing the Pre-Petition Debt, (collectively, the "Post-Petition Collateral") and all proceeds of Post-Petition Collateral shall be applied, *first*, to satisfy the Post-Petition Indebtedness and any other obligations then due under the DIP Agreement, and *second*, to satisfy any unpaid Pre-Petition Debt.

PURPOSE: The DIP Facility would be used by Borrowers to (i) pay $22,000,000 of Pre-Petition Debt; (ii) pay related transaction costs, fees and expenses of the DIP Facility as set forth in this Term Sheet; (iii) finance ongoing working capital needs of Borrowers in connection with the Cases; and (iv) pay administrative costs associated with the Cases consistent with the Budget (as defined below). Subject to the terms and conditions set forth herein, it is the parties' expectation that the Borrowers shall have approximately $4,000,000 of Availability to fund items (ii), (iii) and (iv) above. For the avoidance of doubt, the Post-Petition Lender will not be obligated to fund any amounts under the DIP Facility unless and until the DIP Order permits the DIP Facility Amount to be used to repay $22,000,000 of Pre-Petition Debt (except on an emergency interim basis as described below).

LOAN AVAILABILITY: The DIP Facility would be funded under revolving loans in accordance with a budget, and the aggregate of such loans would be limited to, on any date of determination thereof, an amount equal to Availability. "Availability" shall mean, as to the Obligors on an aggregate basis at any time of calculation, the amount by which: (a) the Borrowing Base exceeds (b) the outstanding aggregate amount of all of the Obligors' Obligations under the DIP Facility. "Borrowing Base" means, on any date of determination thereof, an amount equal to the lesser of: (i) $26,000,000 or (ii) the sum of (a) eighty-five percent (85%) of the aggregate outstanding Eligible Accounts Receivable including past due amounts, Office Depot (approximately $15 million) and accounts owed by foreign parties; plus (b) fifty percent (50%) of the aggregate value of the Eligible Inventory, valued at the lower of cost or market, on a first in, first out basis, wherever located including outside the United States plus (c) any existing Availability on the Petition Date under

the Pre-Petition Loan Agreement, <u>less</u> (d) any Availability Reserves. The Borrowing Base is subject to certain adjustments by Post-Petition Lender, based on review, evaluation and appraisal of the assets included in the Borrowing Base.

AVAILABILITY AND
RELATED TERMS
UNDER PRE-PETITION
LOAN AGREEMENT:

Except as otherwise set forth herein, to the extent applicable, the provisions of the definitive documentation for the DIP Facility shall be substantially as set forth in the Pre-Petition Loan Agreement; with such modifications thereto and additional terms and conditions as the Obligors and the Post-Petition Lender deem appropriate for a facility of this nature under current market conditions.

SECURITY:

All obligations of Obligors to Post-Petition Lender under the DIP Facility shall be: (a) entitled to superpriority administrative expense claim status pursuant to Section 364(c)(1) of the Bankruptcy Code superior to any and all administrative expenses of Obligors; (b) secured, pursuant to Section 364(d) of the Bankruptcy Code, by a first priority, security interest and lien on all now owned or hereafter acquired assets and property of the estate (as defined in the Bankruptcy Code), real and personal, of Obligors, including inventory, accounts receivable, chattel paper, contract rights, documents, equipment, fixtures, deposit accounts, general intangibles (including, without limitation, all copyrights, licensing agreements, patents, trademarks, and trade names), instruments, real property, securities and other investment property, all cash collateral, and proceeds of all of the foregoing, wherever located, subject only to valid and unavoidable liens that are in existence on the Petition Date and that under applicable law are senior to, and have not been subordinated to, the liens and security interests of the Pre-Petition Lender (collectively, the "Prior Liens"); (c) secured, pursuant to Section 364(c)(2) of the Bankruptcy Code, by a perfected first priority lien on all unencumbered property of Obligors; and (d) further secured, pursuant to Section 364(c)(3) of the Bankruptcy Code, by a perfected second priority lien on all property of Obligors that is subject to Prior Liens in existence at the time of the commencement of the Cases or to Prior Liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code. The foregoing is collectively referred to as the "Collateral." Notwithstanding the foregoing, Post-Petition Lender's liens on

Collateral shall be junior to any liens granted to Grupo American Industries, S.A. De C.V. in Obligor's interest in furniture, fixtures and equipment located in Mexico. For the avoidence of doubt, Post-Petition Lender shall have a first priority, security interest in and lien on all insurance proceeds relating to any theft of assets that occurred in Mexico.

The superpriority administrative expense claim and liens granted to Post-Petition Lender shall be subject to a carve-out for professional fees and U.S. Trustee fees in the amounts approved by the Post Petition Lender pursuant to the terms of the Budget and approved by Bankruptcy Court.

The Collateral shall include proceeds of avoidance actions under Chapter 5 of the Bankruptcy Code.

No advances under the DIP Facility and no Collateral proceeds may be used by any person or entity to initiate or prosecute any actions against any Pre-Petition Lender, Post-Petition Lender or any of its respective agents, officers or affiliates, including but not limited to, any avoidance actions, fraudulent transfer actions, or any actions that would impair, prejudice, offset or otherwise alter Post-Petition Lender's liens and claims against any Obligor.

| | |
|---|---|
| CASH DOMINION: | The Obligors shall reinstate the same cash management system used by the Obligors under the Pre-Petition Loan Agreement, in accordance with, among other things, Section 3.4 of the Pre-Petition Loan Agreement. The Obligors shall, among other things: (i) indicate on all of their invoices that funds should be delivered to and deposited in a Depository Account; (ii) direct all of their account debtors to deposit any and all proceeds of Collateral into the Depository Accounts; (iii) irrevocably authorize and direct any banks which maintain the Obligors' initial receipt of cash, checks and other items to promptly wire transfer all available funds to a Depository Account; (iv) advise all such banks of CIT's security interest in such funds; and (v) promptly cause to be deposited all proceeds of Collateral received by any of the Obligors, including all amounts payable to the Obligors from credit card issuers and credit card processors and remit all cash and other monies, as and when received, into the Depository Account. All amounts collected in the Depository Account will be automatically applied to the repayment *first*, to satisfy the Post-Petition Indebtedness and any other obligations then due under the DIP Agreement, and *second*, to satisfy any unpaid Pre-Petition Debt. |
| MATURITY: | The DIP Facility will have a term of the earliest to occur of (i) stated maturity which shall be December 31, 2009, (ii) the |

effective date of an approved Plan of Reorganization, (iii) the entry of an order pursuant to Section 363 of the Bankruptcy Code approving sale of substantially all of Obligors' assets or sale of a controlling interest in the Equity Interests of any Borrower or any Guarantor, (iv) conversion of the Cases to a Chapter 7 Proceeding or (v) any other termination of the DIP Agreement in accordance with the Final Order or the loan documents evidencing the DIP Facility. All obligations and liabilities of Obligors to Post-Petition Lender that remain outstanding or in existence on the last day of the term of the DIP Facility shall be due and payable on the last day of the term of the DIP Facility, but shall be treated in accordance with the plan treatment below.

**PLAN TREATMENT:** Pre-Petition Lender and Post-Petition Lender agree to cooperate with Borrowers during the pendency of the Cases and to vote to accept any plan of reorganization proposed by Borrowers that complies with the terms outlined herein. Post-Petition Lender agrees not to sell the Pre-Petition Debt or otherwise transfer control of the Pre-Petition Debt to any other party.

Pre-Petition Lender and Post-Petition Lender agree that the treatment of the Pre-Petition Debt and Post-Petition Debt under any plan of reorganization proposed by Obligors will be to repay such amounts pursuant to the Exit Facility, as defined and according to the terms set forth on <u>Schedule 2</u> hereto. The Exit Facility shall have similar terms as provided in the Pre-Petition Loan Agreement and as further described on <u>Schedule 2</u>.

**INTEREST, FEES AND EXPENSES:** See <u>Schedule 1</u> attached hereto.

**DIP ORDER:** Interim funding under the DIP Facility up to $11,250,000 (the "<u>Interim DIP Facility Amount</u>") will be subject to (and will not occur until) the entry of an order in form and substance satisfactory to the Post-Petition Lender entered after an interim hearing (the "<u>Interim DIP Order</u>"). The Interim Order shall include the same terms, conditions and protections as the Final Order but shall provide that the purpose of the Interim DIP Facility Amount shall be used by Borrowers to (i) pay $10,000,000 of Pre-Petition Debt; (ii) pay related transaction costs, fees and expenses of the DIP Facility; (iii) finance ongoing working capital needs of Borrowers in connection with the Cases; and (iv) pay administrative costs associated with the Cases consistent with the Budget. For the avoidance of doubt, the Post-Petition Lender will not be obligated to fund any amounts on an interim basis unless and until the Interim DIP Order permits the Interim DIP Facility Amount to be used to repay $10,000,000 of Pre-Petition Debt.

Final funding under the DIP Facility will be subject to (and will not occur until) the entry of an order in form and substance satisfactory to the Post-Petition Lender entered after a final hearing based on the standards prescribed in Bankruptcy Rule 4001(c) and other applicable law and that has not been reversed, modified, amended or stayed (the "<u>Final DIP Order</u>"), (a) approving all aspects of the DIP Facility including, without limitation, the repayment of the Pre-Petition Debt in the amount of $22,000,000, the administrative expense super-priority of and the existence and priority of all liens securing the DIP Loan Documents, and the rights, remedies and obligations thereunder and (b) providing for such other protections of the obligations of Obligors to Post-Petition Lender and the status of the lien priority thereof as Post-Petition Lender and its counsel deem necessary. (The Interim DIP Order and the Final DIP Order are collectively referred to as the DIP Order.)

The DIP Order shall provide for usual and customary protections for Post-Petition Lender, including, but not limited to, (a) a waiver of any and all claims and causes of action of Obligors against the Pre-Petition Lenders and Agents on account of the Pre-Petition Debt and Pre-Petition Credit Documents, including, but not limited to, any claims for preference, fraudulent conveyance or other claims arising under the Bankruptcy Code, and any and all claims regarding the validity, priority, perfection or avoidability of the secured claims of Pre-Petition Lenders or Agents, (b) an acknowledgment by Obligors and a finding by the Bankruptcy Court as to the amount of the Pre-Petition Debt and the validity of Pre-Petition Lender's liens on the Pre-Petition Collateral, (c) notice in the DIP Order of Obligors' intention to waive any right to assert a surcharge or other claim under Section 506(c) of the Bankruptcy Code against any of the Collateral, and waiver of such rights in the DIP Order, (d) a waiver of any right to assert or require marshaling of any Collateral, (e) a waiver of any right to assert the "equities of the case" exception in section 552 of the Bankruptcy Code and (f) preclusion of any post-petition financing on a priming basis or otherwise, other than the DIP Facility unless such post-petition financing first satisfies both the DIP Facility and any Pre-Petition Debt outstanding to Pre-Petition Lender, or Pre-Petition Lender consents to such financing.

Waivers provided in the DIP Order shall be binding on all creditors and parties-in-interest, unless such creditor or party-in-interest, including, without limitation, any committee appointed in this Case, (i) shall have commenced an adversary proceeding or contested matter against the Pre-Petition Lender for the purpose of challenging the validity, extent, priority, perfection, and

enforceability of the Pre-Petition Debt or Pre-Petition Lender's claims, mortgages, and security interests in the Pre-Petition Collateral or otherwise asserting any claims or causes of action against Pre-Petition Lender on behalf of any Borrower's or any Guarantor's estate, no later than forty-five (45) days after the entry of an order approving the DIP Facility and (ii) the Bankruptcy Court rules in favor of the plaintiff or movant in any such timely filed adversary proceeding or contested matter. Any person or entity, including without limitation any committee, that fails to commence such an adversary proceeding or contested matter within such periods shall be barred from doing so.

**TERMS AND CONDITIONS:**

The financing agreements will contain representations and warranties, covenants, events of default, and other provisions mutually agreeable to Post-Petition Lender and Obligors, including, but not limited to, such applicable representations and warranties, covenants, events of default, and other provisions of the Pre-Petition Loan Agreement, or as agreed to by Post-Petition Lender and additionally the following:

1. All advances under the DIP Facility shall be subject to a detailed rolling 13-week cash flow budget (initially and all updates satisfactory to Post-Petition Lender in all respects) on a consolidated basis that includes, among other things, specific line items (which shall include, but not be limited to, professional expenses) for each category of expenses and income as are requested by Post-Petition Lender (the "<u>Budget</u>"). Obligors will be obligated to comply with the Budget. Moreover, Obligors will be permitted to make disbursements only in accordance with the Budget. This provision shall not apply after the 26th week of the closing of the Exit Facility.

2. For each week, (i) the aggregate actual disbursements by the Obligors measured on a rolling 2-week basis must be no greater than 110% of the aggregate amount of projected disbursements for such 2-week period as set forth in the Budget, and (ii) the aggregate actual cash receipts collected by the Obligors measured on a rolling 2-week basis shall not be less than 90% of the aggregate amount of projected cash receipts for such period as set forth in the Budget. This provision shall not apply after the 26th week of the closing of the Exit Facility, but the Borrower will be required to deliver in form and substance satisfactory to CIT: (a) financial statements within 30 days of the end of the second fiscal quarter, reviewed by an independent accounting firm

reasonably acceptable to CIT, and (b) financial statements within 90 days of the end of each fiscal year, certified by an independent accounting firm reasonably acceptable to CIT. Financial statements for the year ending December 31, 2009 shall only require a limited audit.

3.    Financial covenants acceptable to Obligors and the Post-Petition Lender.

4.    Obligors' agreement to provide Post-Petition Lender periodic financial and collateral reporting, including annual audited financial statements, monthly and quarterly internally prepared financial statements, annual financial projections, and periodic borrowing base certificates, appraisals, receivables agings, and other information reasonably requested from time to time by Post-Petition Lender, in each case satisfactory to Post-Petition Lender.

5.    Obligors shall each allow Post-Petition Lender and its agents and advisors (including without limitation Focus Management Group) access to its premises, officers, representatives, and books and records, and allow Post-Petition Lender and its agents and advisors (including without limitation Focus Management Group) to conduct examinations of and to monitor the Collateral held by Post-Petition Lender, all during regular business hours.

6.    Obligors' agreement to maintain insurance with insurance carriers (acceptable to Post-Petition Lender) against such risks and in such amounts as is customary for similar businesses, naming Post-Petition Lender as mortgagee/loss payee and an additional insured.

7.    Restrictions on, among other things, management fees, distributions and dividends, acquisitions and investments, indebtedness, liens, affiliate transactions, and capital expenditures.

8.    Full cash dominion in favor of Post-Petition Lender over the proceeds of all Collateral, including lockbox accounts acceptable to Post-Petition Lender providing for full cash dominion and daily cash sweeps into a collection account controlled by Post-Petition Lender.

9.    The Debtors' will continue to hold those certain Warrants issued by Oxygen Line subject to the liens of Post-Petition Lender.

10. Negative covenants with respect to the Debtors' ability to make payments to or on behalf of Oxygen Line and Bond Street entities.

11. Provisions as to application of proceeds of sales of assets of Obligors in the Cases acceptable to Post-Petition Lender (such as provisions satisfactory to Post-Petition Lender as to reductions and permanent reductions in Credit Line and Borrowing Base).

12. No Obligor may propose any plan of reorganization that does not provide for the payment in full of the Post-Petition Indebtedness and the Pre-Petition Indebtedness (together with all accrued and unpaid interest), without Post-Petition Lender's express prior written consent thereto.

13. The DIP Facility shall include usual and customary events of default, including (i) the failure to pay interest, principal, or fees when due (with grace period to be negotiated on interest and fees) (including, without limitation, failure to reduce borrowings to within availability); (ii) any representation or warranty found to be materially incorrect when made; breach of any affirmative, negative or financial covenant (subject to grace periods to be negotiated); (iii) any post-petition judgment in excess of an amount to be agreed or which would operate to divest the Obligors of any material assets; (iv) the Obligors being enjoined from conducting any material portion of their businesses; disruption of material business operations of the Obligors; (v) material damage to or loss of material assets; conversion of the Cases to a case under Chapter 7 of the Bankruptcy Code; (vi) the dismissal of the Cases; the appointment of a Chapter 11 trustee or an examiner with expanded powers; (vii) the grant of any super priority administrative expense claim or any lien that is *pari passu* with or senior to those of the Post-Petition Lender; any payment of pre-petition debt (other than (a) as already approved by the Bankruptcy Court or (b) as may be reasonably acceptable to the Post-Petition Lender and approved by the Court); (viii) the Bankruptcy Court's entry of an order granting relief from the automatic stay to permit foreclosure of security interests in assets of the Obligors of a value in excess of an amount to be agreed; (ix) an order terminating exclusivity having been entered (or requested, unless contested by the Borrowers); (x) any reversal, revocation or modification without the consent of the Post-Petition Lender of such order or any other order of the Bankruptcy Court with respect to the Case and affecting the

DIP Facility; (xi) the filing or confirmation of a plan of reorganization by the Debtors that is not consistent with the Exit Term Sheet; (xii) failure of the Obligors to timely provide a Budget (updated as provided herein) that is reasonably acceptable to the Post-Petition Lender; and (xiii) any challenge by any Obligor or successful challenge by a party other than any Obligor, to the extent, validity, priority, or unavoidability of Pre-Petition Lender's liens securing the Pre-Petition Collateral.

14. Obligors shall (a) file their disclosure statements and plan of reorganization with the Bankruptcy Court no later than September 30, 2009, and (b) obtain confirmation of their plan of reorganization no later than December 31, 2009.

15. Mandatory repayment of 70% of the net cash proceeds from any settlement, recovery or amount paid to Borrowers relating to the claims Borrowers have against Office Depot.

CONDITIONS
PRECEDENT:

The extension of the aforementioned financing arrangement is subject to the fulfillment of a number of conditions to Post-Petition Lender's satisfaction, including, but not limited to, the following:

1. The execution and delivery, in form and substance acceptable to Post-Petition Lender and its counsel, of Post-Petition Lender's customary agreements, documents, instruments, financing statements, intercreditor agreements, subordination agreements, opinions of counsel, landlord waivers, consents, evidences of corporate authority, and such other writings to confirm and effectuate the DIP Facility as may be required by Post-Petition Lender's or by its counsel.

2. Implementation of the cash management system described above to the satisfaction of CIT.

3. Other than the filing of the Cases and any litigation commenced in connection therewith against Office Depot, no material adverse change in Obligors' (whether on a per entity or person basis or on an aggregate basis) assets, liabilities, business, financial condition, business prospects, or results of operations since the Petition Date.

4. Other than the filing of the Cases and any litigation commenced in connection therewith against Office Depot, as to Obligors, there shall exist no action, suit, investigation, litigation, or proceeding pending or threatened in any court

or before any arbitrator or governmental instrumentality that is not subject to the automatic stay and in Post-Petition Lender's judgment (a) could be expected to have a material adverse effect on Obligors' (whether on a per entity or person basis or on an aggregate basis) assets, liabilities, business, financial condition, business prospects, or results of operations or which could impair Obligors' ability to perform satisfactorily under the DIP Facility, or (b) could be expected to materially and adversely affect the DIP Facility or the transactions contemplated thereby.

5. Post-Petition Lender shall have received, each in form and substance satisfactory to Post-Petition Lender, (a) updated financial projections of Obligors evidencing Obligors' ability to comply with the financial covenants set forth in the DIP Agreement, (b) interim financial statements for Obligors as of a date not more than thirty (30) days prior to the closing date, and (c) a Budget.

6. Post-Petition Lender shall have received certificates of insurance with respect to Obligors' property and liability insurance, together with a loss payable endorsement naming Post-Petition Lender as mortgagee/loss payee, all in form and substance satisfactory to Post-Petition Lender.

7. Post-Petition Lender's receipt of such third party documents and consents as Post-Petition Lender may require, all in form and substance acceptable to Post-Petition Lender.

8. Post-Petition Lender's receipt of original copies of an amended and restated (i) Oxygen Line Warrant and (ii) Promissory Note from Oxygenline reaffirming its obligations to repay loans and advances made by Nukote directly to or on behalf of Oxygenline and amending the note to reflect actual accumulated loans and advances made to date in an amount to be determined by Post-Petition Lender and Borrowers (accompanied by allonges and other instruments of transfer executed in blank), each in form and substance satisfactory to Post-Petition Lender.

9. The Bankruptcy Court shall have entered DIP Order authorizing the financing of Obligors as set forth in this Term Sheet. In addition to the contents of the DIP Order set for the above, the DIP Order shall provide for, among other things:

(a) Approving all the terms and conditions of this Term Sheet and any loan, security and other financing agreement relating hereto, including, without limitation, the DIP Agreement;

(b) Authorizing and directing Obligors to grant the liens, security interests and/or mortgages or deeds of trust in favor of Post-Petition Lender as provided in this Term Sheet;

(c) That Post-Petition Lender may notify Obligors' account debtors of Post-Petition Lender's security in Obligors' accounts, at any time and without the order of the Bankruptcy Court, and direct such account debtors to pay its accounts directly to Post-Petition Lender;

(d) A finding by the Bankruptcy Court that Post-Petition Lender's financing of Obligors is extended in good faith;

(e) That all the terms and conditions in said order may not be modified without Post-Petition Lender's consent;

(f) That upon the occurrence and during the continuance of a default after three (3) business days notice and opportunity to cure, (i) Post-Petition Lender shall be fully authorized, in its sole discretion, to terminate the DIP Agreement and/or demand payment of the Post-Petition Debt then outstanding, and (ii) take any action necessary to preserve and protect the Collateral;

(g) That (i) within three (3) business days from the date of a notice of default, the automatic stay under Section 362 of the Bankruptcy Code will be automatically lifted without further order of the Bankruptcy Court to allow Post-Petition Lender to take any and all actions, as if no case were pending under the Bankruptcy Code, and (ii) any further order of the Bankruptcy Court which authorizes (x) the use of cash collateral, including accounts receivable, inventory and proceeds thereof, of Obligors in which Post-Petition Lender has an interest, or (y) under Section 362 of the Bankruptcy Code, the obtaining of credit or the incurring of indebtedness secured by a lien or security interest which is equal or senior to a lien or security interest held by Post-Petition Lender or which is entitled to

priority administrative status which is equal or superior to that granted to Post-Petition Lender shall be prohibited unless within such three day period of time the Bankruptcy Court determines that no default occurred and is continuing;

(h)     That no order of the Bankruptcy Court shall be entered at the request of Obligors or with the support of Obligors which authorizes the obtaining of credit or the incurring of indebtedness secured by a lien or security interest which is equal or senior to a lien or security interest held by Post-Petition Lender or which is entitled to priority administrative status which is equal or superior to that granted to Post-Petition Lender; and

(i)     Authorizing all other terms and conditions as may be required by Post-Petition Lender (including, without limitation, all rights and remedies to Post-Petition Lender if Obligors do not exit from the Cases on terms and conditions satisfactory to Post-Petition Lender).

OTHER:            This term sheet is intended as an outline only of certain of the material terms of the DIP Facility and does not purport to summarize all of the conditions, covenants, representations, warranties and other provisions which will be contained in definitive legal documentation for the DIP Facility.

## SCHEDULE 1
## INTEREST, FEES AND EXPENSES

INTEREST RATES:

The DIP Facility will bear interest at the Prime rate plus 500 basis points and will be payable monthly. All interest would be calculated on the basis of actual number of days elapsed in a year of 360 days.

UP FRONT FEE:

$150,000, fully earned upon the entry of the Interim Order and payable upon the entry of the Final Order.

EXIT FEE:

$150,000, fully earned upon the entry of the Interim Order and due and payable upon confirmation by the Bankruptcy Court of the Borrowers' plan of reorganization or upon an Event of Default under the DIP Facility.

OTHER FEES:

Obligors must pay for the benefit of the Post-Petition Lender each month, a collateral management fee (the "Collateral Management Fee") equal to $50,000 per year. The Collateral Management Fee shall be non-refundable and fully-earned on the Closing Date and then annually commencing on the first anniversary of the Closing Date, and each year thereafter and payable in equal monthly installments.

EXPENSES:

Obligors must pay (a) all reasonable out-of-pocket costs and expenses (including legal fees of Post-Petition Lender's counsel) incurred by the Post-Petition Lender in connection with the Obligors' Bankruptcy Cases and the DIP Facility, including costs and expenses of (i) Post-Petition Lender's due diligence, including field examinations, appraisals and environmental audits, and (ii) preparing, administering, syndicating and monitoring, and enforcing all documents executed in connection with the DIP Facility and (b) a $1,000 per day per field examiner charge, in addition to all out-of-pocket expenses for field examinations. All such expenses shall be fully earned upon the entry of the Interim Order and due and payable upon the entry of the Final Order.

## EXIT TERM SHEET

### SUMMARY OF PROPOSED TERMS AND CONDITIONS AS TO SENIOR SECURED EXIT CREDIT FACILITY

**This Term Sheet is not a commitment, obligation or understanding on the part of any present or potential future lender to provide financing to or for the benefit of Borrowers or any other person or entity. Any commitment, obligation or understanding to provide financing shall only arise pursuant to definitive documentation that is hereafter negotiated, executed and delivered by all parties thereto and with respect to which all conditions precedent are satisfied or waived in writing and CIT has received internal credit approval for. The definitive documentation will be consistent with the terms described herein.**

Capitalized terms used herein are defined in the Pre-Petition Loan Agreement (as defined below), unless otherwise stated.

BORROWERS:    Nukote International, Inc., Nukote Imperial, Inc., International Communication Materials, Inc., Envirosmart, Inc. and Black Creek Holdings, Ltd. (collectively, the "Borrowers").

GUARANTORS:    Black Creek Holdings Ltd., Nukote Holdings, Inc. and all Domestic Subsidiaries of a Borrower (together with the Borrowers, collectively, the "Obligors").

LENDER:    The CIT Group/Business Credit, Inc. ("CIT" or "Exit Lender").

CREDIT FACILITY:    A senior secured super-priority credit facility (the "Exit Facility") evidenced by a Financing Agreement (the "Exit Agreement") and consisting of (i) a revolving credit facility of up to $10,000,000 (the "Credit Line"); (ii) a Term Loan in the original principal amount as calculated below (estimated to equal approximately $25,000,000) (the "Term Loan"), which consist of two tranches of equal amounts, Tranche A and Tranche B. The original principal amount of Term Loan will be (A) the sum of (i) Post-Petition Indebtedness, and (ii) any amount of Pre-Petition Debt not included in the calculation of Post-Petition Indebtedness, *minus* (B) the sum of (i) any cash on hand, and (ii) the contractual amount of Availability on the closing date of the Exit Facility.

PURPOSE:    The Exit Facility would be used by Borrowers to (i) pay Pre-Petition and Post-Petition Indebtedness; (ii) pay related transaction costs, fees and expenses of the Exit Facility; and (iii) finance ongoing working capital needs of Borrowers.

LOAN AVAILABILITY: The Exit Facility will be funded under revolving loans and the aggregate of such loans will be limited to, on any date of determination thereof, an amount equal to Availability. "Availability" shall mean, as to the Obligors on an aggregate basis at any time of calculation, the amount by which: (a) the Borrowing Base exceeds (b) the outstanding aggregate amount of all of the Obligors' Obligations under the Exit Facility. "Borrowing Base" means, on any date of determination thereof, an amount equal to the lesser of: (i) $10,000,000 ("$10MM Cap") or (ii) the sum of (a) eighty-five percent (85%) of the aggregate outstanding Eligible Accounts Receivable but excluding past due amounts, Office Depot account and accounts owed by foreign parties; plus (b) fifty percent (50%) of the aggregate value of the Eligible Inventory, valued at the lower of cost or market, on a first in, first out basis, wherever located inside the United States, less (c) any Availability Reserves. The Borrowing Base is subject to certain adjustments by Exit Lender, based on review, evaluation and appraisal of the assets included in the Borrowing Base.

AVAILABILITY AND
RELATED TERMS
UNDER PRE-PETITION
LOAN AGREEMENT: Except as otherwise set forth herein, to the extent applicable, the provisions of the definitive documentation for the Exit Facility shall be substantially as set forth in the Pre-Petition Loan Agreement; with such modifications thereto and additional terms and conditions as the Obligors and the Exit Lender deem appropriate for a facility of this nature under current market conditions.

SECURITY: All obligations of Obligors to Exit Lender under the Exit Facility shall be secured by a first priority, security interest in and lien on all now owned or hereafter acquired assets and property of the estate (as defined in the Bankruptcy Code), real and personal, of Obligors, including inventory, accounts receivable, chattel paper, contract rights, documents, equipment, fixtures, deposit accounts, general intangibles (including, without limitation, all copyrights, licensing agreements, patents, trademarks, and trade names), instruments, real property, securities and other investment property, all cash collateral, and proceeds of all of the foregoing, wherever located, subject only to valid and unavoidable liens that are in existence on the Closing Date and that under applicable law are senior to, and have not been subordinated to, the liens and security interests of the Exit Lender (collectively, the "Prior Liens"). The foregoing is collectively referred to as the "Collateral." Notwithstanding the foregoing, Exit Lender's liens on

|                  | Collateral shall be junior to any liens granted to Grupo American Industries, S.A. De C.V. in Obligor's interest in furniture, fixtures and equipment located in Mexico. For the avoidence of doubt, Exit Lender shall have a first priority, security interest in and lien on all insurance proceeds relating to any theft of assets that occurred in Mexico. |

CASH DOMINION: The Obligors shall reinstate the same cash management system used by the Obligors under the Pre-Petition Loan Agreement, in accordance with, among other things, Section 3.4 of the Pre-Petition Loan Agreement.

MATURITY: The Exit Facility will have a term of five (5) years from the effective date of the Exit Facility (the "Maturity Date"). All obligations and liabilities of Obligors to Exit Lender that remain outstanding or in existence on the Maturity Date shall be due and payable on the Maturity Date.

AMORTIZATION 100% of the outstanding loans under the Credit Line will be due and payable in full on the Maturity Date.

Outstandings under the Term Loan will amortize quarterly and payments will be due and payable on the forty-fifth (45th) day following the end of each fiscal quarter beginning with June 30, 2010 and continuing on the forty-fifth (45th) day following the end of each fiscal quarter thereafter with the aggregate unpaid balance due on the Maturity Date (the "Quarterly Payments"). The amount of each Quarterly Payment will be equal to the greater of (i) $100,000 or (ii) 50% of EBITDA for such fiscal quarter, *minus*, interest paid in cash during such fiscal quarter with respect to the Credit Line and the Term Loan.

Application of the proceeds from the Quarterly Payments and any mandatory repayment will be allocated, first, to reduce the unpaid and accrued interest of Term Loan *Tranche B* (including any amount of interest paid in kind and added to the principal amount of the Term Loan), second, to permanently reduce the principal of Term Loan *Tranche B*, and, after the Term Loan *Tranche B* has been reduced to $0, third, to reduce the unpaid and accrued interest of Term Loan *Tranche A*, fourth, to permanently reduce the principal of Term Loan *Tranche A*, and, after the Term Loan *Tranche A* has been reduced to $0, fifth, to permanently reduce the Credit Line. All such repayments of principal of Term Loan shall be applied to reduce the then remaining scheduled amortization payments of the Term Loan in reverse order of maturity (based upon the then remaining amounts of such payments).

The Exit Lender agrees that failure to make the Quarterly Payment as and when due will not constitute an Event of Default so long as (i) no other default or Event of Default has occurred and is continuing and (ii) the Borrowers are unable to make such Quarterly Payment because of a lack of Availability as a result of (and only because of) the $10MM Cap, both ten days prior to and ten days after the date such payment is due and owing ("Suppressed Availability Payment Event"). Upon a Suppressed Availability Payment Event, the Borrowers and Exit Lender will engage in good faith negotiations to address such payment and availability issues. A Suppressed Availability Payment Event will constitute an Event of Default (A) upon the occurrence of an Event of Default (other than the Suppressed Availability Payment Event), or (B) on the thirtieth (30th) day following the date such Quarterly Payment was otherwise due and payable.

**INTEREST, FEES AND EXPENSES:**

Interest:  *Credit Line*:  Prime plus 400 basis points, payable monthly.

*Term Loan Tranche A*:  Prime plus 400 basis points, payable monthly.

*Term Loan Tranche B*:  Prime plus 400 basis points for the first 3 years and prime plus 600 basis points for the next two years, paid in kind and not in cash, and shall have the effect of increasing the principal amount of Term Loan B on a monthly basis by the amount of interest paid in kind.

Other Fees:  Obligors must pay for the benefit of the Exit Lender each month, a collateral management fee (the "Collateral Management Fee") equal to $50,000 per year. The Collateral Management Fee shall be non-refundable and fully-earned on the Closing Date and then annually commencing on the first anniversary of the Closing Date, and each year thereafter and payable in equal monthly installments.

Expenses:  Obligors must pay (a) all out-of-pocket costs and expenses (including legal fees of Exit Lender's counsel) incurred by the Exit Lender in connection with the Exit Facility, including costs and expenses of (i) Exit Lender's due diligence, including field examinations, appraisals and environmental audits, and (ii) preparing, administering, syndicating and monitoring, and enforcing all documents executed in connection with the Exit

Facility and (b) a $1,000 per day per field examiner charge, in addition to all out-of-pocket expenses for field examinations.

TERMS AND
CONDITIONS:

The financing agreements will contain representations and warranties, covenants, events of default, and other provisions acceptable to Exit Lender, including, but not limited to, such applicable representations and warranties, covenants, events of default, and other provisions of the Pre-Petition Loan Agreement and all applicable provisions of the DIP Facility (including the Terms and Conditions in the DIP Term Sheet set forth above), or as agreed to by Exit Lender, and additionally the following:

10.    *Mandatory Prepayments*: Subject to exceptions to be further negotiated, the following mandatory prepayments of the Exit Facility shall be required:

i.        75% of Excess Cash Flow. Excess Cash Flow shall be (A) calculated on a quarterly basis and Borrowers shall make an Excess Cash Flow payment on or before the forty-fifth (45th) day after the end of each fiscal quarter ("Quarterly Excess Cash Flow Payment") and (B) calculated on an annual basis (the "Annual Excess Cash Flow Amount") and Borrowers shall make an Excess Cash Flow payment on or before the nintieth (90th) day after the end of each fiscal year in an amount equal to the difference between (X) Annual Excess Cash Flow Amount and (Y) the aggregate amount of Quarterly Excess Cash Flow Payments paid during such fiscal year pursuant. The definition of "Excess Cash Flow" will mean with respect to any period of determination, without duplication, an amount equal to EBITDA for such period (a) minus the sum of (i) all applicable taxes paid in such period, (ii) permitted capital expenditures made during such period of an amount not greater than $300,000 annually, and (iii) debt service paid in cash during such period, and (b) plus or minus (as applicable) changes in any working capital. The definition of Excess Cash Flow is subject to change and will be the definition contained in definitive legal documentation.

ii.       70% of the net cash proceeds from any settlement, recovery or amount paid to Borrowers relating to the claims Borrowers have against Office Depot.

Application of the proceeds from mandatory prepayments will be applied in the same manner as the Term Payments.

11. Financial covenants acceptable to Obligors and the Exit Lender.

CONDITIONS
PRECEDENT:

The extension of the aforementioned financing arrangement is subject to the fulfillment of a number of conditions to Exit Lender's satisfaction, including, but not limited to, the following:

1. The execution and delivery, in form and substance acceptable to Exit Lender and its counsel, of Exit Lender's customary agreements, documents, instruments, financing statements, intercreditor agreements, subordination agreements, opinions of counsel, landlord waivers, consents, evidences of corporate authority, and such other writings to confirm and effectuate the Exit Facility as may be required by Exit Lender's or by its counsel.

2. Implementation of the cash management system satisfactory to the Exit Lender.

3. Other than the filing of the Cases and any litigation commenced in connection therewith against Office Depot, no material adverse change in Obligors' (whether on a per entity or person basis or on an aggregate basis) assets, liabilities, business, financial condition, business prospects, or results of operations since the Petition Date.

4. Other than the filing of the Cases and any litigation commenced in connection therewith against Office Depot, as to Obligors, there shall exist no action, suit, investigation, litigation, or proceeding pending or threatened in any court or before any arbitrator or governmental instrumentality that is not subject to the automatic stay and in Exit Lender's judgment (a) could be expected to have a material adverse effect on Obligors' (whether on a per entity or person basis or on an aggregate basis) assets, liabilities, business, financial condition, business prospects, or results of operations or which could impair Obligors' ability to perform satisfactorily under the Exit Facility, or (b) could be expected to materially and adversely affect the Exit Facility or the transactions contemplated thereby.

5. Exit Lender shall have received, each in form and substance satisfactory to Exit Lender, (a) updated financial projections of Obligors evidencing Obligors' ability to comply with the financial covenants set forth in the Exit Agreement, (b)

interim financial statements for Obligors as of a date not more than thirty (30) days prior to the closing date, and (c) a 5-year Budget.

6.     Exit Lender shall have received certificates of insurance with respect to Obligors' property and liability insurance, together with a loss payable endorsement naming Exit Lender as mortgagee/loss payee, all in form and substance satisfactory to Exit Lender.

7.     Exit Lender's satisfactory due diligence of the assets and Collateral of the Obligors.

8.     Exit Lender's receipt of such third party documents and consents as Exit Lender may require, all in form and substance acceptable to Exit Lender.

9.     [Intentionally deleted]

10.     Final Credit Approval by CIT which shall be obtained prior to the entry of the Final DIP Order.

OTHER:     This term sheet is intended as an outline only of certain of the material terms of the Exit Facility and does not purport to summarize all of the conditions, covenants, representations, warranties and other provisions which will be contained in definitive legal documentation for the Exit Facility.

# Nukote Cash Forecast

## EXHIBIT B

| | Budget 9/11/2009 | Budget 9/18/2009 | Budget 9/25/2009 |
|---|---|---|---|
| Beginning Weekly Cash | 226,197 | | |
| Cash Receipts - Existing Business | 811,549 | 854,459 | 917,698 |
| **Total Cash Receipts** | **1,037,746** | **854,459** | **917,698** |
| | | | |
| **Fixed Payments** | | | |
| Payroll | 50,000 | 300,000 | 50,000 |
| Weekly Plant Costs - Monterrey | 276,710 | 356,210 | 231,710 |
| Materials Expenses - Prepayment | 420,036 | 909,581 | 382,882 |
| UPS Ground | 31,504 | 32,707 | 34,658 |
| Freight Expenses | 37,804 | 39,248 | 41,590 |
| Other Expenses | 75,000 | 75,000 | 75,000 |
| *Rents* | | | |
| *JJM Inc. - Bardstown* | 4,056 | | |
| *Bentley Forbes - Dallas* | 21,500 | | |
| *Ridgeway Industrial - Rochester* | 10,000 | 10,000 | 10,000 |
| *ARKA - Franklin* | 20,000 | 10,000 | 10,000 |
| Total Rents | 55,556 | 20,000 | 20,000 |
| *Utilities* | | | |
| *Rochester* | | | 15,000 |
| *Beasley* | | | 15,000 |
| *ICMI* | | | 50,000 |
| *Bardstown* | | | 1,000 |
| Total Utilities | 0 | 0 | 81,000 |
| *Insurance/Benefits* | | | |
| *AETNA* | | | 7,500 |
| *Ameritas* | | | 1,000 |
| *AETNA Life & Casualty* | | | 1,000 |
| *AFLAC* | | | 10,000 |
| *Bank Direct* | | | 5,000 |
| *Blue Cross Blue Shield of Tennessee* | 25,000 | 25,000 | 25,000 |
| *A.I. Credit Corp* | 56,000 | | |
| *Tudor Insurance* | | | |
| *Unum Life Insurance* | | | |
| *Express Scripts* | | | |
| *Metlife* | | | 10,000 |
| *National Union* | | | 10,000 |
| *Beacon Risk* | 15,000 | | |
| Total Insurance/Benefits | 96,000 | 25,000 | 69,500 |
| *Reorganization Expenses* | | | |
| *Legal Fees* | | 200,000 | |
| *US Trustee Fees* | | 15,000 | |
| *Consulting Fees* | | 15,000 | |
| *Creditor committee fees* | | 35,000 | |
| *Other Reorg Fees* | | 5,000 | |
| Total Reorganization expenses | 0 | 270,000 | 0 |
| **Total Payments** | **1,042,610** | **2,027,747** | **986,340** |
| | | | |
| Net Weekly Cash Flow | (4,864) | (1,173,288) | (68,642) |