Keith M. Lundin
Keith M. Lundin
U.S. Bankruptcy Judge
Dated: 09/25/09



# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Case No. 09-06240 |
| | ) | Chapter 11 |
| NUKOTE INTERNATIONAL, INC., *et al.*, | ) | Judge Keith M. Lundin |
| | ) | |
| Debtors. | ) | Jointly Administered |

## FINAL ORDER APPROVING DEBTORS' EXPEDITED MOTION FOR AUTHORITY TO OBTAIN CREDIT SECURED BY SENIOR LIENS AND WITH SUPERPRIORITY ADMINISTRATIVE CLAIM STATUS PURSUANT TO 11 U.S.C. §§ 364(c) AND (d)

Upon consideration of the Motion dated September 1, 2009, filed in the above-captioned

jointly administered bankruptcy cases (the "Bankruptcy Cases") of the debtors and debtors-in-

possession[1] (the "Debtors") for Authority to Obtain Credit Secured by Senior Liens and With

Superpriority Administrative Claim Status Pursuant to 11 U.S.C. §§ 364(c) and (d) (the

"Financing Motion"), the evidence and the arguments of counsel; and all objections, if any, to

the entry of this Final Order having been withdrawn, resolved or overruled by this Court; and

after due deliberation and consideration, and for good and sufficient cause appearing therefor:

---

[1] The Debtors in these cases are Nukote International, Inc., Nu-kote Imperial, Ltd., International
Communication Materials, Inc., Envirosmart, Inc. and Black Creek Holdings, Ltd.

Based upon the record established at the interim hearing on the Financing Motion held on September 9, 2009 (the "Interim Hearing") and the final hearing held on September 22, 2009 (the "Final Hearing"); and the Court having considered any objections to the Financing Motion, including the Limited Objection to the Financing Motion filed by the Official Committee of Unsecured Creditors [D.I. 249] (the "Committee's Limited Objection") and the Court having entered, after the Interim Hearing, that certain Interim Order Approving Debtors' Expedited Motion for Authority to Obtain Credit Secured by Senior Liens and With Superpriority Administrative Claim Status Pursuant to 11 U.S.C. §§ 364(c) and (d) [D.I. 251] (the "Interim Order"); and in accordance with Rules 2002, 4001(b), (c) and (d), and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules of the Bankruptcy Court, due and proper notice of the Motion, the Interim Hearing and the Final Hearing having been given; the Final Hearing having been held and concluded on September 22, 2009; and upon the record of the Interim Hearing and the Final Hearing; and it appearing that approval of the relief requested in the Financing Motion is necessary to avoid immediate and irreparable harm to the Debtors and otherwise is fair and reasonable and in the best interests of the Debtors, their creditors and their bankruptcy estates, and is essential for the continued operation of the Debtors' businesses; and, subject to the terms hereof, there is adequate protection of the interests of holders of liens on the property of the estates on which liens are granted; and all objections, including the Committee's Limited Objection, to the entry of this Final Order having been withdrawn, resolved or overruled by this Court (without limiting the Committee's reservation of rights set forth herein); and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING AND THE FINAL HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.     **The Petition Date.**  On June 3, 2009 (the "Petition Date") the Debtors filed voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Middle District of Tennessee (the "Bankruptcy Court" or this "Court").  Since the Petition Date, the Debtors have remained in possession and control of their assets as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Bankruptcy Cases.

B.     **Jurisdiction and Venue.**  This Court has jurisdiction to hear the Financing Motion pursuant to 28 U.S.C. § 1334.  Consideration of the Financing Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(D), (K), (M), and (O).  Venue for the Bankruptcy Cases and proceedings on the Financing Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     **Committee Formations.**  On June 12 and June 19, 2009, the United States Trustee (the "US Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee").  The Court has authorized the formation of an additional committee of former ~~committee of form~~er employees but at this time no committee has been formed.

D.     **Interim Order.**  At the Interim Hearing, the Court approved the Financing Motion on an interim basis pending the Final Hearing and entry of this Final Order.  Pursuant to the Interim Order, the Final Hearing was scheduled for September 22, 2009.

E.     **Notice.**  Notice of the Final Hearing (as defined herein) and the relief requested in the Financing Motion has been provided by the Debtors as set forth in the Financing Motion.

- 3 -

Under the circumstances, such notice of the Final Hearing and the relief requested in the

Financing Motion constitutes due, sufficient and appropriate notice and complies with Section

102(1) of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") 2002 and 4001(b), and applicable local rules.

F.    **The Pre-Petition Loan Agreement.**    As of the date of the Interim Order, the

Debtors were indebted to The CIT Group/Business Credit, Inc. ("CIT") in the amount of at least

$31,664,131.00. and other obligations (collectively, the "Pre-Petition Debt") arising in

connection with that certain Amended and Restated Financing Agreement effective as of October

31, 2003 (as amended, modified, supplemented, restated, extended, renewed, increased and/or

replaced from time to time and together with all schedules, exhibits, annexes, addenda and

related documents, the "Pre-Petition Credit Agreement").

G.    **The Pre-Petition Liens.**    Pursuant to the Pre-Petition Credit Agreement, the

Debtors executed various notes, guaranties, security agreements, stock pledge agreements and

other documentation (collectively, together with the Pre-Petition Credit Agreement, the "Pre-

Petition Credit Documents"). Pursuant to the Pre-Petition Credit Documents, CIT holds liens

and security interests in or upon all or substantially all of the assets of the Debtors (the "Pre-

Petition Collateral"), including, without limitation, inventory, accounts receivable, equipment,

general intangibles, and cash collateral (the "Pre-Petition Liens").

H.    **Enforceability of Obligations Arising Under Pre-Petition Credit Documents.**

The obligations of the Debtors under the Pre-Petition Credit Documents are (a) legal, valid,

binding, and enforceable against each of the Debtors and their respective bankruptcy estates in

the Bankruptcy Cases (the "Bankruptcy Estates") and (b) not subject to any contest, attack,

objection, recoupment, defense, counterclaim, offset, subordination, re-characterization,

- 4 -

avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise. The Debtors and the Bankruptcy Estates do not have, hereby forever release, and are forever barred from bringing any claims, counterclaims, causes of action, defenses or setoff rights relating to the Pre-Petition Debt, whether arising under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise, against CIT and its respective affiliates, subsidiaries, agents, officers, directors, employees and attorneys.

**I.** **Enforceability of Liens and Security Interests Granted Pursuant to the Pre-Petition Credit Documents.** The Pre-Petition Liens are legal, valid, enforceable, non-avoidable, and duly perfected and are not subject to avoidance, attack, offset, recharacterization or subordination under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise and, as of the date hereof, there are no liens or security interests having priority over the Pre-Petition Liens.

**J.** **Adequate Protection for Use of Cash Collateral.** Pursuant to orders entered by the Bankruptcy Court authorizing the Debtors to use the cash collateral of CIT, CIT holds replacement liens on the same types of collateral in which CIT held valid and properly perfected liens prior to the Petition Date, including, without limitation, the Debtors' post-petition inventory and accounts receivable (the "Adequate Protection Replacement Liens"). The Adequate Protection Replacement Liens are legal, valid, enforceable, non-avoidable, and duly perfected and are not subject to avoidance, attack, offset, recharacterization or subordination under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise and, as of the date hereof, there are no liens or security interests having priority over the Adequate Protection Replacement Liens and no other person or entity asserts an interest in the Debtors' cash collateral.

**K.     Need for Post-Petition Financing.** An immediate need exists for the Debtors to obtain funds in order to continue operations and to administer and preserve the value of the Bankruptcy Estates. The ability of the Debtors to finance their operations, to preserve and maintain the value of their assets and maximize the return for all creditors requires the availability of working capital under the terms of the debtor-in-possession financing transaction described in the term sheet attached hereto as Exhibit A (the "Term Sheet"). The debtor-in-possession financing transaction summarized in the Term Sheet shall hereinafter be referred to as the "DIP Facility". On September 21, 2009, the Debtors filed with the Court the final form of that certain Senior Secured Super-Priority Debtor-in-Possession Credit Facility dated as of September 15, 2009 (Docket No. 270) (the "DIP Financing Agreement"). The various agreements, instruments, documents and documentation governing the DIP Facility, including, without limitation, the Term Sheet and the DIP Financing Agreement are collectively referred to herein as the "DIP Financing Documents." In the absence of the availability of such funds in accordance with the terms hereof and the DIP Financing Documents, the continued operation of the Debtors' businesses would not be possible, and serious and irreparable harm to the Debtors, the Bankruptcy Estates, their creditors and equity holders would occur. Further, the possibility for a successful reorganization and the maintenance of the Debtors as going concerns would be jeopardized in the absence of the availability of funds pursuant to the DIP Facility and the DIP Financing Documents.

**L.     No Credit Available on More Favorable Terms.** The Debtors have been unable to obtain (a) adequate unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense; (b) credit with priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b); (c) credit secured solely by a lien on

- 6 -

property of the Bankruptcy Estates that is not otherwise subject to a lien; or (d) credit secured by a junior lien on property of the Bankruptcy Estates which is subject to a lien, in each case, on more favorable terms and conditions than those set forth in the Term Sheet and this Final Order.

**M.**     **Use of Proceeds of the DIP Facility.**  Proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Financing Documents) shall be used, in each case in a manner consistent with the Term Sheet, the DIP Financing Documents, and this Final Order; provided that no amount of the proceeds of the DIP Facility may be used by the Committees or any other official committee appointed in these Cases, to investigate the Pre-petition Liens and the claims of, or against, CIT.

**N.**     **Business Judgment and Good Faith Pursuant to Section 364(e).**  The terms and conditions of the DIP Facility, as set forth in the DIP Financing Documents, and the fees paid and to be paid thereunder (i) are fair, reasonable, and the best available under the circumstances; (ii) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties; and (iii) are supported by reasonably equivalent value and consideration. The DIP Facility was negotiated in good faith and at arm's length between the Debtors and CIT. CIT has indicated its willingness to provide financing to the Debtors pursuant to the DIP Financing Documents.  The funds to be extended under the DIP Facility will be extended by CIT in good faith, and for valid business purposes and uses by the Debtors, and, as a consequence, CIT is entitled to the protection and benefits afforded by Section 364(e) of the Bankruptcy Code. The DIP Superpriority Claim (as defined herein), the DIP Liens (as defined herein) and other protections granted pursuant to this Final Order, the DIP Financing Documents and the DIP Facility will not be affected by any subsequent reversal, modification, vacatur or amendment of this Final Order or any other order, as provided in Section 364(e) of the Bankruptcy Code.

- 7 -

**O.** **Relief Essential; Best Interests.** The relief requested in the Financing Motion (and as provided in this Final Order) is necessary, essential, and appropriate for the continued operation of the Debtors' businesses and management and preservation of the Bankruptcy Estates. It is in the best interests of the Bankruptcy Estates that the Debtors be allowed to obtain credit pursuant to the DIP Facility and the DIP Financing Documents.

**P.** **Entry of Final Order.** For the reasons stated above, the Debtors have requested and are entitled to immediate entry of this Final Order pursuant to Bankruptcy Rule 4001(c)(2).

**NOW, THEREFORE,** upon the Financing Motion and the record before this Court with respect to the Financing Motion, including the record made during the Final Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.     **Motion Granted.** The Financing Motion is granted in accordance with the terms and conditions set forth in this Final Order and the DIP Financing Documents. Any objections to the Financing Motion with respect to the entry of this Final Order to the extent not withdrawn, waived or otherwise resolved, and all reservations of rights included therein, if any, are hereby denied and overruled.

2.     **DIP Financing Documents.**

(a)     **Approval of Entry into the DIP Financing Documents.** The Debtors are expressly and immediately authorized, empowered and directed to execute and deliver the DIP Financing Documents and to incur and to perform in accordance therewith and in accordance with this Final Order, and to execute and deliver all instruments, certificates, agreements and documents which may be required or necessary for the performance by the Debtors in connection with the DIP Facility and the creation and perfection of the liens and

- 8 -

security interests granted pursuant to this Final Order and the DIP Financing Documents (the "DIP Liens" and collectively with the Pre-Petition Liens and the Adequate Protection Replacement Liens, the "CIT Liens") described in and provided for by this Final Order and the DIP Financing Documents. The Debtors are hereby authorized and directed to do and perform all acts, satisfy all obligations, and to pay all principal, interest, fees, expenses and other amounts described in the DIP Financing Documents as such become due (collectively with all other obligations under and as defined in the DIP Financing Documents, the "DIP Obligations"), which amounts shall not otherwise be subject to further approval of this Court. Upon execution and delivery, the DIP Financing Documents shall represent valid and binding obligations of the Debtors in accordance with their terms enforceable against the Debtors and the Bankruptcy Estates.

(b)     **Authorization to Borrow.** The Debtors are immediately authorized to borrow, subject to and in accordance with the terms and conditions of the DIP Financing Documents, up to the amount of $26,000,000 (the "DIP Facility Amount"). For the avoidance of doubt, the DIP Facility Amount includes the $11,250,000.00 borrowed pursuant to authority granted under the Interim Order.

(c)     **Use of the DIP Facility Amount.** The first TWENTY TWO MILLION DOLLARS (US $22,000,000.00) of the DIP Facility Amount advanced by CIT to the Debtors shall be used to repay TWENTY TWO MILLION DOLLARS (US $22,000,000.00) of the Pre-Petition Debt. For the avoidance of doubt, the $22,000,000 required by this Final Order to be used by the Debtors to repay the Pre-Petition Debt as set forth in the previous sentence includes the TEN MILLION DOLLARS (US $10,000,000.00) required to be used for the same purpose pursuant to the Interim Order. Portions of the DIP Facility Amount advanced by CIT to the

- 9 -

Debtors thereafter shall be used by the Debtors to (i) pay related transaction costs, fees and expenses of the DIP Facility in accordance with the DIP Financing Documents; (ii) fund ongoing working capital needs of the Debtors; and (iii) pay administrative costs associated with the Bankruptcy Cases. All advances by CIT to the Debtors of the DIP Facility Amount shall be subject to the budget that is attached hereto as "Exhibit B" (the "Budget").

(d) **Use of Cash Collateral**. The Debtors shall only use cash collateral to the extent of the amount of opening cash identified in the Budget. The use of the above-referenced cash collateral shall be subject to the terms and conditions of the Sixth Amended Expedited Interim Order Granting Debtors Authority to Use Cash Collateral.

(e) **Conditions Precedent.** CIT shall have no obligation to make any loan or any other financial accommodations under the DIP Financing Documents unless the conditions precedent to make such loans or financial accommodations under the DIP Financing Documents have been satisfied in full or waived in accordance with the DIP Financing Documents.

(f) **DIP Superpriority Claim and DIP Liens.** Effective immediately upon the entry of this Final Order, and subject to the terms of the DIP Financing Documents, CIT, as adequate protection and security for the obligations of the Debtors under the DIP Facility and the DIP Financing Documents, is hereby granted (x) a superpriority administrative expense claim pursuant to Section 364(c)(1) of the Bankruptcy Code superior to any and all administrative expenses in the Bankruptcy Cases, including without limitation, any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Sections 105, 326, 328, 330, 331, 503(b) 506(c), 507(a), 507(b) and 726 of the Bankruptcy Code (the "DIP Superpriority Claim") and (y) the following security

interests and liens, all of which shall immediately be valid, binding, permanent, continuing, enforceable and non-avoidable (collectively, the "DIP Liens"):

(I)      a first priority security interest and lien, pursuant to Section 364(d) of the Bankruptcy Code, on all property of the Bankruptcy Estates, which includes, without limitation, all now owned or hereafter acquired property of the Debtors and the Bankruptcy Estates including, without limitation, all unencumbered cash, any investment of such cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, tradenames, other intellectual property, equity interests and proceeds of the foregoing, wherever located and which shall also include the Debtors' and the Bankruptcy Estates' claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, and other avoidance or similar actions under the Bankruptcy Code or similar state law and the proceeds thereof, whether received by judgment, settlement or otherwise (collectively, "Avoidance Actions"), subject only to valid and unavoidable liens that are in existence as of the date hereof and that under applicable law are senior to, and have not been subordinated to, the liens and security interests of CIT (collectively, "Prior Liens"); provided, however, that upon the effective date of a Reorganization Plan which provides for the repayment in full of all obligations owed to CIT by the Debtors (including the amounts owed under the DIP Financing Documents and the Pre-Petition Debt) pursuant to the terms of the Exit Term Sheet, CIT shall release its lien on all Avoidance Actions other than Avoidance Actions (i) against any Debtor, Guarantor, Office Depot, Inc. and/or its affiliates, Oxygenline and the Bond Street Entities (including, without limitation, Richmont Global Unlimited, Inc., Oxygenline, Ltd., Bond Street Ltd., LLC, Inkbrary,

- 11 -

LLC, BSL-Applied Laser Technologies, LLC, BSL-Gem/Laser Express, LLC, Southeast Printer Connection, LLC, Superior Acquisition, LLC, Toner Plus Southwest, LLC, Toner Solutions Acquisitions, LLC, Richmont Mezzanine Fund, Richmont Aviation, Richmont Holdings, Richmont Corporation, Obsidian Arrowpoint, Ltd., New Regent China Ltd. and New Regent (Zhuhai) Printers Supplies Co, Ltd., and Nukote Trading Corporation) or any officer, director, employee, agent, attorney, representative, relative, shareholder, subsidiary, insider, affiliate, or affiliate of affiliate of any of the foregoing or any company owned or controlled by any of the foregoing, (ii) avoidance actions pursuant to Section 549, or (iii) that would impair, prejudice, offset or otherwise alter CIT's liens and claims against any of the Debtors or Guarantors;[2]

(II)     a first priority security interest and lien, pursuant to Section 364(c)(2) of the Bankruptcy Code, on all unencumbered property of the Debtors and the Bankruptcy Estates; and

(III)     a second priority security interest and lien, pursuant to Section 364(c)(3), on all property of Debtors that is subject to Prior Liens perfected as of the date hereof or Prior Liens that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code.

The foregoing property described in paragraphs (I), (II) and (III) above shall hereinafter be referred to as the "DIP Collateral"; and, collectively with the Pre-Petition Collateral, the "CIT Collateral."

---

[2] Capitalized terms used in this proviso not otherwise defined herein shall have the meaning ascribed to them in the DIP Financing Agreement.

(g) **Authorization to Perfect Liens.** CIT shall be and hereby is authorized to take any action it deems necessary or appropriate to perfect the liens and security interests granted to CIT pursuant to the DIP Financing Documents and this Final Order, including but not limited to filing financing statements, all of which shall be deemed to have been filed on the date of entry of the Interim Order and shall continue in full force and effect through and after the entry of this Final Order.

(h) **Grupo American Industries, S.A. de C.V.** To enable the Debtors to consummate a settlement with Grupo American Industries, S.A. de C.V. ("Grupo") and to solely secure the payment of pre-petition claims of Grupo in connection therewith, CIT has agreed, upon Bankruptcy Court approval of the applicable settlement between the Debtors and Grupo, to subordinate its liens in furniture, fixtures and equipment currently located in Mexico to any liens to be granted to Grupo under the settlement. For the avoidance of doubt, CIT shall have a first priority security interest and lien upon all insurance proceeds relating to any theft of assets that has occurred in Mexico.

(i) **Carve-Out.** The claims and liens granted hereunder to CIT, the DIP Liens and any claims or liens ranking *pari passu* with or junior in priority to such claims shall be subject to the Carve-Out. As used in this Final Order, "Carve-Out" means the sum of (i) all fees required to be paid to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 contained in the Budget and (ii) the aggregate amount in the Budget of accrued, but unpaid fees and expenses of the Debtors' and the Committees' professionals. No portion of the DIP Facility Amount or the cash collateral of CIT may be used to fund or pay professional fees in connection with a challenge of the amount, validity, perfection, priority or enforceability of or assert any defenses counterclaim or offset to the Pre-petition Credit Agreement, Pre-Petition Debt, the Pre-

Case 3:09-bk-06240    Doc 278    Filed 09/24/09    Entered 09/24/09 17:36:14    Desc Main
Document      Page 13 of 52

Petition Liens or the Adequate Protection Replacement Lien or any other claims, security interests and liens of CIT or to otherwise litigate against CIT.

(j)     The automatic stay imposed under Section 362(a) of the Bankruptcy Code is hereby modified as necessary to (i) permit the Debtors to grant the DIP Liens and to incur all liabilities and obligations to CIT under and in connection with the DIP Financing Documents, the DIP Facility and this Final Order, and (ii) authorize CIT to retain and apply payments hereunder.

3.     **DIP Lien Priority and DIP Collateral.** The DIP Liens shall have the priorities set forth in this Final Order and, except as may otherwise be expressly set forth herein, shall in each and every instance be first priority senior liens. The DIP Liens shall secure all of the Debtors' obligations under the DIP Financing Documents and the DIP obligations. The DIP Liens shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereafter entered in the Bankruptcy Cases and shall be valid and enforceable against any trustee appointed in the Bankruptcy Cases, upon the conversion of any of any of the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (any "Successor Cases"), and/or upon the dismissal of any of the Bankruptcy Cases. The CIT Liens, the DIP Obligations and the Pre-Petition Debt and any proceeds, products, offspring or profits of any of the foregoing, shall not be subject to Sections 510, 549, 550 or 551 of the Bankruptcy Code or the "equities of the case" exception of Section 552 of the Bankruptcy Code or Section 506(c) of the Bankruptcy Code.

4.     **Maturity**. The DIP Facility will mature (the "Maturity Date") upon the earliest to occur of (i) December 31, 2009, (ii) September 30, 2009, if the Final Order has not been entered, (iii) the effective date of a plan of reorganization consistent with Schedule 1 of the Term Sheet,

- 14 -

(iv) the entry of an order pursuant to Section 363 of the Bankruptcy Code approving sale of substantially all of the assets or sale of a controlling interest in the equity of any of the Debtors, (v) conversion of the cases to a Chapter 7 or (vi) any other Event of Default under the DIP Financing Documents or this Final Order. All obligations and liabilities of the Debtors to CIT that remain outstanding or are in existence on the last day of the term of the DIP Facility shall be due and payable on the last day of the term of the DIP Facility, but, to the extent applicable, shall be treated in accordance with a plan consistent with Schedule 1 of the Term Sheet.

5. **Enforceable Obligations**. The DIP Financing Documents shall constitute and evidence the valid and binding obligations of the Debtors, which obligations shall be enforceable against the Debtors, the Bankruptcy Estates and any successors thereto and their creditors, in accordance with their terms.

6. **Use of DIP Facility Amount**. From and after the date hereof, the Debtors shall use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the DIP Financing Documents, this Final Order and the Budget.

7. **Superpriority Administrative Claim Status.** The DIP Obligations, pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute the DIP Superpriority Claim and be payable from and have recourse to all DIP Collateral. Other than as provided in the DIP Financing Documents and this Final Order with respect to any Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Bankruptcy Code Sections 105, 326, 328, 330, 331, 503(b) 506(c), 507(a), 507(b) and 726, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to or on a parity with the DIP Liens and the

DIP Superpriority Claims or the DIP Obligations, or with any other claims of CIT arising hereunder.

8. **Authorization to Use Cash Collateral and Proceeds of DIP Financing Documents**. Pursuant to the terms and conditions of this Final Order, the DIP Facility and the DIP Financing Documents, and in a manner consistent with the Budget (as the same may be modified, supplemented or updated from time to time with the agreement of CIT and consistent with the terms and conditions of the DIP Financing Documents), each of the Debtors is authorized to use the advances under the DIP Financing Documents. The Debtors' right to use the extensions of credit under the DIP Financing Documents shall terminate upon notice being provided by CIT (i) that an Event of Default has occurred and is continuing or (ii) of the occurrence of the Maturity Date. Nothing in this Final Order shall authorize the disposition of any assets of the Debtors or the Bankruptcy Estates outside the ordinary course of business or other proceeds resulting therefrom, except as permitted under the DIP Facility and the DIP Financing Documents (subject to any required court approval).

9. **Cash Dominion**. The Debtors shall reinstate the same cash management system used by the Debtors under the Pre-Petition Credit Agreement, in accordance with, among other things, Section 3.4 of the Pre-Petition Credit Agreement. All cash collateral collected by the Debtors will be automatically applied, in accordance with the DIP Financing Documents, to the repayment *first*, to satisfy the DIP Obligations and any other obligations then due under the DIP Agreement, and *second,* to satisfy any unpaid Pre-Petition Debt.

10. **Monitoring of Collateral.** CIT shall be permitted to retain consultants and financial advisors at the expense of the Debtors, and CIT and its consultants and advisors shall be given reasonable access to the Pre-Petition Collateral and the DIP Collateral.

- 16 -

11. **Financial Reporting.**. The Debtors shall provide CIT with all financial and other reporting in full compliance with the Pre-Petition Credit Agreement and the DIP Financing Documents.

12. **DIP and Adequate Protection Replacement Lien Perfection**. The Interim Order and this Final Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Lien or to entitle the DIP Liens to the priorities granted herein. Notwithstanding the foregoing, CIT may, in its sole discretion, file such financing statements, mortgages, security agreements, notices of liens and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices and other agreements or documents shall be deemed to have been filed on the date of entry of the Interim Order and shall continue in full force and effect through and after the entry of this Final Order. The Debtors shall execute and deliver to CIT all such financing statements, mortgages, security agreements, notices and other documents as CIT may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the DIP Liens. CIT, in its sole discretion, may file a photocopy of the Interim Order and this Final Order as a financing statement with any recording officer designated to file financing statements or with any registry or recorder of deeds or similar office in any jurisdiction in which any of the Debtors has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Final Order. To the extent that CIT is the secured party under any account control agreements, listed

as loss payee under any of the Debtors' insurance policies or is the secured party under any of the Pre-Petition Credit Documents, CIT shall also deemed to be the secured party under such account control agreements, loss payee under the Debtors' insurance policies and the secured party under each such document, shall have all rights and powers attendant to that position (including, without limitation, rights of enforcement) and shall act in that capacity and distribute any proceeds recovered or received in accordance with the terms of this Final Order and the other DIP Financing Documents.

13. **Payment of Compensation**. Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors or any official committee including, without limitation, the Committee, or shall affect the right of CIT to object to the allowance and payment of such fees and expenses

14. **Waiver of Claims and Causes of Action.** All claims and causes of action of the Debtors and the Bankruptcy Estates against CIT on account of the Pre-Petition Debt and Pre-Petition Credit Documents or otherwise, including, but not limited to, any claims for preference, fraudulent conveyance or other claims arising under the Bankruptcy Code, and any and all claims regarding the validity, priority, perfection or avoidability of the Pre-Petition Debt or the Pre-Petition Liens are hereby released, relinquished and waived.

15. **Waiver of Surcharge Rights.** As a further condition of the DIP Facility and any obligations of CIT to make credit extensions pursuant to the DIP Financing Documents, the Debtors and the Bankruptcy Estates (and any successors thereto or any representative thereof, including any trustees appointed in the Bankruptcy Cases) shall be deemed to have waived any rights, benefits, or causes of action under Section 506(c) of the Bankruptcy Code as they may relate to or be asserted against CIT, or the CIT Liens. Nothing contained in this Final Order shall

Case 3:09-bk-06240    Doc 278    Filed 09/24/09    Entered 09/24/09 17:36:14    Desc Main
Document      Page 18 of 52

be deemed a consent by CIT to any charge, lien, assessment or claim against the DIP Collateral or the Pre-Petition Collateral under Section 506(c) or otherwise.

(a) **No Additional Liens**. From and after entry of the Interim Order, unless CIT has provided its prior written consent or all DIP Obligations have been indefeasibly paid in full in cash, there shall not be entered in these proceedings, or in any Successor Case, any order which authorizes the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral and/or entitled to priority administrative status which is superior to or *pari passu* with those granted pursuant to this Final Order to CIT.

16. **Proceeds of Subsequent Financing**. Without limiting the provisions and protections of any part of this Final Order, if at any time prior to the indefeasible repayment in full in cash of all DIP Obligations, the Bankruptcy Estates, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to Sections 364(b), 364(c) or 364(d) of the Bankruptcy Code in violation of the DIP Financing Documents, then all of the cash proceeds derived from such credit or debt and all cash collateral shall immediately be turned over to CIT in reduction of the DIP Obligations in accordance with the relative rights, claims, and priorities specified herein and in the DIP Financing Documents.

17. **Disposition of DIP Collateral.** The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral without the prior written consent of CIT required under the applicable DIP Financing Documents, except for sales of inventory in the ordinary course of business or except as otherwise provided for in the DIP

Financing Documents and this Final Order and approved by the Bankruptcy Court to the extent required under applicable bankruptcy law.

18. **No Marshaling/Applications of Proceeds**. CIT and the CIT Liens shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the CIT Liens or any of the CIT Collateral.

19. **Events of Default.** Subject to the provisions of the DIP Financing Documents and this Final Order, unless and until all DIP Obligations are indefeasibly paid in full in cash (or other arrangements for payment of such amounts satisfactory (in their sole discretion) to CIT have been made), the protections afforded CIT pursuant to this Final Order and under the other DIP Financing Documents, and any actions taken pursuant thereto, shall survive the entry of any order confirming a chapter 11 plan or converting these Cases into a case under chapter 7, and the DIP Liens and the DIP Superpriority Claim shall continue in these proceedings and in any Successor Case, and such DIP Liens and DIP Superpriority Claim shall maintain their respective priority as provided by this Final Order.

20. **Rights and Remedies Upon Occurrence of Event(s) of Default.**

(a) Any automatic stay otherwise applicable to CIT is hereby modified so that (i) after the occurrence of any Event of Default and (ii) at any time thereafter during the continuance of such Event of Default, upon three (3) business days' prior written notice of such occurrence and the opportunity to cure, in each case given to each of the Debtors, counsel to the Debtors, counsel for the Committee, and the U.S. Trustee, CIT shall be entitled to exercise its rights and remedies in accordance with the DIP Financing Documents (unless within such three (3) day period the Bankruptcy Court determines that no default has occurred and is continuing), including, without limitation, (i) to terminate any obligations of CIT under the DIP

- 20 -

Financing Documents and/or demand payment, and seek enforcement, of the DIP Obligations then outstanding, (ii) to take any action, in its sole discretion, necessary to preserve and protect the CIT Collateral, (iii) upon the motion of CIT, a chapter 11 trustee acceptable to CIT shall be appointed for the Debtors by the Bankruptcy Court in accordance with Section 1104 of the Bankruptcy Code; and (iv) upon the motion of CIT requesting authority under Section 363 of the Bankruptcy Code, the Bankruptcy Court shall authorize CIT to conduct absolute auction sales in accordance with Section 363 of the Bankruptcy Code of the Debtors' interests in any of the CIT Collateral. Notwithstanding the immediately preceding sentence, immediately following the giving of notice by CIT of the occurrence of an Event of Default: (i) the Debtors shall continue to deliver and cause the delivery of the proceeds of CIT Collateral to CIT as provided in the DIP Financing Documents; (ii) CIT shall continue to apply such proceeds in accordance with the provisions of the DIP Financing Documents; (iii) the Debtors shall have no right to use any of such proceeds, or any other cash collateral other than towards the satisfaction of the DIP Obligations, as provided in the applicable DIP Financing Documents; and (iv) any obligation otherwise imposed on CIT to provide any loan or advance to the Debtors pursuant to the DIP Financing Documents shall immediately be suspended.

(b)     Subject to the provisions of the foregoing paragraph, upon the occurrence of an Event of Default, CIT, is authorized to exercise its remedies pursuant to the DIP Financing Documents and applicable law. All proceeds realized in connection with the exercise of the rights and remedies of CIT shall be applied to the DIP Obligations and the Pre-Petition Debt under, and in accordance with the provisions of, the DIP Financing Documents. Three (3) business days after notice of an Event of Default, absent cure of such Event of Default, the automatic stay under Section 362(a) of the Bankruptcy Code will be automatically lifted without

Case 3:09-bk-06240   Doc 278   Filed 09/24/09   Entered 09/24/09 17:36:14   Desc Main
Document      Page 21 of 52

need for further order of the Bankruptcy Court to allow CIT to take any and all actions in furtherance of its rights and remedies, as if no case were pending under the Bankruptcy Code, unless within such three day period the Bankruptcy Court determines that no default has occurred and is continuing.

21. **Proofs of Claim.** CIT shall not be required to file proofs of claim in these Cases or in any Successor Case, and the Debtors' stipulations under this Final Order shall be deemed to constitute a timely filed proof of claim. Any order entered by this Court in connection with the establishment of a bar date for any claim (including without limitation administrative claims) in the Case or any Successor Case shall not apply to CIT.

22. **Good Faith Under Section 364(e); No Modification or Stay of this Final Order.** CIT is extending credit pursuant to the Order in "good-faith" within the meaning of Section 364(e) of the Bankruptcy Code, and the credit extended by CIT pursuant to this Order, and in connection with the DIP Facility and the DIP Financing Documents shall be deemed to be extended in good faith within the meaning of section 364(e) of the Bankruptcy Code and CIT is entitled to the protections afforded by section 364(e) of the Bankruptcy Code and no such appeal, modification, amendment or vacation shall affect the validity and enforceability of any advances made hereunder or the liens, rights, claims, or priority authorized or created hereby. Notwithstanding any such potential modification, amendment or vacation, any liens, rights, claims or priorities granted to CIT hereunder arising prior to the effective date of such modification, amendment or vacation of any DIP Liens and DIP Superiority Claims granted to CIT shall be governed in all respects by the original provisions of this Final Order, and CIT shall be entitled to all of the rights, liens, priorities remedies, privileges and benefits, including the DIP Liens and DIP Superpriority Claims granted herein, with respect to any such claim. Since

the loans made pursuant to the DIP Financing Documents are made in reliance on this Final Order, the obligations owed CIT prior to the effective date of any stay, modification or vacation of this Final Order shall not, as a result or any subsequent order in the Bankruptcy Cases or in any Successor Cases, be subordinated, lose their lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to CIT under this Final Order and/or the DIP Financing Documents.

23. **Expenses of CIT.** As provided in the DIP Financing Documents, the Debtors shall pay all reasonable expenses incurred by CIT (including, without limitation, the reasonable fees and disbursements of counsel for CIT, any other local or foreign counsel that CIT shall retain and any internal or third-party appraisers, consultants and auditors advising CIT) in connection with the preparation, execution, delivery and administration of the DIP Financing Documents. Payment of such fees shall not be subject to allowance by the Bankruptcy Court and shall not be required to comply with the U.S. Trustee fee guidelines.

24. **Binding Effect.** The provisions of this Final Order shall be binding upon and shall inure to the benefit of CIT, the Debtors, the Bankruptcy Estates and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors) whether in the Bankruptcy Cases, in any Successor Cases, or upon dismissal of any such chapter 11 or chapter 7 Case. Notwithstanding the foregoing, the waivers contained in this Final Order concerning the Pre-Petition Debt and the Pre-Petition Liens shall not apply to a Committee if within forty five (45) days after entry of the Interim Order, such party shall have commenced an adversary proceeding for the purpose of challenging the validity, extent, priority, perfection or enforceability of the Pre-Petition Debt or the Pre-Petition Liens. To the extent any such

- 23 -

adversary is not timely commenced, than all such waivers shall apply to all interested parties in the Bankruptcy Cases and all interested parties shall be forever bound by all such waivers. Further, to the extent that any waiver contained in the Interim Order or this Final Order is not expressly challenged in any such adversary proceeding, than all interested parties in these Bankruptcy Cases shall be forever bound by such waiver.

25. **No Waiver.** The failure of CIT to seek relief or otherwise exercise their rights and remedies under the DIP Financing Documents, the DIP Facility, the Interim Order or this Final Order or otherwise, as applicable, shall not constitute a waiver of any of CIT's rights hereunder, thereunder, or otherwise. Notwithstanding anything herein, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair any of the rights or remedies of CIT under the Bankruptcy Code or under non-bankruptcy law, including without limitation, the rights of CIT upon an Event of Default (i) to request conversion of any or all of the Bankruptcy Cases to cases under chapter 7, dismissal of the Bankruptcy Cases, or the appointment of a trustee in the Bankruptcy Cases, or (ii) to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan, or (iii) to exercise any of the rights, claims or privileges (whether legal, equitable or otherwise) of CIT, including against any non-Debtor entity. Neither the commencement of the Bankruptcy Cases nor the entry of this Final Order shall limit or otherwise modify the rights and remedies of CIT upon an Event of Default with respect to non-Debtor entities or third parties or their respective assets, whether such rights and remedies arise under the Pre-Petition Credit Agreement, applicable law or equity.

Case 3:09-bk-06240   Doc 278   Filed 09/24/09   Entered 09/24/09 17:36:14   Desc Main
Document      Page 24 of 52

26.    **No Third Party Rights.**  Except as explicitly provided for herein, this Final

Order does not create any rights for the benefit of any third party, creditor, equity holder or any

direct, indirect, or incidental beneficiary.

27.    **Section 552(b).**  CIT shall be entitled to all of the rights and benefits of section

552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of

the Bankruptcy Code shall not apply to the Pre-Petition Debt, the DIP Obligations or the CIT

Liens and any proceeds, products, offspring or profits of any of the foregoing.

28.    **Amendment.**  Between the date hereof and the date of entry of the Final DIP

Order, the DIP Financing Documents may not be modified in any material respect without

further order of the Bankruptcy Court.  Upon entry of the Final DIP Order, the Debtors and CIT

may amend, modify, supplement or waive any provision of the DIP Financing Documents

without further approval of the Bankruptcy Court, unless such amendment, modification,

supplement or waiver (x) increases the interest rate (other than as a result of the imposition of the

default rate), (y) increases the commitments of CIT under the DIP Financing Documents, or (z)

changes the Maturity Date (as defined in the DIP Financing Documents).  Except as otherwise

provided herein, no waiver, modification, or amendment of any of the provisions hereof shall be

effective unless set forth in writing, signed by, or on behalf of, all the Debtors and CIT and

approved by the Bankruptcy Court.  The Debtors shall provide notice to counsel to the

Committee of any modification, amendment, supplement or waiver of any provision of the DIP

Financing Documents.

29.    **Survival of Interim and Final Orders.**  The provisions of and any actions taken

pursuant to this Final Order shall survive entry of any order which may be entered (i) confirming

any chapter 11 plan in the Bankruptcy Cases, (ii) converting any of the Bankruptcy Cases to a

Case 3:09-bk-06240    Doc 278    Filed 09/24/09    Entered 09/24/09 17:36:14    Desc Main
Document      Page 25 of 52

case under Chapter 7 of the Bankruptcy Code, (iii) to the extent authorized by applicable law, dismissing any of the Bankruptcy Cases, (iv) withdrawing of the reference of any of the Bankruptcy Cases from the Bankruptcy Court, or (v) providing for abstention from handling or retaining of jurisdiction of any of the Bankruptcy Cases in the Bankruptcy Court. The terms and provisions of this Final Order, including the DIP Liens and DIP Superpriority Claims granted pursuant to this Final Order and the DIP Financing Documents and any protections granted CIT, shall continue in full force and effect notwithstanding the entry of such order, and such DIP Liens and DIP Superpriority Claims and protections for CIT shall maintain their priority as provided by this Final Order until all the DIP Obligations and the Pre-Petition Debt have been indefeasibly paid in full and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms). The DIP Obligations shall not be discharged by the entry of an order confirming a chapter 11 plan the Debtors having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.

30. **Inconsistency.** In the event of any inconsistency between the terms and conditions of the DIP Financing Documents and of this Final Order, the provisions of this Final Order shall govern and control.

31. **Enforceability.** This Final Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable immediately upon execution hereof

32. **No Waivers or Modification of this Final Order.** The Debtors irrevocably waive any right to seek any modification or extension of this Final Order without the prior written consent of CIT and no such consent shall be implied by any other action, inaction or acquiescence of CIT.

33.  **Waiver of any Applicable Stay, including Bankruptcy Rule 6004(h).**  Any

applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived

and shall not apply to this Final Order.

34.  **Retention of Jurisdiction**.  The Bankruptcy Court has and will retain jurisdiction

to enforce this Final Order according to its terms.

**THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY
AS INDICATED AT THE TOP OF THE FIRST PAGE**

Submitted for entry by:

WRIGHT GINSBERG BRUSILOW P.C.

By:  /s/ Frank J. Wright
        Frank J. Wright
        Paul B. Geilich
        C. Ashley Ellis
        600 Signature Place
        14755 Preston Road
        Dallas, TX 75254
        Telephone: 972-788-1600
        Facsimile: 972-239-0138
        Email: fwright, pgelich, or
        aellis@wgblawfirm.com

HARWELL HOWARD HYNE
GABBERT & MANNER, P.C.

By:  /s/ Barbara D. Holmes
        Craig V. Gabbert, Jr.
        Barbara D. Holmes
        315 Deaderick Street, Suite 1800
        Nashville, TN 37238-1800
        Telephone: 615-256-0500
        Facsimile: 615-251-1058
        Email: cvg or bdh@h3gm.com

Attorneys for Debtors

**Exhibit A to Final Order**

**TERM SHEET**

**SUMMARY OF PROPOSED TERMS AND CONDITIONS AS TO SENIOR SECURED
SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT FACILITY**

**This Term Sheet is not a commitment, obligation or understanding on the part of any
present or potential future lender to provide financing to or for the benefit of Borrowers or
any other person or entity. Any commitment, obligation or understanding to provide
financing shall only arise pursuant to definitive documentation that is hereafter negotiated,
executed and delivered by all parties thereto and with respect to which all conditions
precedent are satisfied or waived in writing and CIT has received internal credit approval
for. The definitive documentation will be consistent with the terms described herein.**

Capitalized terms used herein are defined in the Pre-Petition Loan Agreement (as defined
below), unless otherwise stated.

| | |
|---|---|
| BORROWERS: | Nukote International, Inc., Nukote Imperial, Inc., International Communication Materials, Inc., Envirosmart, Inc. and Black Creek Holdings, Ltd. (collectively, the "Borrowers") which entities filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") and are jointly being administered under Case No. 09-06240 (the "Cases") pending in the United States Bankruptcy Court for the Middle District of Tennessee (the "Bankruptcy Court"). |
| GUARANTORS: | Black Creek Holdings Ltd., Nukote Holdings, Inc. and all Domestic Subsidiaries of a Borrower (together with the Borrowers, collectively, the "Obligors"). |
| POST-PETITION LENDER: | The CIT Group/Business Credit, Inc. ("CIT" or "Post-Petition Lender"). |
| DIP CREDIT FACILITY: | A senior secured super-priority debtor-in-possession credit facility (the "DIP Facility") evidenced by a DIP Financing Agreement ("DIP Agreement") and consisting of a revolving credit facility of up to $26,000,000 (the "Credit Line"). All indebtedness incurred under the DIP Facility is hereinafter referred to as the "Post-Petition Indebtedness." |
| PRE-PETITION CREDIT FACILITY: | Obligors are presently indebted to CIT (in such capacity, the "Pre-Petition Lender") on account of the indebtedness and other obligations (collectively, the "Pre-Petition Debt") arising under that certain Amended and Restated Financing Agreement effective as of October 31, 2003, as amended modified, supplemented, restated, extended, renewed, increased and/or replaced from time |

to time, by and among the Obligors and CIT (as further amended, the "Pre-Petition Loan Agreement" and together with all other loan and security documents related to or executed in connection with the Pre-Petition Loan Agreement, being collectively the "Pre-Petition Credit Documents"). Pursuant to the Pre-Petition Credit Documents, the Pre-Petition Debt is secured by certain of Obligors' assets (collectively, the "Pre-Petition Collateral"). Pursuant to the DIP Agreement and DIP Order, all proceeds of the Pre-Petition Collateral and any Collateral arising on or after the filing date of the Cases, or not otherwise securing the Pre-Petition Debt, (collectively, the "Post-Petition Collateral") and all proceeds of Post-Petition Collateral shall be applied, *first*, to satisfy the Post-Petition Indebtedness and any other obligations then due under the DIP Agreement, and *second*, to satisfy any unpaid Pre-Petition Debt.

PURPOSE:

The DIP Facility would be used by Borrowers to (i) pay $22,000,000 of Pre-Petition Debt; (ii) pay related transaction costs, fees and expenses of the DIP Facility as set forth in this Term Sheet; (iii) finance ongoing working capital needs of Borrowers in connection with the Cases; and (iv) pay administrative costs associated with the Cases consistent with the Budget (as defined below). Subject to the terms and conditions set forth herein, it is the parties' expectation that the Borrowers shall have approximately $4,000,000 of Availability to fund items (ii), (iii) and (iv) above. For the avoidance of doubt, the Post-Petition Lender will not be obligated to fund any amounts under the DIP Facility unless and until the DIP Order permits the DIP Facility Amount to be used to repay $22,000,000 of Pre-Petition Debt (except on an emergency interim basis as described below).

LOAN AVAILABILITY:

The DIP Facility would be funded under revolving loans in accordance with a budget, and the aggregate of such loans would be limited to, on any date of determination thereof, an amount equal to Availability. "Availability" shall mean, as to the Obligors on an aggregate basis at any time of calculation, the amount by which: (a) the Borrowing Base exceeds (b) the outstanding aggregate amount of all of the Obligors' Obligations under the DIP Facility. "Borrowing Base" means, on any date of determination thereof, an amount equal to the lesser of: (i) $26,000,000 or (ii) the sum of (a) eighty-five percent (85%) of the aggregate outstanding Eligible Accounts Receivable including past due amounts, Office Depot (approximately $15 million) and accounts owed by foreign parties; plus (b) fifty percent (50%) of the aggregate value of the Eligible Inventory, valued at the lower of cost or market, on a first in, first out basis, wherever located including outside the United States plus (c) any existing Availability on the Petition Date under

the Pre-Petition Loan Agreement, <u>less</u> (d) any Availability Reserves. The Borrowing Base is subject to certain adjustments by Post-Petition Lender, based on review, evaluation and appraisal of the assets included in the Borrowing Base.

|  |  |
|---|---|
| **AVAILABILITY AND RELATED TERMS UNDER PRE-PETITION LOAN AGREEMENT:** | Except as otherwise set forth herein, to the extent applicable, the provisions of the definitive documentation for the DIP Facility shall be substantially as set forth in the Pre-Petition Loan Agreement; with such modifications thereto and additional terms and conditions as the Obligors and the Post-Petition Lender deem appropriate for a facility of this nature under current market conditions. |
| **SECURITY:** | All obligations of Obligors to Post-Petition Lender under the DIP Facility shall be: (a) entitled to superpriority administrative expense claim status pursuant to Section 364(c)(1) of the Bankruptcy Code superior to any and all administrative expenses of Obligors; (b) secured, pursuant to Section 364(d) of the Bankruptcy Code, by a first priority, security interest in and lien on all now owned or hereafter acquired assets and property of the estate (as defined in the Bankruptcy Code), real and personal, of Obligors, including inventory, accounts receivable, chattel paper, contract rights, documents, equipment, fixtures, deposit accounts, general intangibles (including, without limitation, all copyrights, licensing agreements, patents, trademarks, and trade names), instruments, real property, securities and other investment property, all cash collateral, and proceeds of all of the foregoing, wherever located, subject only to valid and unavoidable liens that are in existence on the Petition Date and that under applicable law are senior to, and have not been subordinated to, the liens and security interests of the Pre-Petition Lender (collectively, the "<u>Prior Liens</u>"); (c) secured, pursuant to Section 364(c)(2) of the Bankruptcy Code, by a perfected first priority lien on all unencumbered property of Obligors; and (d) further secured, pursuant to Section 364(c)(3) of the Bankruptcy Code, by a perfected second priority lien on all property of Obligors that is subject to Prior Liens in existence at the time of the commencement of the Cases or to Prior Liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code. The foregoing is collectively referred to as the "<u>Collateral</u>." Notwithstanding the foregoing, Post-Petition Lender's liens on |

Collateral shall be junior to any liens granted to Grupo American Industries, S.A. De C.V. in Obligor's interest in furniture, fixtures and equipment located in Mexico. For the avoidance of doubt, Post-Petition Lender shall have a first priority, security interest in and lien on all insurance proceeds relating to any theft of assets that occurred in Mexico.

The superpriority administrative expense claim and liens granted to Post-Petition Lender shall be subject to a carve-out for professional fees and U.S. Trustee fees in the amounts approved by the Post Petition Lender pursuant to the terms of the Budget and approved by Bankruptcy Court.

The Collateral shall include proceeds of avoidance actions under Chapter 5 of the Bankruptcy Code.

No advances under the DIP Facility and no Collateral proceeds may be used by any person or entity to initiate or prosecute any actions against any Pre-Petition Lender, Post-Petition Lender or any of its respective agents, officers or affiliates, including but not limited to, any avoidance actions, fraudulent transfer actions, or any actions that would impair, prejudice, offset or otherwise alter Post-Petition Lender's liens and claims against any Obligor.

| | |
|---|---|
| **CASH DOMINION:** | The Obligors shall reinstate the same cash management system used by the Obligors under the Pre-Petition Loan Agreement, in accordance with, among other things, Section 3.4 of the Pre-Petition Loan Agreement. The Obligors shall, among other things: (i) indicate on all of their invoices that funds should be delivered to and deposited in a Depository Account; (ii) direct all of their account debtors to deposit any and all proceeds of Collateral into the Depository Accounts; (iii) irrevocably authorize and direct any banks which maintain the Obligors' initial receipt of cash, checks and other items to promptly wire transfer all available funds to a Depository Account; (iv) advise all such banks of CIT's security interest in such funds; and (v) promptly cause to be deposited all proceeds of Collateral received by any of the Obligors, including all amounts payable to the Obligors from credit card issuers and credit card processors and remit all cash and other monies, as and when received, into the Depository Account. All amounts collected in the Depository Account will be automatically applied to the repayment *first*, to satisfy the Post-Petition Indebtedness and any other obligations then due under the DIP Agreement, and *second*, to satisfy any unpaid Pre-Petition Debt. |
| **MATURITY:** | The DIP Facility will have a term of the earliest to occur of (i) stated maturity which shall be December 31, 2009, (ii) the |

effective date of an approved Plan of Reorganization, (iii) the entry of an order pursuant to Section 363 of the Bankruptcy Code approving sale of substantially all of Obligors' assets or sale of a controlling interest in the Equity Interests of any Borrower or any Guarantor, (iv) conversion of the Cases to a Chapter 7 Proceeding or (v) any other termination of the DIP Agreement in accordance with the Final Order or the loan documents evidencing the DIP Facility. All obligations and liabilities of Obligors to Post-Petition Lender that remain outstanding or in existence on the last day of the term of the DIP Facility shall be due and payable on the last day of the term of the DIP Facility, but shall be treated in accordance with the plan treatment below.

PLAN TREATMENT:

Pre-Petition Lender and Post-Petition Lender agree to cooperate with Borrowers during the pendency of the Cases and to vote to accept any plan of reorganization proposed by Borrowers that complies with the terms outlined herein. Post-Petition Lender agrees not to sell the Pre-Petition Debt or otherwise transfer control of the Pre-Petition Debt to any other party.

Pre-Petition Lender and Post-Petition Lender agree that the treatment of the Pre-Petition Debt and Post-Petition Debt under any plan of reorganization proposed by Obligors will be to repay such amounts pursuant to the Exit Facility, as defined and according to the terms set forth on Schedule 2 hereto. The Exit Facility shall have similar terms as provided in the Pre-Petition Loan Agreement and as further described on Schedule 2.

INTEREST, FEES
AND EXPENSES:

See Schedule 1 attached hereto.

DIP ORDER:

Interim funding under the DIP Facility up to $11,250,000 (the "Interim DIP Facility Amount") will be subject to (and will not occur until) the entry of an order in form and substance satisfactory to the Post-Petition Lender entered after an interim hearing (the "Interim DIP Order"). The Interim Order shall include the same terms, conditions and protections as the Final Order but shall provide that the purpose of the Interim DIP Facility Amount shall be used by Borrowers to (i) pay $10,000,000 of Pre-Petition Debt; (ii) pay related transaction costs, fees and expenses of the DIP Facility; (iii) finance ongoing working capital needs of Borrowers in connection with the Cases; and (iv) pay administrative costs associated with the Cases consistent with the Budget. For the avoidance of doubt, the Post-Petition Lender will not be obligated to fund any amounts on an interim basis unless and until the Interim DIP Order permits the Interim DIP Facility Amount to be used to repay $10,000,000 of Pre-Petition Debt.

Final funding under the DIP Facility will be subject to (and will not occur until) the entry of an order in form and substance satisfactory to the Post-Petition Lender entered after a final hearing based on the standards prescribed in Bankruptcy Rule 4001(c) and other applicable law and that has not been reversed, modified, amended or stayed (the "Final DIP Order"), (a) approving all aspects of the DIP Facility including, without limitation, the repayment of the Pre-Petition Debt in the amount of $22,000,000, the administrative expense super-priority of and the existence and priority of all liens securing the DIP Loan Documents, and the rights, remedies and obligations thereunder and (b) providing for such other protections of the obligations of Obligors to Post-Petition Lender and the status of the lien priority thereof as Post-Petition Lender and its counsel deem necessary. (The Interim DIP Order and the Final DIP Order are collectively referred to as the DIP Order.)

The DIP Order shall provide for usual and customary protections for Post-Petition Lender, including, but not limited to, (a) a waiver of any and all claims and causes of action of Obligors against the Pre-Petition Lenders and Agents on account of the Pre-Petition Debt and Pre-Petition Credit Documents, including, but not limited to, any claims for preference, fraudulent conveyance or other claims arising under the Bankruptcy Code, and any and all claims regarding the validity, priority, perfection or avoidability of the secured claims of Pre-Petition Lenders or Agents, (b) an acknowledgment by Obligors and a finding by the Bankruptcy Court as to the amount of the Pre-Petition Debt and the validity of Pre-Petition Lender's liens on the Pre-Petition Collateral, (c) notice in the DIP Order of Obligors' intention to waive any right to assert a surcharge or other claim under Section 506(c) of the Bankruptcy Code against any of the Collateral, and waiver of such rights in the DIP Order, (d) a waiver of any right to assert or require marshaling of any Collateral, (e) a waiver of any right to assert the "equities of the case" exception in section 552 of the Bankruptcy Code and (f) preclusion of any post-petition financing on a priming basis or otherwise, other than the DIP Facility unless such post-petition financing first satisfies both the DIP Facility and any Pre-Petition Debt outstanding to Pre-Petition Lender, or Pre-Petition Lender consents to such financing.

Waivers provided in the DIP Order shall be binding on all creditors and parties-in-interest, unless such creditor or party-in-interest, including, without limitation, any committee appointed in this Case, (i) shall have commenced an adversary proceeding or contested matter against the Pre-Petition Lender for the purpose of challenging the validity, extent, priority, perfection, and

enforceability of the Pre-Petition Debt or Pre-Petition Lender's claims, mortgages, and security interests in the Pre-Petition Collateral or otherwise asserting any claims or causes of action against Pre-Petition Lender on behalf of any Borrower's or any Guarantor's estate, no later than forty-five (45) days after the entry of an order approving the DIP Facility and (ii) the Bankruptcy Court rules in favor of the plaintiff or movant in any such timely filed adversary proceeding or contested matter. Any person or entity, including without limitation any committee, that fails to commence such an adversary proceeding or contested matter within such periods shall be barred from doing so.

TERMS AND
CONDITIONS:

The financing agreements will contain representations and warranties, covenants, events of default, and other provisions mutually agreeable to Post-Petition Lender and Obligors, including, but not limited to, such applicable representations and warranties, covenants, events of default, and other provisions of the Pre-Petition Loan Agreement, or as agreed to by Post-Petition Lender and additionally the following:

1.    All advances under the DIP Facility shall be subject to a detailed rolling 13-week cash flow budget (initially and all updates satisfactory to Post-Petition Lender in all respects) on a consolidated basis that includes, among other things, specific line items (which shall include, but not be limited to, professional expenses) for each category of expenses and income as are requested by Post-Petition Lender (the "Budget"). Obligors will be obligated to comply with the Budget. Moreover, Obligors will be permitted to make disbursements only in accordance with the Budget. This provision shall not apply after the 26th week of the closing of the Exit Facility.

2.    For each week, (i) the aggregate actual disbursements by the Obligors measured on a rolling 2-week basis must be no greater than 110% of the aggregate amount of projected disbursements for such 2-week period as set forth in the Budget, and (ii) the aggregate actual cash receipts collected by the Obligors measured on a rolling 2-week basis shall not be less than 90% of the aggregate amount of projected cash receipts for such period as set forth in the Budget. This provision shall not apply after the 26th week of the closing of the Exit Facility, but the Borrower will be required to deliver in form and substance satisfactory to CIT: (a) financial statements within 30 days of the end of the second fiscal quarter, reviewed by an independent accounting firm

reasonably acceptable to CIT, and (b) financial statements within 90 days of the end of each fiscal year, certified by an independent accounting firm reasonably acceptable to CIT. Financial statements for the year ending December 31, 2009 shall only require a limited audit.

3. Financial covenants acceptable to Obligors and the Post-Petition Lender.

4. Obligors' agreement to provide Post-Petition Lender periodic financial and collateral reporting, including annual audited financial statements, monthly and quarterly internally prepared financial statements, annual financial projections, and periodic borrowing base certificates, appraisals, receivables agings, and other information reasonably requested from time to time by Post-Petition Lender, in each case satisfactory to Post-Petition Lender.

5. Obligors shall each allow Post-Petition Lender and its agents and advisors (including without limitation Focus Management Group) access to its premises, officers, representatives, and books and records, and allow Post-Petition Lender and its agents and advisors (including without limitation Focus Management Group) to conduct examinations of and to monitor the Collateral held by Post-Petition Lender, all during regular business hours.

6. Obligors' agreement to maintain insurance with insurance carriers (acceptable to Post-Petition Lender) against such risks and in such amounts as is customary for similar businesses, naming Post-Petition Lender as mortgagee/loss payee and an additional insured.

7. Restrictions on, among other things, management fees, distributions and dividends, acquisitions and investments, indebtedness, liens, affiliate transactions, and capital expenditures.

8. Full cash dominion in favor of Post-Petition Lender over the proceeds of all Collateral, including lockbox accounts acceptable to Post-Petition Lender providing for full cash dominion and daily cash sweeps into a collection account controlled by Post-Petition Lender.

9. The Debtors' will continue to hold those certain Warrants issued by Oxygen Line subject to the liens of Post-Petition Lender.

10. Negative covenants with respect to the Debtors' ability to make payments to or on behalf of Oxygen Line and Bond Street entities.

11. Provisions as to application of proceeds of sales of assets of Obligors in the Cases acceptable to Post-Petition Lender (such as provisions satisfactory to Post-Petition Lender as to reductions and permanent reductions in Credit Line and Borrowing Base).

12. No Obligor may propose any plan of reorganization that does not provide for the payment in full of the Post-Petition Indebtedness and the Pre-Petition Indebtedness (together with all accrued and unpaid interest), without Post-Petition Lender's express prior written consent thereto.

13. The DIP Facility shall include usual and customary events of default, including (i) the failure to pay interest, principal, or fees when due (with grace period to be negotiated on interest and fees) (including, without limitation, failure to reduce borrowings to within availability); (ii) any representation or warranty found to be materially incorrect when made; breach of any affirmative, negative or financial covenant (subject to grace periods to be negotiated); (iii) any post-petition judgment in excess of an amount to be agreed or which would operate to divest the Obligors of any material assets; (iv) the Obligors being enjoined from conducting any material portion of their businesses; disruption of material business operations of the Obligors; (v) material damage to or loss of material assets; conversion of the Cases to a case under Chapter 7 of the Bankruptcy Code; (vi) the dismissal of the Cases; the appointment of a Chapter 11 trustee or an examiner with expanded powers; (vii) the grant of any super priority administrative expense claim or any lien that is *pari passu* with or senior to those of the Post-Petition Lender; any payment of pre-petition debt (other than (a) as already approved by the Bankruptcy Court or (b) as may be reasonably acceptable to the Post-Petition Lender and approved by the Court); (viii) the Bankruptcy Court's entry of an order granting relief from the automatic stay to permit foreclosure of security interests in assets of the Obligors of a value in excess of an amount to be agreed; (ix) an order terminating exclusivity having been entered (or requested, unless contested by the Borrowers); (x) any reversal, revocation or modification without the consent of the Post-Petition Lender of such order or any other order of the Bankruptcy Court with respect to the Case and affecting the

DIP Facility; (xi) the filing or confirmation of a plan of reorganization by the Debtors that is not consistent with the Exit Term Sheet; (xii) failure of the Obligors to timely provide a Budget (updated as provided herein) that is reasonably acceptable to the Post-Petition Lender; and (xiii) any challenge by any Obligor or successful challenge by a party other than any Obligor, to the extent, validity, priority, or unavoidability of Pre-Petition Lender's liens securing the Pre-Petition Collateral.

14. Obligors shall (a) file their disclosure statements and plan of reorganization with the Bankruptcy Court no later than September 30, 2009, and (b) obtain confirmation of their plan of reorganization no later than December 31, 2009.

15. Mandatory repayment of 70% of the net cash proceeds from any settlement, recovery or amount paid to Borrowers relating to the claims Borrowers have against Office Depot.

CONDITIONS
PRECEDENT:

The extension of the aforementioned financing arrangement is subject to the fulfillment of a number of conditions to Post-Petition Lender's satisfaction, including, but not limited to, the following:

1. The execution and delivery, in form and substance acceptable to Post-Petition Lender and its counsel, of Post-Petition Lender's customary agreements, documents, instruments, financing statements, intercreditor agreements, subordination agreements, opinions of counsel, landlord waivers, consents, evidences of corporate authority, and such other writings to confirm and effectuate the DIP Facility as may be required by Post-Petition Lender's or by its counsel.

2. Implementation of the cash management system described above to the satisfaction of CIT.

3. Other than the filing of the Cases and any litigation commenced in connection therewith against Office Depot, no material adverse change in Obligors' (whether on a per entity or person basis or on an aggregate basis) assets, liabilities, business, financial condition, business prospects, or results of operations since the Petition Date.

4. Other than the filing of the Cases and any litigation commenced in connection therewith against Office Depot, as to Obligors, there shall exist no action, suit, investigation, litigation, or proceeding pending or threatened in any court

or before any arbitrator or governmental instrumentality that is not subject to the automatic stay and in Post-Petition Lender's judgment (a) could be expected to have a material adverse effect on Obligors' (whether on a per entity or person basis or on an aggregate basis) assets, liabilities, business, financial condition, business prospects, or results of operations or which could impair Obligors' ability to perform satisfactorily under the DIP Facility, or (b) could be expected to materially and adversely affect the DIP Facility or the transactions contemplated thereby.

5.     Post-Petition Lender shall have received, each in form and substance satisfactory to Post-Petition Lender, (a) updated financial projections of Obligors evidencing Obligors' ability to comply with the financial covenants set forth in the DIP Agreement, (b) interim financial statements for Obligors as of a date not more than thirty (30) days prior to the closing date, and (c) a Budget.

6.     Post-Petition Lender shall have received certificates of insurance with respect to Obligors' property and liability insurance, together with a loss payable endorsement naming Post-Petition Lender as mortgagee/loss payee, all in form and substance satisfactory to Post-Petition Lender.

7.     Post-Petition Lender's receipt of such third party documents and consents as Post-Petition Lender may require, all in form and substance acceptable to Post-Petition Lender.

8.     Post-Petition Lender's receipt of original copies of an amended and restated (i) Oxygen Line Warrant and (ii) Promissory Note from Oxygenline reaffirming its obligations to repay loans and advances made by Nukote directly to or on behalf of Oxygenline and amending the note to reflect actual accumulated loans and advances made to date in an amount to be determined by Post-Petition Lender and Borrowers (accompanied by allonges and other instruments of transfer executed in blank), each in form and substance satisfactory to Post-Petition Lender.

9.     The Bankruptcy Court shall have entered DIP Order authorizing the financing of Obligors as set forth in this Term Sheet. In addition to the contents of the DIP Order set for the above, the DIP Order shall provide for, among other things:

(a) Approving all the terms and conditions of this Term Sheet and any loan, security and other financing agreement relating hereto, including, without limitation, the DIP Agreement;

(b) Authorizing and directing Obligors to grant the liens, security interests and/or mortgages or deeds of trust in favor of Post-Petition Lender as provided in this Term Sheet;

(c) That Post-Petition Lender may notify Obligors' account debtors of Post-Petition Lender's security in Obligors' accounts, at any time and without the order of the Bankruptcy Court, and direct such account debtors to pay its accounts directly to Post-Petition Lender;

(d) A finding by the Bankruptcy Court that Post-Petition Lender's financing of Obligors is extended in good faith;

(e) That all the terms and conditions in said order may not be modified without Post-Petition Lender's consent;

(f) That upon the occurrence and during the continuance of a default after three (3) business days notice and opportunity to cure, (i) Post-Petition Lender shall be fully authorized, in its sole discretion, to terminate the DIP Agreement and/or demand payment of the Post-Petition Debt then outstanding, and (ii) take any action necessary to preserve and protect the Collateral;

(g) That (i) within three (3) business days from the date of a notice of default, the automatic stay under Section 362 of the Bankruptcy Code will be automatically lifted without further order of the Bankruptcy Court to allow Post-Petition Lender to take any and all actions, as if no case were pending under the Bankruptcy Code, and (ii) any further order of the Bankruptcy Court which authorizes (x) the use of cash collateral, including accounts receivable, inventory and proceeds thereof, of Obligors in which Post-Petition Lender has an interest, or (y) under Section 362 of the Bankruptcy Code, the obtaining of credit or the incurring of indebtedness secured by a lien or security interest which is equal or senior to a lien or security interest held by Post-Petition Lender or which is entitled to

priority administrative status which is equal or superior to that granted to Post-Petition Lender shall be prohibited unless within such three day period of time the Bankruptcy Court determines that no default occurred and is continuing;

(h)    That no order of the Bankruptcy Court shall be entered at the request of Obligors or with the support of Obligors which authorizes the obtaining of credit or the incurring of indebtedness secured by a lien or security interest which is equal or senior to a lien or security interest held by Post-Petition Lender or which is entitled to priority administrative status which is equal or superior to that granted to Post-Petition Lender; and

(i)    Authorizing all other terms and conditions as may be required by Post-Petition Lender (including, without limitation, all rights and remedies to Post-Petition Lender if Obligors do not exit from the Cases on terms and conditions satisfactory to Post-Petition Lender).

OTHER:    This term sheet is intended as an outline only of certain of the material terms of the DIP Facility and does not purport to summarize all of the conditions, covenants, representations, warranties and other provisions which will be contained in definitive legal documentation for the DIP Facility.

## SCHEDULE 1
## INTEREST, FEES AND EXPENSES

INTEREST RATES:  The DIP Facility will bear interest at the Prime rate plus 600 basis points and will be payable monthly. "Prime" shall mean the rate of interest per annum equal to the greater of (a) three percent (3.00%) or (b) the rate of interest announced by JPMorgan Chase Bank from time to time as its prime rate in effect at its principal office in New York City. All interest would be calculated on the basis of actual number of days elapsed in a year of 360 days.

UP FRONT FEE:  $150,000, fully earned upon the entry of the Interim Order and payable upon the entry of the Final Order.

EXIT FEE:  $150,000, fully earned upon the entry of the Interim Order and due and payable upon confirmation by the Bankruptcy Court of the Borrowers' plan of reorganization or upon an Event of Default under the DIP Facility.

OTHER FEES:  Obligors must pay for the benefit of the Post-Petition Lender each month, a collateral management fee (the "Collateral Management Fee") equal to $50,000 per year. The Collateral Management Fee shall be non-refundable and fully-earned on the Closing Date and then annually commencing on the first anniversary of the Closing Date, and each year thereafter and payable in equal monthly installments.

EXPENSES:  Obligors must pay (a) all reasonable out-of-pocket costs and expenses (including legal fees of Post-Petition Lender's counsel) incurred by the Post-Petition Lender in connection with the Obligors' Bankruptcy Cases and the DIP Facility, including costs and expenses of (i) Post-Petition Lender's due diligence, including field examinations, appraisals and environmental audits, and (ii) preparing, administering, syndicating and monitoring, and enforcing all documents executed in connection with the DIP Facility and (b) a $1,000 per day per field examiner charge, in addition to all out-of-pocket expenses for field examinations. All such expenses shall be fully earned upon the entry of the Interim Order and due and payable upon the entry of the Final Order.

SCHEDULE 2

## EXIT TERM SHEET

## SUMMARY OF PROPOSED TERMS AND CONDITIONS AS TO SENIOR SECURED EXIT CREDIT FACILITY

**This Term Sheet is not a commitment, obligation or understanding on the part of any present or potential future lender to provide financing to or for the benefit of Borrowers or any other person or entity. Any commitment, obligation or understanding to provide financing shall only arise pursuant to definitive documentation that is hereafter negotiated, executed and delivered by all parties thereto and with respect to which all conditions precedent are satisfied or waived in writing and CIT has received internal credit approval for. The definitive documentation will be consistent with the terms described herein.**

Capitalized terms used herein are defined in the Pre-Petition Loan Agreement (as defined below), unless otherwise stated.

| | |
|---|---|
| BORROWERS: | Nukote International, Inc., Nukote Imperial, Inc., International Communication Materials, Inc., Envirosmart, Inc. and Black Creek Holdings, Ltd. (collectively, the "Borrowers"). |
| GUARANTORS: | Black Creek Holdings Ltd., Nukote Holdings, Inc. and all Domestic Subsidiaries of a Borrower (together with the Borrowers, collectively, the "Obligors"). |
| LENDER: | The CIT Group/Business Credit, Inc. ("CIT" or "Exit Lender"). |
| CREDIT FACILITY: | A senior secured super-priority credit facility (the "Exit Facility") evidenced by a Financing Agreement (the "Exit Agreement") and consisting of (i) a revolving credit facility of up to $10,000,000 (the "Credit Line"); (ii) a Term Loan in the original principal amount as calculated below (estimated to equal approximately $25,000,000) (the "Term Loan"), which consist of two tranches of equal amounts, Tranche A and Tranche B. The original principal amount of Term Loan will be (A) the sum of (i) Post-Petition Indebtedness, and (ii) any amount of Pre-Petition Debt not included in the calculation of Post-Petition Indebtedness, *minus* (B) the sum of (i) any cash on hand, and (ii) the contractual amount of Availability on the closing date of the Exit Facility. |
| PURPOSE: | The Exit Facility would be used by Borrowers to (i) pay Pre-Petition and Post-Petition Indebtedness; (ii) pay related transaction costs, fees and expenses of the Exit Facility; and (iii) finance ongoing working capital needs of Borrowers. |

| | |
|---|---|
| LOAN AVAILABILITY: | The Exit Facility will be funded under revolving loans and the aggregate of such loans will be limited to, on any date of determination thereof, an amount equal to Availability. "Availability" shall mean, as to the Obligors on an aggregate basis at any time of calculation, the amount by which: (a) the Borrowing Base exceeds (b) the outstanding aggregate amount of all of the Obligors' Obligations under the Exit Facility. "Borrowing Base" means, on any date of determination thereof, an amount equal to the lesser of: (i) $10,000,000 ("$10MM Cap") or (ii) the sum of (a) eighty-five percent (85%) of the aggregate outstanding Eligible Accounts Receivable but excluding past due amounts, Office Depot account and accounts owed by foreign parties; plus (b) fifty percent (50%) of the aggregate value of the Eligible Inventory, valued at the lower of cost or market, on a first in, first out basis, wherever located inside the United States, less (c) any Availability Reserves. The Borrowing Base is subject to certain adjustments by Exit Lender, based on review, evaluation and appraisal of the assets included in the Borrowing Base. |
| AVAILABILITY AND RELATED TERMS UNDER PRE-PETITION LOAN AGREEMENT: | Except as otherwise set forth herein, to the extent applicable, the provisions of the definitive documentation for the Exit Facility shall be substantially as set forth in the Pre-Petition Loan Agreement; with such modifications thereto and additional terms and conditions as the Obligors and the Exit Lender deem appropriate for a facility of this nature under current market conditions. |
| SECURITY: | All obligations of Obligors to Exit Lender under the Exit Facility shall be secured by a first priority, security interest in and lien on all now owned or hereafter acquired assets and property of the estate (as defined in the Bankruptcy Code), real and personal, of Obligors, including inventory, accounts receivable, chattel paper, contract rights, documents, equipment, fixtures, deposit accounts, general intangibles (including, without limitation, all copyrights, licensing agreements, patents, trademarks, and trade names), instruments, real property, securities and other investment property, all cash collateral, and proceeds of all of the foregoing, wherever located, subject only to valid and unavoidable liens that are in existence on the Closing Date and that under applicable law are senior to, and have not been subordinated to, the liens and security interests of the Exit Lender (collectively, the "Prior Liens"). The foregoing is collectively referred to as the "Collateral." Notwithstanding the foregoing, Exit Lender's liens on |

Collateral shall be junior to any liens granted to Grupo American Industries, S.A. De C.V. in Obligor's interest in furniture, fixtures and equipment located in Mexico. For the avoidence of doubt, Exit Lender shall have a first priority, security interest in and lien on all insurance proceeds relating to any theft of assets that occurred in Mexico.

CASH DOMINION: The Obligors shall reinstate the same cash management system used by the Obligors under the Pre-Petition Loan Agreement, in accordance with, among other things, Section 3.4 of the Pre-Petition Loan Agreement.

MATURITY: The Exit Facility will have a term of five (5) years from the effective date of the Exit Facility (the "Maturity Date"). All obligations and liabilities of Obligors to Exit Lender that remain outstanding or in existence on the Maturity Date shall be due and payable on the Maturity Date.

AMORTIZATION 100% of the outstanding loans under the Credit Line will be due and payable in full on the Maturity Date.

Outstandings under the Term Loan will amortize quarterly and payments will be due and payable on the forty-fifth (45th) day following the end of each fiscal quarter beginning with June 30, 2010 and continuing on the forty-fifth (45th) day following the end of each fiscal quarter thereafter with the aggregate unpaid balance due on the Maturity Date (the "Quarterly Payments"). The amount of each Quarterly Payment will be equal to the greater of (i) $100,000 or (ii) 50% of EBITDA for such fiscal quarter, *minus*, interest paid in cash during such fiscal quarter with respect to the Credit Line and the Term Loan.

Application of the proceeds from the Quarterly Payments and any mandatory repayment will be allocated, first, to reduce the unpaid and accrued interest of Term Loan *Tranche B* (including any amount of interest paid in kind and added to the principal amount of the Term Loan), second, to permanently reduce the principal of Term Loan *Tranche B*, and, after the Term Loan *Tranche B* has been reduced to $0, third, to reduce the unpaid and accrued interest of Term Loan *Tranche A*, fourth, to permanently reduce the principal of Term Loan *Tranche A*, and, after the Term Loan *Tranche A* has been reduced to $0, fifth, to permanently reduce the Credit Line. All such repayments of principal of Term Loan shall be applied to reduce the then remaining scheduled amortization payments of the Term Loan in reverse order of maturity (based upon the then remaining amounts of such payments).

The Exit Lender agrees that failure to make the Quarterly Payment as and when due will not constitute an Event of Default so long as (i) no other default or Event of Default has occurred and is continuing and (ii) the Borrowers are unable to make such Quarterly Payment because of a lack of Availability as a result of (and only because of) the $10MM Cap, both ten days prior to and ten days after the date such payment is due and owing ("Suppressed Availability Payment Event"). Upon a Suppressed Availability Payment Event, the Borrowers and Exit Lender will engage in good faith negotiations to address such payment and availability issues. A Suppressed Availability Payment Event will constitute an Event of Default (A) upon the occurrence of an Event of Default (other than the Suppressed Availability Payment Event), or (B) on the thirtieth (30th) day following the date such Quarterly Payment was otherwise due and payable.

INTEREST, FEES
AND EXPENSES:  Interest:  *Credit Line*:  Prime plus 500 basis points, payable monthly.

*Term Loan Tranche A*:  Prime plus 500 basis points, payable monthly.

*Term Loan Tranche B*:  Prime plus 500 basis points for the first 3 years and Prime plus 700 basis points for the next two years, paid in kind and not in cash, and shall have the effect of increasing the principal amount of Term Loan B on a monthly basis by the amount of interest paid in kind.

*Prime* shall mean the rate of interest per annum equal to the greater of (a) three percent (3.00%) or (b) the rate of interest announced by JPMorgan Chase Bank from time to time as its prime rate in effect at its principal office in New York City.

Other Fees:  Obligors must pay for the benefit of the Exit Lender each month, a collateral management fee (the "Collateral Management Fee") equal to $50,000 per year. The Collateral Management Fee shall be non-refundable and fully-earned on the Closing Date and then annually commencing on the first anniversary of the Closing Date, and each year thereafter and payable in equal monthly installments.

Expenses:  Obligors must pay (a) all out-of-pocket costs and expenses (including legal fees of Exit Lender's counsel) incurred by the Exit Lender in connection with the Exit Facility, including

costs and expenses of (i) Exit Lender's due diligence, including field examinations, appraisals and environmental audits, and (ii) preparing, administering, syndicating and monitoring, and enforcing all documents executed in connection with the Exit Facility and (b) a $1,000 per day per field examiner charge, in addition to all out-of-pocket expenses for field examinations.

TERMS AND CONDITIONS:

The financing agreements will contain representations and warranties, covenants, events of default, and other provisions acceptable to Exit Lender, including, but not limited to, such applicable representations and warranties, covenants, events of default, and other provisions of the Pre-Petition Loan Agreement and all applicable provisions of the DIP Facility (including the Terms and Conditions in the DIP Term Sheet set forth above), or as agreed to by Exit Lender, and additionally the following:

10. *Mandatory Prepayments*: Subject to exceptions to be further negotiated, the following mandatory prepayments of the Exit Facility shall be required:

i.        75% of Excess Cash Flow. Excess Cash Flow shall be (A) calculated on a quarterly basis and Borrowers shall make an Excess Cash Flow payment on or before the forty-fifth (45th) day after the end of each fiscal quarter ("Quarterly Excess Cash Flow Payment") and (B) calculated on an annual basis (the "Annual Excess Cash Flow Amount") and Borrowers shall make an Excess Cash Flow payment on or before the nintieth (90th) day after the end of each fiscal year in an amount equal to the difference between (X) Annual Excess Cash Flow Amount and (Y) the aggregate amount of Quarely Excess Cash Flow Payments paid during such fiscal year pursuant. The definition of "Excess Cash Flow" will mean with respect to any period of determination, without duplication, an amount equal to EBITDA for such period (a) minus the sum of (i) all applicable taxes paid in such period, (ii) permitted capital expenditures made during such period of an amount not greater than $300,000 annually, and (iii) debt service paid in cash during such period, and (b) plus or minus (as applicable) changes in any working capital. The definition of Excess Cash Flow is subject to change and will be the definition contained in definitive legal documentation.

ii.        70% of the net cash proceeds from any settlement, recovery or amount paid to Borrowers relating to the claims Borrowers have against Office Depot.

Application of the proceeds from mandatory prepayments will be applied in the same manner as the Term Payments.

11. Financial covenants acceptable to Obligors and the Exit Lender.

CONDITIONS
PRECEDENT:

The extension of the aforementioned financing arrangement is subject to the fulfillment of a number of conditions to Exit Lender's satisfaction, including, but not limited to, the following:

1. The execution and delivery, in form and substance acceptable to Exit Lender's and its counsel, of Exit Lender's customary agreements, documents, instruments, financing statements, intercreditor agreements, subordination agreements, opinions of counsel, landlord waivers, consents, evidences of corporate authority, and such other writings to confirm and effectuate the Exit Facility as may be required by Exit Lender's or by its counsel.

2. Implementation of the cash management system satisfactory to the Exit Lender.

3. Other than the filing of the Cases and any litigation commenced in connection therewith against Office Depot, no material adverse change in Obligors' (whether on a per entity or person basis or on an aggregate basis) assets, liabilities, business, financial condition, business prospects, or results of operations since the Petition Date.

4. Other than the filing of the Cases and any litigation commenced in connection therewith against Office Depot, as to Obligors, there shall exist no action, suit, investigation, litigation, or proceeding pending or threatened in any court or before any arbitrator or governmental instrumentality that is not subject to the automatic stay and in Exit Lender's judgment (a) could be expected to have a material adverse effect on Obligors' (whether on a per entity or person basis or on an aggregate basis) assets, liabilities, business, financial condition, business prospects, or results of operations or which could impair Obligors' ability to perform satisfactorily under the Exit Facility, or (b) could be expected to materially and adversely affect the Exit Facility or the transactions contemplated thereby.

5.      Exit Lender shall have received, each in form and substance satisfactory to Exit Lender, (a) updated financial projections of Obligors evidencing Obligors' ability to comply with the financial covenants set forth in the Exit Agreement, (b) interim financial statements for Obligors as of a date not more than thirty (30) days prior to the closing date, and (c) a 5-year Budget.

6.      Exit Lender shall have received certificates of insurance with respect to Obligors' property and liability insurance, together with a loss payable endorsement naming Exit Lender as mortgagee/loss payee, all in form and substance satisfactory to Exit Lender.

7.      Exit Lender's satisfactory due diligence of the assets and Collateral of the Obligors.

8.      Exit Lender's receipt of such third party documents and consents as Exit Lender may require, all in form and substance acceptable to Exit Lender.

9.      [Intentionally deleted]

10.    Final Credit Approval by CIT which shall be obtained prior to the entry of the Final DIP Order.

OTHER:      This term sheet is intended as an outline only of certain of the material terms of the Exit Facility and does not purport to summarize all of the conditions, covenants, representations, warranties and other provisions which will be contained in definitive legal documentation for the Exit Facility.

**Exhibit B to Final Order**

- 29 -

**Nukote Cash Forecast**

# EXHIBIT B

Row labels (left column):

- Cash Receipts - Existing Business
- Cash Receipts - New Business
- Total Cash Receipts

Disbursements
- Fixed Payments
- Variable Plant Costs - Monterrey
- Material Expenses - Prepayment
- Freight Expenses
- Total Expenses

- JLM — Bardstown
- JLM — Forbes - Dallas
- JLM — Industrial - Rochester
- AGFA - Franklin
- Total

- Rent
- Nibbler
- ICR
- Bar - Down
- Total Utilities

Insurance/Benefits
- AD&D
- AD&D
- AD&D Life & Casualty
- Total

Bank Agent
- Blue Cross Blue Shield of Tennessee
- Total Crop
- Tax Insurance

The Hartford
- Medical Union
- UBP

Benefits
- Risk
- Total Benefits
- Garnishments

Total Payroll/Benefits

Total Cash Flow

Reorganization Expenses
- Professional Fees
- US Trustee Fees
- Director Fees
- Other committee fees
- Other Recrg Fees
- Total Reorganization expenses

- DIP Expenses
- Total Organization expenses

Net Daily Cash Flow (after Recrg and Financing e)
- Ending Cash

Revolver/Balance
- Term Fees
- DIP Facility
- DIP Facility
- Total Expenses - DIP Facility
- Ending Balance on DIP Facility

Net Daily Cash Flow from Financing
- Ending Cash

Revol/Balance
- Draws
- Adjustment
- Ending Balance on DIP Revolver

DIP Balance on Revolver

Interest Expense
- Monthly Interest Expense

Case 09-bk-06240    Doc 378    Filed 09/24/09    Entered 09/24/09 17:36:14    Desc Main
Document      Page 51 of 52

# Nukote Cash Flow Forecast

| | Week 44 | 45 | 46 | 47 | 48 | 49 | 50 | 51 | 52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | 11/6/2009 | 11/13/2009 | 11/20/2009 | 11/27/2009 | 12/4/2009 | 12/11/2009 | 12/18/2009 | 12/25/2009 | 1/1/2010 | |
| | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 5 | |
| Cash Receipts - Existing Business | 1,027,376 | 1,182,317 | 1,227,690 | 1,300,928 | 922,097 | 1,063,890 | 1,092,840 | 1,165,248 | 1,135,295 | 30,541,695 |
| Cash Receipts - New Business | 90,011 | 103,093 | 107,561 | 113,977 | 110,764 | 127,774 | 131,276 | 139,974 | 136,376 | 1,061,316 |
| **Total Cash Receipts** | 1,117,387 | 1,286,121 | 1,335,250 | 1,414,903 | 1,032,861 | 1,191,464 | 1,224,115 | 1,305,222 | 1,271,671 | 31,603,011 |
| Payroll | 64,483 | 300,000 | 64,483 | 300,000 | 64,483 | 300,000 | 64,483 | 300,000 | 64,483 | 5,613,488 |
| Plant Costs - Monterrey | 322,054 | 272,242 | 317,742 | 188,451 | 283,883 | 233,451 | 608,399 | 189,451 | 208,199 | 5,046,603 |
| Materials Expenses - Prepayment | 316,504 | 326,243 | 335,981 | 345,720 | 577,211 | 593,225 | 608,399 | 624,653 | 615,597 | 13,501,320 |
| (2.50%) Payroll | 42,927 | 42,927 | 42,927 | 42,927 | 24,346 | 24,346 | 24,346 | 24,346 | 24,346 | 728,628 |
| (4.00%) Payroll Benefits | 68,684 | 68,684 | 68,684 | 68,684 | 38,954 | 38,954 | 38,954 | 38,954 | 38,954 | 1,274,791 |
| Rent Expenses | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 2,037,762 |
| Janitor - Bardstown | | | | | 4,056 | | | | 4,056 | 28,394 |
| Murray Forbes - Dallas | 21,500 | | | | 21,500 | | | | 21,500 | 149,032 |
| Sidney Industrial - Rochester | 20,000 | 2,500 | 2,500 | 2,500 | 20,000 | | | | 20,000 | 150,253 |
| ABC - Franklin | 25,000 | | | | 20,000 | | | | 20,000 | 140,000 |
| Utilities | 70,558 | 2,500 | 2,500 | 2,500 | 65,556 | | 25,000 | 25,000 | 65,556 | 512,079 |
| Roster | 15,000 | | | | 15,000 | 7,500 | | | 15,000 | 123,181 |
| Bentley | 15,000 | | | | 15,000 | | | | 15,000 | 103,356 |
| ZBR | 60,000 | | | 25,000 | 60,000 | 1,000 | 25,000 | | 60,000 | 415,874 |
| ZBR Down | 1,000 | | | | | | | | 1,000 | 7,713 |
| Total Utilities | 91,000 | | | | 91,000 | 7,500 | | | 91,000 | 650,123 |
| ADP | | 7,500 | | | | 7,500 | | | | 57,374 |
| AT&T | | 1,000 | | | | 1,000 | | | | 7,596 |
| AFLAC Life & Casualty | | 1,000 | | | | 1,000 | | | | 9,371 |
| AFLAC | | 5,000 | | | | 5,000 | | | 3,844 | 61,990 |
| Blue Cross Blue Shield of Tennessee | 25,000 | 25,000 | 25,000 | | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 792,490 |
| Ameritech Corp | | 55,000 | | | | 55,000 | | | | 300,000 |
| The Hartford | | | | | | | | | | 113,017 |
| Unum Life Insurance | | | | | | | | | | 33,000 |
| Emp Scripts | | | | | | | | | | 858 |
| Metlife | | | | | | | | | | 27,125 |
| Mutual of Risk | | 10,000 | | | | 10,000 | | | | 91,232 |
| Credit Union | | 10,000 | | | | 10,000 | | | | 51,934 |
| Insurance/Benefits | 28,844 | 16,000 | | 25,000 | 28,844 | 15,000 | 25,000 | 25,000 | 28,844 | 138,950 |
| Commitments | 1,080,652 | 1,228,065 | 932,317 | 1,048,282 | 1,468,258 | 1,495,277 | 1,100,573 | 1,276,465 | 1,211,950 | 24,039,815 |
| Weekly Net Cash Flow | 36,735 | 58,025 | 402,934 | 366,621 | (218,407) | (213,813) | 123,542 | 28,817 | 59,721 | (2,437,804) |
| Reorganization Expenses | | | | | | | | | | |
| Fees | 5,000 | 50,000 | 50,000 | 50,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 | 650,000 |
| Fees | | 15,000 | 15,000 | | | | | | 15,000 | 61,025 |
| Banker Fees | 2,500 | 2,500 | 10,000 | | | | | | 15,000 | 70,000 |
| Consulting Fees | | | 35,000 | | | | | | 35,000 | 140,000 |
| Other committee fees | | | 5,000 | 50,000 | | | | | 5,000 | 20,000 |
| Other Reorg Fees | 7,500 | 52,500 | 115,000 | | 5,000 | 5,000 | 5,000 | 5,000 | 130,000 | 941,625 |
| Total Reorganization expenses | | | | | | | | | | |
| | | | | | 183,350 | | | | | 425,180 |
| DIP Interest Expenses | | 160,726 | | | | 183,350 | | | | 150,000 |
| DIP Facility | | | | | | | | | | 575,180 |
| Insurance Expenses | | 160,726 | | | | 183,350 | | | | |
| **Ending Cash** | | | | | | | | | | (3,944,610) |

DIP Revolver Draw (Repaid)

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Starting Balance | 25,831,709 | 25,802,473 | 25,977,675 | 25,689,741 | 25,373,120 | 25,594,527 | 25,996,690 | 25,878,148 | 25,854,331 | |
| Draw | 1,098,152 | 1,461,322 | 1,047,317 | 1,098,282 | 1,254,258 | 1,593,627 | 1,105,573 | 1,281,465 | 1,381,950 | |
| Payment | (1,117,387) | (1,286,121) | (1,335,250) | (1,414,903) | (1,032,851) | (1,191,464) | (1,224,115) | (1,305,222) | (1,271,671) | |
| Ending Balance on Revolver | 25,802,473 | 25,977,675 | 25,689,741 | 25,373,120 | 25,594,527 | 25,996,690 | 25,878,148 | 25,854,331 | 25,944,610 | |
| DIP Revolver Facility | 3,802,473 | 3,977,675 | 3,689,741 | 3,373,120 | 3,594,527 | 3,996,690 | 3,878,148 | 3,854,331 | 3,944,610 | |
| (9.25%) Interest Expense | 45,505 | 46,054 | 45,416 | 45,332 | 45,886 | 46,139 | 46,139 | 46,012 | 46,071 | |
| Monthly Interest Expense | 180,726 | | | | 183,350 | | | | | |

This Document has been electronically signed by the Judge. The Judge's signature and Court seal appear at the top of the first page. Balance on the Bankruptcy Court.