# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **NUKOTE INTERNATIONAL, INC.** | § | |
| | § | |
| **NUKOTE IMPERIAL, LTD.** | § | **JOINTLY ADMINISTERED** |
| | § | **UNDER CASE NO. 09-06240** |
| **INTERNATIONAL COMMUNICATION** | § | |
| **MATERIALS, INC.** | § | **CHAPTER 11** |
| | § | |
| **ENVIROSMART, INC.** | § | **Judge Keith M. Lundin** |
| | § | |
| **BLACK CREEK HOLDINGS LTD.,** | § | |
| | § | |
| **DEBTORS** | § | |
| | § | |
| | § | |

## FIRST AMENDED JOINT PLAN OF REORGANIZATION FOR NUKOTE
### (Dated: November 12, 2009)

Nukote International, Inc. ("**International**"), Nukote Imperial, Ltd. ("**Imperial**"), International Communication Materials, Inc. ("**ICMI**"), Envirosmart, Inc. ("**Envirosmart**") and Black Creek Holdings Ltd. ("**Black Creek**"), Debtors and Debtors-in-Possession (collectively, "**Nukote**" or the "**Debtors**"), and Richmont Global Unlimited, Inc. ("**Richmont**"), the entity acquiring the new equity to be issued hereunder (the "**Plan Proponents**") propose the following First Amended Joint Plan of Reorganization for Nukote (the "**Plan**") pursuant to the United States Bankruptcy Code (the "**Bankruptcy Code**") for the Debtors and their Estates. The Plan is presented with the support and cooperation of the Official Unsecured Creditors' Committee ("**Committee**").

## ARTICLE I

## INTRODUCTION

**1.1** **Background of the Debtors.** The Debtors, together with their non-debtor affiliates (collectively, the "**Company**"), are independent manufacturers and distributors of supplies for office and home printing devices. The Company manufactures and/or distributes products including ink jet and laser toner cartridges; cartridge refill kits; ribbons, ink-rollers, and lift-off tapes; copier toner; and thermal fax ribbons for use in a variety of models of impact and non-impact printing mechanisms. The Debtors employ, directly or indirectly, approximately 1100 persons worldwide, and Debtors sell their products primarily in the United States, Canada, Mexico and Europe.

Debtor Nukote International, Inc., through its subsidiaries and affiliates, has multiple locations in several states in the United States and also in Mexico. The Debtors operate their collective businesses from the following locations: executive and corporate headquarters located in Plano, Texas; administrative offices and coating operations located in Rochester, New York; a distribution center located in Franklin, Tennessee; accounting and customer service operations in Bardstown, Kentucky; toner manufacturing in Connellsville, PA; a maquiladora manufacturing operation for remanufactured ink jet and laser toner cartridges in Monterrey, Mexico; a third party distribution center in Ventura, CA; and a distribution/sales/customer service office for European operations in Membury, UK.

**1.2** **Summary of the Plan.** The Plan is a comprehensive proposal by Nukote and Richmont, with the cooperation and support of CIT, that provides for the following:

(a) **Continuation of Business:** The Plan provides for the continuation of the business of Nukote. Upon confirmation of the Plan, the Company will be well-positioned to take the actions necessary to eliminate corporate complexity, re-align its assets, dissolve or liquidate non-essential entities, and right-size the business by streamlining and focusing manufacturing operations.

(b) **Pursuit of the Office Depot Causes of Action**: The Plan provides for the pursuit of the litigation against Office Depot. As detailed in the lawsuit filed against Office Depot, the OD Causes of Action include claims stemming from a series of egregious fraudulent misrepresentations and breaches of contract by Office Depot which resulted in millions of dollars in damages to Nukote. Nukote firmly believes in the merits of the OD

Causes of Action and intends to vigorously purse these claims. Nukote has sued Office Depot for in excess of $200 million.

(c) **Exit Financing**: The Plan incorporates the terms upon which CIT will provide exit financing to effectuate this Plan and provide working capital for Nukote to thrive in business operations post-confirmation. The Exit Facility shall be evidenced by a financing agreement (the "Exit Financing Agreement") that will not be deemed effective until all conditions precedent in the Exit Term Sheet have been satisfied. The Exit Financing Agreement shall set forth all terms and conditions upon which CIT shall make advances to the borrowers thereunder and nothing in the Plan shall be interpreted as a requirement of CIT to fund or make any advances except as set forth in the Exit Financing Agreement. Nothing in the Plan shall limit or prohibit CIT's ability to amend, modify, exercise any right or remedy or take any other action permitted under the Exit Financing Agreement and applicable law. Notwithstanding anything to the contrary contained in the Plan, no provision of the Exit Financing Agreement is intended to benefit any party other than the signatories thereto nor shall any such provision be enforceable by any other party, including any creditor of these estates.

(d) **Issuance of New Stock:** The Plan provides that, on the Effective Date, Richmont shall infuse $500,000.00 (or such higher amount as Richmont determines is necessary) in cash and/or equipment to the Debtors to effectuate this Plan, in exchange for which cash infusion the Nukote Affiliated Parties will receive releases and Richmont shall receive 100% of the common stock of International which post-confirmation shall be renamed "Nukote, Inc."

(e) **Treatment of Allowed Administrative and Priority Claims:** The Plan provides for the payment in full of all Allowed Administrative Claims and Priority Claims by the Reorganized Debtors on or promptly after the Effective Date except for Priority Tax Claims which will be paid over time in accordance with the Code and Priority Wage Claims which will be paid by the Trust.

(f) **Treatment of Allowed Unsecured Claims:** The Plan generally provides the following treatment for Allowed Unsecured Claims:

  1. **Administrative Convenience Claims (Unsecured Claims of $2,000.00 or less):** Unsecured Creditors with Allowed Claims of $2,000.00 or less will receive a cash dividend equal to 25% of their Allowed Claim.

  2. **General Unsecured Claims:** General Unsecured Creditors will each receive their Pro Rata share of the Trust Interest which entitles them to be paid their Pro Rata share of (i) Net Recoveries from the Avoidance Actions; and (ii) 17.5% of the OD Net Recoveries.

  3. **Trade Creditors:** Entities holding Unsecured Claims who agree to extend credit terms to Nukote post-confirmation and participate in the Credit Terms

Initiative Program will, along with General Unsecured Claims, receive their Pro Rata share of the Trust Interest which entitles them to be paid their Pro Rata share of (i) Net Recoveries from the Avoidance Actions; and (ii)17.5% of the OD Net Recoveries *plus* (iii) 5% of Excess Cash Flow generated from post-confirmation business for the years 2010 through 2014 up to an aggregate five year cap of $750,000; provided that payments from Excess Cash Flow shall not exceed 25% of any individual Trade Creditors Claim, provided further that such payment shall be payable only if and to the extent that the Debtors are entitled to receive Excess Cash Flow payments under the Exit Financing Agreement.

## ARTICLE II

## DEFINITIONS

Unless the context otherwise requires, the following terms shall have the following meanings when used in initially capitalized form in this Plan. Such meanings shall be equally applicable to both the singular and plural forms of such terms. Any term used in initially capitalized form in this Plan that is not defined herein, but that is defined in the Bankruptcy Code, shall have the meaning assigned to such term in the Bankruptcy Code.

2.1 **AI** means Grupo American Industries S.A. de C.V.

2.2 **Administrative Claim** means an administrative expense under §503(b) of the Bankruptcy Code, including Fee Claims, whenever incurred and irrespective of whether any payment or transfer has been made on behalf of such administrative expense, including the fees payable to the United States Trustee under 28 U.S.C. §1930.

2.3 **Allowed Amount** means the amount in lawful currency of the United States of any Allowed Claim, or the number of shares representing any Allowed Interest.

2.4 **Allowed Claim and Allowed Interest** means, with reference to any Claim or Interest: (i) a Claim against or Interest in the Debtors, proof of which, if required, was filed on or before the Bar Date, which is not a Contested Claim or Contested Interest, (ii) if no proof of claim or interest was so filed, a Claim against or Interest in the Debtors that has been or hereafter is listed by the Debtors in their Schedules as liquidated in amount and not disputed or contingent, or (iii) a Claim or Interest allowed hereunder or by Final Order. An Allowed Claim or Allowed Interest does not include any Claim or Interest or portion thereof which is a Disallowed Claim or Disallowed Interest or which has been subsequently withdrawn, disallowed, released or waived by the holder thereof, by this Plan, or pursuant to a Final Order. Unless otherwise specifically provided in this Plan, an Allowed Claim or Allowed Interest shall not include any amount for punitive damages or penalties.

2.5 **Avoidance Actions** means any claim or Cause of Action belonging to the Debtors and arising under the Bankruptcy Code including, but not limited to, §§544, 547, 548 and 550 but specifically excluding any claim or Cause of Action against the Nukote Affiliated Parties.

2.6 **Bankruptcy Code** means Title 11 of the United States Code, as amended.

2.7 **Bankruptcy Court** means the United States Bankruptcy Court for the Middle District of Tennessee, Nashville Division.

2.8 **Bar Date** means the deadline by which a Claim must have been timely filed. The Bar Date is November 13, 2009 as to Creditors with prepetition Claims other than governmental units and terminated employees; November 30, 2009 for governmental units; and December 1, 2009 for terminated employees. The CIT Claim will be treated in accordance with the agreed and negotiated terms of the DIP Facility and the Exit Facility as detailed in the Plan. Pursuant to the order approving the DIP facility, CIT does not have to file a proof of claim.

2.9 **Business Day** means any day, other than a Saturday, Sunday, or legal holiday (as that term is defined in Bankruptcy Rule 9006(a)).

2.10 **Case(s)** means the above entitled and numbered jointly administered and substantively consolidated cases filed by the Debtors pursuant to the provisions of Chapter 11 of the Bankruptcy Code or any single case of a Debtor.

2.11 **Causes of Action** means all claims or causes of action that belong to the Debtors and/or that could have been brought by the Debtors under state or federal law, including Avoidance Actions arising under the Bankruptcy Code, except such claims and causes of action which are otherwise released, discharged, or made the subject of an injunction pursuant to the terms of section 1141 of the Bankruptcy Code, this Plan or the Confirmation Order.

2.12 **CIT** means The CIT Group/Business Credit, Inc., a New York Corporation.

2.13 **CIT Claim** means, collectively (i) the senior secured indebtedness and other obligations of the Debtors to CIT arising under the Pre-Petition Loan Documents in an amount not less than $31,664,131.00 and (ii) the Allowed Claim of CIT approved by the Court arising from the DIP Financing Agreement pursuant to §364(d) of the Code, providing CIT with a superpriority claim under §364(c) of the Bankruptcy Code for all amounts due and owing under the DIP Facility, superior to all administrative expenses of the kind specified in §§503(a) and 507(b) of the Code. The CIT Claim will be treated in accordance with the agreed and negotiated terms of the DIP Facility and the Exit Facility as detailed in the Plan.

2.14 **Claim** means: (i) a right of payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (ii) a right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is

reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

2.15    **Claimant** means a holder of a Claim.

2.16    **Class** means all of the holders of Claims against or Interests with respect to the Debtors that have been designated as a class in Article III hereof.

2.17    **Committee** means the Official Unsecured Creditors' Committee.

2.18    **Confirmation** means the entry by the Bankruptcy Court of the Confirmation Order.

2.19    **Confirmation Date** means the date of entry by the Court of the order confirming the Plan.

2.20    **Confirmation Hearing** means the hearing or hearings to be held before the Bankruptcy Court in which the Plan Proponents shall seek Confirmation of this Plan.

2.21    **Confirmation Order** means the Final Order confirming this Plan.

2.22    **Consummation** shall mean the instant upon which the Exit Financing Agreement for the Exit Facility with CIT has been executed, the Trust has been formed and the Avoidance Actions have been transferred to the Trust, all payments required to be made by Richmont on the Effective Date have been made, and the new stock of International has been issued to Richmont, at which time this Plan shall be deemed fully consummated and on which date this Plan shall be fully effective. Consummation shall occur on or promptly following the Effective Date.

2.23    **Contested** when used with respect to a Claim or Interest, means a Claim against or Interest in the Debtors that is: (i) listed in the Debtors' Schedules as disputed, contingent, or unliquidated and as to which a proof of claim has been timely filed; (ii) listed in the Debtors' Schedules as undisputed, liquidated, and not contingent and as to which a proof of Claim or Interest has been filed with the Bankruptcy Court, to the extent the proof of Claim or Interest amount exceeds the amount provided for in the Debtors' Schedules; or (iii) the subject of an objection which has been or may be timely filed by any party in interest or the US Trustee and which claim has not been disallowed by Final Order. To the extent an objection relates to the allowance of only a part of a Claim or Interest, such a Claim or Interest shall be a Contested Claim or Contested Interest only to the extent of the objection.

2.24    **Credit Terms Initiative Program** means the business incentives program to be implemented post-confirmation by Nukote under which Trade Creditors that are suppliers commit to provide 2% 10 days, net sixty (60) day credit terms and Trade Creditors that are shippers commit to provide net thirty (30) day credit terms (or such other credit terms as agreed to between the Trade Creditor and Nukote) to Nukote for a minimum period of one (1) year and actually provide goods or services during such one year period totaling in excess of $500,000.00 per Trade Creditor. Each Trade Creditor desiring to participate in the program must so notify Nukote in writing prior to the

Effective Date of the Plan. In the event the Debtors default in two instances in any single calendar year under payment terms provided for under the Credit Terms Initiative Program with respect to any Trade Creditor providing terms thereunder, which default is not cured within fifteen (15) days of written notice of default, such Trade Creditor may cease providing credit without affecting its right to a payment for Excess Cash Flow that calendar year, so long as the Trade Creditor has otherwise complied with the terms of the Credit Terms Initiative Plan. Nukote reserves the right to withdraw the program if Trade Creditors holding at least $3 million in Claims do not elect to participate.

2.25    **Creditor** means holder of a Claim as of the Petition Date.

2.26    **Debtor or Debtors** means Nukote International, Inc. ("International"), Nukote Imperial, Ltd. ("Imperial"), International Communication Materials, Inc. ("ICMI"), Envirosmart, Inc. ("Envirosmart") and Black Creek Holdings, Ltd. ("Black Creek"), the Debtors and Debtors-in-Possession in these Cases.

2.27    **Deficiency Claims** means an Allowed Claim of a Creditor, equal to the amount by which the aggregate Allowed Claims of such Creditor exceed the sum of (a) any set off rights of the Creditor permitted under §553 of the Code, plus (b) the Secured Claim of such Creditor; provided, however, that if the holder of a Secured Claim or the Class of which such Claim is a member makes the election provided in §1111(b)(2) of the Code, there shall be no Deficiency Claim in respect of such Claim.

2.28    **DIP Facility** means the $26,000,000 senior secured superpriority debtor in possession credit facility provided by CIT to the Debtors pursuant to DIP Financing Agreement dated as of September 15, 2009 and approved on a final basis by the Court pursuant to an Order dated September 28, 2009.

2.29    **DIP Financing Agreement** means the loan agreement titled "DIP Financing Agreement" executed on September 15, 2009 in connection with the DIP Facility.

2.30    **Disallowed Claim or Disallowed Interest** means a Claim against, or Interest in, the Debtor, or any portion thereof, (i) that has been disallowed by Final Order, (ii) proof of which has been untimely filed and as to which no order of allowance has been entered by the Bankruptcy Court, or (iii) listed as disputed, contingent, or unliquidated and as to which no proof of claim or proof of interest has been timely filed.

2.31    **Disclosure Statement** means the Disclosure Statement for this Plan, together with any supplements, amendments, or modifications thereto.

2.32    **Effective Date** means the date on which (i) the Trust is formed, (ii) the Exit Financing Agreement for the Exit Facility with CIT is executed, and (iii) Richmont acquires the new stock of International and funds the amounts required by the Plan, which date shall be not later than 30 days after the date that the Confirmation Order becomes a Final Confirmation Order. Notice of the occurrence of the Effective Date shall be filed by the Plan Proponent and provided to all professionals retained by the Debtors and the Committee.

2.33 **Entity(ies)** includes any individual, partnership, limited liability company, corporation, estate, trust, governmental unit, person, and the United States Trustee.

2.34 **Estates** mean the respective bankruptcy estates of the Debtors created by Section 541 of the Bankruptcy Code upon the commencement of their Cases.

2.35 **Estimated Claim** means any Contested Claim which is estimated in accordance with §502(c) of the Code. For purposes of distribution, the estimated amount of such Contested Claim shall be deemed the Allowed Amount of such Claim. For the full satisfaction of its Contested Claim and its Allowed Claim, a Claimant shall have, as its sole and exclusive remedy, the rights to payment provided under this Plan and shall have no other rights or remedies and may not, following Consummation, assert any other right against the pertinent Debtor, Claimant's estimated and Allowed Claim being fully satisfied by such Debtors' payment obligations described in this Plan, and any amount in excess thereof being fully released, voided and discharged by the confirmation of this Plan.

2.36 **Excess Cash Flow** means with respect to any period of determination, without duplication, an amount equal to EBITDA for such period (a) minus the sum of (i) all applicable taxes paid in such period, (ii) permitted capital expenditures made during such period of an amount not greater than $300,000 annually, and (iii) debt service paid in cash during such period, and (b) plus or minus (as applicable) changes in any working capital.

2.37 **Exit Facility** means a senior secured credit facility provided pursuant to and in accordance with the Exit Term Sheet between the Debtors and CIT evidenced by a financing agreement and consisting of (i) a revolving credit facility of up to $10,000,000 and (ii) a term loan in the estimated original principal amount of $25,000,000 and consisting of two tranches of equal amounts, Tranche A and Tranche B.

2.38 **Exit Financing Agreement** means the loan agreement, together with any and all other documents necessary to effectuate said loan agreement, and all exhibits and attachments to any of the foregoing, documenting the Exit Facility, as amended or modified from time to time.

2.39 **Exit Term Sheet** means the term sheet describing the Exit Facility that is Schedule 2 to Exhibit A to the final order approving the DIP Facility entered by the Court on September 25, 2009 [Docket No. 281].

2.40 **Fee Claim** means a Claim for fees and expense reimbursements under Sections 330, 331 or 503(b) of the Bankruptcy Code.

2.41 **Final Confirmation Order** means the Confirmation Order entered by the Bankruptcy Court confirming this Plan provided that such Confirmation Order has not been amended, modified or reversed in such a manner as is unacceptable to the Plan Proponents and provided that (i) no appeal, petition for certiorari, motion for reargument or rehearing shall then be pending or (ii) in the event that an appeal, writ of certiorari, reargument or rehearing thereof has been sought, no stay has

been granted. In the event that an appeal, writ of certiorari, reargument or rehearing thereof has been sought and a stay has been obtained, the Confirmation Order shall become a Final Order after it has been affirmed by the highest court to which such order may be appealed, or certiorari has been denied, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired.

2.42    **Final Order** means an order or judgment, entered by the Bankruptcy Court or other court of competent jurisdiction as to which (i) the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing, shall then be pending or, (iii) in the event that an appeal, writ of certiorari, reargument or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order may be appealed, or certiorari has been denied, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired.

2.43    **General Unsecured Claims** means the holders of Unsecured Claims that are not Priority Claims and not included in Classes 8 or 9.

2.44    **Impaired** means the treatment of an Allowed Claim or Allowed Interest under this Plan <u>unless</u>, with respect to such Claim or Interest, either: (i) this Plan leaves unaltered the legal, equitable, and contractual rights to which such Claim or Interest entitles the holder of such Claim or Interest, or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after occurrence of a default, the Reorganized Debtors (A) cure any default that occurred before, on or after the commencement of the Cases other than default of the kind specified in Section 365(b)(2) of the Bankruptcy Code; (B) reinstate the maturity of such Claim or Interest as such maturity existed before such default; (C) compensate the holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (D) do not otherwise alter the legal, equitable or contractual rights to which such Claim or Interest entitles the holder of such Claim or Interest.

2.45    **Interest** means the equity interests in the Debtors represented by shares of issued and outstanding common stock, preferred stock or any options, warrants or rights to purchase or acquire such stock.

2.46    **Lien** means all valid and enforceable liens, security interests, claims and encumbrances against any property of the Debtors' estates which are permitted by, or not avoided pursuant to the Bankruptcy Code.

2.47    **Net Recoveries** means any proceeds of settlement, litigation or other disposition of the Causes of Action, other than the OD Causes of Action, following payment or reimbursement of all costs incurred in connection with such Causes of Action including the fees and expenses of the professionals engaged by the Trustee, the Debtors or the Reorganized Debtors (including the establishment of such reserves as the Trustee, the Debtors or the Reorganized Debtors deem appropriate).

Case 3:09-bk-06240    Doc 404    Filed 11/12/09    Entered 11/12/09 10:44:39    Desc Main
Document    Page 9 of 50

2.48    **Nukote Affiliated Parties** means Richmont Global Unlimited, Inc., Oxygenline, Ltd., Bond Street Ltd., LLC, Inkbrary, LLC, BSL-Applied Laser Technologies, LLC, BSL-Gem/Laser Express, LLC, Southeast Printer Connection, LLC, Superior Acquisition, LLC, Toner Plus Southwest, LLC, Toner Solutions Acquisitions, LLC, Richmont Mezzanine Fund, LLC, Richmont Aviation, Inc., Richmont Holdings, Inc., Richmont Corporation, Obsidian Arrowpoint, Ltd., New Regent China Ltd. and New Regent (Zhuhai) Printers Supplies Co, Ltd., and Nukote Trading Corporation or any officer, director, employee, agent, attorney, representative, relative, shareholder, subsidiary, insider, affiliate, or affiliate of affiliate of any of the foregoing or any company owned or controlled by any of the foregoing and each of their officers and directors.

2.49    **OD** means Office Depot, Inc. the defendant in that certain litigation styled *Nukote International, Inc. et al. v. Office Depot, Inc.*, Adv No. 09-00341, pending in the Bankruptcy Court.

2.50    **OD Causes of Action** means any and all claims, causes of action, counterclaims, or demands at law or in equity, in contract in tort, or otherwise asserted against OD by one or more of the Debtors in that certain litigation styled *Nukote International, Inc. et al. v. Office Depot, Inc.*, Adv No. 09-00341 as same may be amended or modified.

2.51    **OD Net Recoveries** means any proceeds of settlement, litigation or other disposition of the OD Causes of Action following payment or reimbursement of all costs incurred in connection with such Causes of Action including the fees and expenses of the professionals engaged by the Debtors or the Reorganized Debtors in connection with the pursuit of the OD Causes of Action and provision for payment of any associated tax obligations (including the establishment of such reserves as the Reorganized Debtors deem appropriate).

2.52    **Other Priority Claims** means and includes all Priority Claims except Administrative Claims, Priority Wage Claims and Priority Tax Claims.

2.53    **Petition Date** means June 3, 2009, the date the Debtors commenced these Cases.

2.54    **Plan** means this Joint Plan of Reorganization for Nukote, as it may be amended or modified from time to time as permitted herein or in accordance with Section 1127 of the Bankruptcy Code.

2.55    **Priority Claim** means all Claims entitled to priority under Section 507(a)(2)-(a)(7) and (a)(9) of the Bankruptcy Code.

2.56    **Priority Tax Claim** means all Claims for Taxes entitled to priority under section 507(a)(8) of the Bankruptcy Code, and shall include all Tax Claims secured by assets of the Estates.

2.57    **Priority Wage Claim** means all Claims of any individual or corporation entitled to priority under section 507(a)(4) of the Bankruptcy Code.

2.58    **Pro Rata** means, with reference to any distribution on account of an Allowed Claim or Allowed Interest, the proportion that an Allowed Claim or Allowed Interest in a particular Class bears, respectively, to the aggregate amount of all Claims or Interests in such Class, including Contested Claims or Contested Interests which are not Disallowed Claims or Disallowed Interests as of the date of such calculation.

2.59    **Record Holder** means an equity security holder or creditor whose claim is based on a security of record and who is the holder of record of the security on the date the order approving the Disclosure Statement is entered or on another date fixed by the Bankruptcy Court, for cause, after notice and a hearing.

2.60    **Reorganized Debtor(s)** means one or more of the Debtors as reorganized on the Effective Date under this Joint Plan and, thereafter; such inclusion and the structure of the Reorganized Debtors to be determined by Richmont.

2.61    **Richmont** means Richmont Global Unlimited, Inc.

2.62    **Schedules** means those schedules and statements of financial affairs filed by the applicable Debtor under Federal Rule of Bankruptcy Procedure 1007, as same may be amended from time to time.

2.63    **Secured** means an Allowed Claim that is secured by a lien or security interest in property in which any of the Estates has an interest, or that is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the value of a Claimant's interest in such Estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be.

2.64    **Taxes** means and includes all federal, state, county and local income, ad valorem, excise, stamp and other taxes of any type or nature whatsoever.

2.65    **Tax Claims** mean any and all Secured or Priority Claims of any Entity for the payment of any Taxes (a) accorded a priority pursuant to §§507(a)(8) of the Code (but excluding all Claims for post-petition interest and pre-petition and post-petition penalties all of which interest and penalties, pre-confirmation and post-confirmation, shall be (i) deemed disallowed and (ii) fully discharged on the Confirmation Date), or (b) secured by valid Liens on assets of any Debtor existing on the Confirmation Date (but excluding all Claims for post-petition interest and pre-petition and post-petition penalties, all of which interest and penalties shall be (i) deemed disallowed and (ii) discharged on the Confirmation Date).  Additionally, all Liens securing Tax Claims shall be deemed and legally treated as released, voided and discharged on the Confirmation Date.

2.66    **Trade Creditor** means any Creditor doing business with the Debtors who elects to continue to do business with the Debtors post-confirmation and extends credit to the Debtors by participating in the Credit Terms Initiative Program.

2.67 **Trust** means the trust which shall be created on the Effective Date for the benefit of the holders of Allowed Unsecured Claims to receive the Avoidance Actions. The name of the Trust shall be the "NI Creditors' Trust."

2.68 **Trust Agreement** means the agreement governing the Trust, a copy of which is attached hereto as Exhibit "A."

2.69 **Trust Assets** means (i) the Avoidance Actions; (ii) 17.5% of the OD Net Recoveries; and (iii) 5% of the Excess Cash Flow for 2010 through 2014 payable to Trade Creditors in Class 9, if and to the extent the Debtors are entitled to receive Excess Cash Flow payments under the Exit Financing Agreement..

2.70 **Trustee** means the trustee appointed to serve as administrator for the Trust pursuant to the Trust Agreement and appointed by the Confirmation Order as trustee, and any successor trustee selected pursuant to the Trust Agreement.

2.71 **Trust Interest** means beneficial ownership interest in the Trust entitling the holder to share in the Trust Assets.

2.72 **Unsecured Claim** means a Claim that is not an Administrative Claim, a Priority Claim, a Priority Tax Claim, or a Secured Claim.

**ARTICLE III**

**TREATMENT OF NON-CLASSIFIED CLAIMS**

This Plan does not classify Claims against the Debtors having priority as specified in Section 507 of the Bankruptcy Code, which Claims shall be treated as follows:

3.1 **Administrative Claims**

(a) **In General**. Each holder of an Administrative Claim except as otherwise set forth in this Article 3 (and specifically excluding Priority Tax Claims as set forth in Section 3.2 below) shall receive from the Reorganized Debtors either: (i) with respect to Administrative Claims which are Allowed Claims on the Effective Date, the amount of such holder's Allowed Claim in one cash payment; (ii) with respect to Administrative Claims which become Allowed Claims after the Effective Date, the amount of such holder's Allowed Claim in one cash payment as soon as practicable after such claim becomes an Allowed Administrative Claim; or (iii) such other treatment agreed upon by the Debtors and such holder; provided, however, that any such Administrative Claim representing a liability incurred in the ordinary course of business by any of the Debtors shall be paid by Reorganized Debtors in accordance with the terms and conditions of the particular transaction giving rise to such liability and any agreements relating thereto.

(b) **Fee Claims**. Each professional person whose retention with respect to the Debtors' Cases has been approved by the Bankruptcy Court or who holds, or asserts, an Administrative Claim that is a Fee Claim shall be required to file with the Bankruptcy Court a final fee application within sixty (60) days after the Effective Date.

(c) **Other Administrative Claims**. Any other person or Entity who claims to hold any other Administrative Claim (other than an Administrative Claim representing a liability incurred in the ordinary course of business by any of the Debtors) shall be required to file with the Court an application within thirty (30) days after the Confirmation Date and to serve notice thereof on all parties entitled to such notice. The failure to file timely the application as required under this Section 3.1(c) shall result in the Claim being forever barred and discharged. An Administrative Claim with respect to which an application has been properly filed pursuant to this Section 3.1(c) and to which no objection has been filed or an objection has been filed but overruled by the Court, shall become an Allowed Administrative Claim to the extent such claim is allowed by Final Order. Notwithstanding the foregoing, the U. S. Trustee shall not be required to file an Administrative Claim with respect to quarterly fees owed by the Debtors.

### 3.2    Administrative Tax Claims

(a) **Administrative Tax Claims**. Each holder of an Administrative Claim that is an Allowed Claim for Taxes for which the Debtor is responsible for the period during which the Debtors' Cases are being administered shall be paid the Allowed Amount of such holder's Claim in cash, in full, by Reorganized Debtors on the latest of: (i) the Effective Date, (ii) the date such Claim is allowed by Final Order, or (iii) the date such payment is due under applicable law.

3.3    **U.S. Trustee Fees**. All fees payable under 28 U.S.C. § 1930 shall be paid in cash in full when due by the Reorganized Debtors.

## ARTICLE IV

## DESIGNATION OF CLASSES OF CLAIMS AND INTERESTS

Pursuant to Sections 1122 and 1123 of the Bankruptcy Code, the Debtors designate the following Classes of Claims and Interests.

4.1    **Class 1- CIT Secured Claim**. The Plan Proponents designate as a Class the Secured Claims of CIT.

4.2    **Class 2- Secured Claim of Grupo American Industries S.A. de C.V.** The Plan Proponents designate as a Class the Allowed Secured Claim of AI. The Debtors filed a Motion to Assume Shelter Agreement, as Modified (the **"AI Motion"**) seeking to assume and modify the prepetition Shelter Agreement between the Debtors and AI, setting the schedule by which the cure amount due to AI pursuant to § 365(b) in the amount of $2,500,000 will be paid, and providing

security to AI for the cure amount and other amounts due under the modified Shelter Agreement (the **"AI Claim"**). The AI Motion proposed that the Shelter Agreement (as modified) be assumed, and that the resulting AI Claim be satisfied in accordance with the terms of a secured, negotiable promissory note (the "Note") in the amount of $2,500,000, with an interest rate of seven point five percent (7.5%) per annum compounded annually. The AI Claim is proposed to be secured by the creation of a Mexican guarantee trust comprised of the equipment owned by Nukote and its affiliated companies that is physically located in Mexico upon which AI will be granted a first priority lien. The Court approved the AI Motion by order entered on November 3, 2009.

4.3    **Class 3 - Secured Tax Claims**. The Plan proponents designate as a Class any Allowed Secured Tax Claims.

4.4    **Class 4 - Other Secured Claims**. The Plan Proponents designate as separate Classes each of the following Other Secured Claims against the Debtors. This Class consists of all other allowed Secured Claims of any Creditor other than those Secured Claims in Class 1, 2 and 3. The following Creditors have filed Secured Claims, and, to the extent such Secured Claims are Allowed, each shall be treated as a separate subclass in Class 4:

|     |           |                          |
|-----|-----------|--------------------------|
| (a) | Class 4A: | Kimbro Mechanical, LLC   |
| (b) | Class 4B: | NMHG Financial Services  |
| (c) | Class 4C: | Toyota Motor Credit Corp.|
| (d) | Class 4D: | Hartford Specialty Co.   |

4.5    **Class 5: Priority Tax Claims**.  The Plan Proponents designate as a Class any Allowed Claim for Taxes entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

4.6    **Class 6: Priority Wage Claims**.  The Plan Proponents designate as a Class any Allowed Claims of any individual or corporation entitled to priority pursuant to section 507(a)(4) of the Bankruptcy Code.

4.7    **Class 7: Other Priority Claims**.  The Plan Proponents designate as a Class any Allowed Claims of any Entity entitled to priority pursuant to Section 507(a) that is not a Priority Tax Claim or a Priority Wage Claim.

4.8    **Class 8:  Administrative Convenience Class.**  The Plan Proponents designate as a Class all Allowed Unsecured Claims of $2,000 or less, including all Allowed Unsecured Claims in excess of $2,000 whose holders elect to reduce their claim to $2,000; provided that the Plan Proponents reserve the right to limit such elections if it would cause the total payments to holders of Class 8 Claims to exceed $50,000.00.

4.9　**Class 9: Unsecured Trade Creditors**. The Plan Proponents designate as a Class all Trade Creditors who elect, on their ballot or otherwise, to continue to do business with the Debtors post-confirmation, participate in the Credit Terms Initiative Program, and thereby opt into Class 9.

4.10　**Class 10: General Unsecured Claims.** The Plan Proponents designate as a class all Allowed Unsecured Claims, other than Claims in Class 8 or 9.

4.11　**Class 11 - Interests (Holders of Common Stock).** The Plan Proponents designate a Class consisting of: (i) the Record Holders of Interests of Black Creek Common Stock and any Record Holder of an Interest in any Debtor and (ii) Holders of Claims arising from rescission of a purchase or sale of a security of any of the Debtors or of any affiliate of any of the Debtors, or Claims for damages allegedly arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a Claim.

## ARTICLE V

## PROVISIONS FOR SATISFACTION
## OF CLAIMS AND INTERESTS

The Claims and Interests as classified in Article IV hereof shall be satisfied in the manner set forth in this Article V. The treatment of, and the consideration to be received by Entities holding Claims against and/or Interests in the Debtors pursuant to this Plan shall be in full settlement, release, and discharge of their respective Claims against and Interests in the Debtors, but shall not affect the liability of any other Entity on such Claim or Interest except as otherwise provided pursuant to the terms of this Plan or the Confirmation Order, in the form as originally entered or as may be later amended or modified. All classified Claims against and Interests in the Debtors, except Administrative Claims and Priority Claims, shall be treated as follows:

5.1　**Class 1 - CIT Claim.** The CIT Claim will be treated in accordance with the agreed and negotiated terms of the DIP Facility and the Exit Facility.[1] Specifically, the CIT Claims shall be satisfied through repayment of the Exit Facility pursuant to the terms of the Exit Financing Agreement. The substantive terms of the Exit Financing Agreement are set forth in the Exit Term Sheet which is set forth as Schedule 10 to the DIP Financing Agreement and incorporated herein by reference. The Exit Facility shall be evidenced by the Exit Financing Agreement that will not be deemed effective until all conditions precedent in the Exit Term Sheet have been satisfied.

5.2　**Class 2 - AI Secured Claim.** The Court approved a motion to amend and assume the agreements with AI. Under those agreements, AI now has an Allowed Secured Claim. The AI Claim will be satisfied in accordance with the agreement approved by the Court. Specifically, AI will be paid via weekly payments scheduled to commence within fifteen (15) days after the AI Motion is granted as follows: Weeks 1-13: $15,000 per week; Weeks 14-26: $20,000 per week;

---

[1]　Note that certain definitions set forth within this section 5.1 are only applicable within this section as they relate to the treatments of the CIT Claim.

Weeks 27-39: $25,000; Weeks 40-52: $30,000 per week; and then either (i) payment of the balance in full if Nukote is successful in obtaining sufficient funding to pay the Note in full by August 1, 2010; or (ii) Nukote will continue making payments in the amount of $50,000 per week for an additional 26 weeks, followed by a final balloon payment of $350,000 (or such amount that remains outstanding) made on or prior to February 28, 2011, which shall be the maturity date under the Note.

     5.3    **Class 3 - Secured Tax Claims**. Each Allowed Secured Tax Claim shall be paid by the Reorganized Debtors in full within 6 months of the Effective Date.

     5.4    **Class 4 - Other Secured Claims.** Except to the extent that a Class 3 Claimant may otherwise agree, each holder of an Allowed Secured Class 4 Claim shall be fully satisfied, at the Reorganized Debtors' option, by one of the following:

     (a)    **Note Option:** Each holder of a Class 4 Claim shall retain all Liens securing such Claim until such Claim is fully paid or until such holder otherwise agrees. The terms and provisions relating to such Liens shall be set forth in appropriate documents agreed to between the parties, or, in the event of disagreement, as directed by the Court. The appropriate Reorganized Debtor shall execute a note payable to the Class 4 Creditor and deliver it to the holder of such Claim, along with an appropriate mortgage and/or security agreement, no later than the tenth (10th) Business Day after the later of the Effective Date or the date that such Claim becomes an Allowed Claim. The initial principal amount of each Class 4 Claim shall be equal to the lesser of (i) the amount which the Court shall determine is equal to the value of the assets securing such Claim or (ii) the amount of the Class 4 Claim. To the extent that any Creditor has a Deficiency Claim in addition to its Class 4 Claim, the Deficiency Claim shall be treated under this Joint Plan as an Unsecured Claim against the Debtors.

     (b)    **Unimpairment Option:** At the option of the Reorganized Debtors, any Class 4 Claim may be deemed unimpaired. If such election is to be made, it must be made on or before the Effective Date. Any arrearage or other amounts owed by the Debtors as of the Effective Date (and any other payments which may at such date be required to make each such Claim unimpaired) shall be paid in cash, in full, on or before the forty-fifth (45th) Business Day after the Effective Date or as shall otherwise be agreed to in writing by the holder of such Claim, and all other defaults with respect to such Claim required to be cured by Section 1124(2) of the Code shall be cured on or prior to the forty-fifth (45th) Business Day after the Effective Date as shall be agreed to in writing by the holder of such Claim, and from and after the date of such cure any previously accelerated indebtedness shall be reinstated and any default rate of interest shall no longer apply, but shall be deemed waived (not forgiven). Each Class 4 Creditor whose claim is unimpaired pursuant to the terms hereof shall retain such lien as such Creditor held prior to the Petition Date. After the reinstatement of its Class 4 Claim, each Class 4 Creditor will receive payments in accordance with the instruments governing such Claim or as such Creditor may otherwise in writing agree. Furthermore, after such unimpairment, each Class 4 Creditor will be entitled to exercise all rights, privileges, and remedies available to it under the instruments governing

its Class 4 Claim in accordance with the terms for such instruments, without need for any application to or order of the Court.

(c) **Cash Option:** The Reorganized Debtors may also elect, at any time on or before the Effective Date, to pay a Class 4 Secured Claim in full, in cash, on or promptly after the Effective Date.

(d) **Abandonment Option:** The Reorganized Debtors may also elect, at any time on or before the Effective Date, to fully satisfy a Class 4 Claim by abandoning the collateral securing such Claim to the holder of such Claim.

(e) **Release of Lien:** Upon the satisfaction of any note given to any holder of a Class 4 Secured Claim pursuant to any of the methods provided for in this Plan, the holder of such Class 4 Secured Claim shall execute all instruments and documents necessary to release its Lien securing such Claim or note.

5.5    **Class 5: Priority Tax Claims**. Each Allowed Priority Tax Claim shall be paid by the Reorganized Debtors in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code.

5.6    **Class 6: Priority Wage Claims**. Allowed Priority Wage Claims shall be paid in full by the Trust on the Effective Date or as soon as assets are available.

5.7    **Class 7: Other Priority Claims**. Allowed Claims that are not a Priority Tax Claim or a Priority Wage Claim but are otherwise entitled to priority pursuant to section 507(a) of the Bankruptcy Code shall be paid by the Trust in accordance with Section 1129(a)(9).

5.8    **Class 8: Administrative Convenience Class**. Allowed Unsecured Claims in Class 8 shall be fully satisfied by payment of 25% of the Allowed Amount of such Claims by the Reorganized Debtors, on the later of 90 days after the Effective Date or within 10 days after entry of a Final Order allowing such Claim.

5.9    **Class 9:  Unsecured Trade Creditors**. Allowed Unsecured Claims of Trade Creditors in Class 9 who elect to continue to do business with the Debtors post-confirmation and participate in the Credit Terms Initiative Program shall each receive their Pro Rata share of the Trust Interest which entitles them to be paid their Pro Rata share of (i) Net Recoveries from the Avoidance Actions; and (ii)17.5% of the OD Net Recoveries *plus* (iii) 5% of Excess Cash Flow generated from post-confirmation business for the years 2010 through 2014 up to an aggregate five year cap of $750,000; provided that payments from Excess Cash Flow shall not exceed 25% of any individual Trade Creditors Claim, provided further that such payment shall be payable only if and to the extent that the Debtors are entitled to receive Excess Cash Flow payments under the Exit Financing Agreement.

5.10    **Class 10:  Unsecured Claims**. The holders of all Allowed Unsecured Class 10 Claims shall each receive their Pro Rata share of the Trust Interest which entitles them to be paid

their Pro Rata share of (i) Net Recoveries from the Avoidance Actions; and (ii) 17.5% of the OD Net Recoveries.

5.11    **Class 11: Interests.** The holders of Allowed Class 11 Interests or Claims other than Richmont shall have their respective Interests or Claims terminated and canceled on the Effective Date and shall not be entitled to receive any present or future distribution or other benefit on account of their Interests or Claims. Richmont shall retain its Interests in the Debtors and be the holder of 100% of the outstanding stock of Reorganized International in consideration of its new cash infusion on the Effective Date.

## ARTICLE VI

### DESIGNATION OF THE CLASSES OF CLAIMS
### IMPAIRED UNDER THIS PLAN

6.1    **Impairment.** For purposes of Plan solicitation, all Classes of Claims are Impaired and are, therefore, entitled to cast ballots on this Plan. Holders of Class 11 Interests are deemed to have rejected the Plan and are not entitled to cast ballots on this Plan.

## ARTICLE VII

### SUBSTANTIVE CONSOLIDATION

7.1    **Substantive Consolidation.** The entry of the Confirmation Order shall effect the substantive consolidation of the separate bankruptcy estates of the Debtors. Upon substantive consolidation:

(a)    The assets of the Debtors shall be treated as a single consolidated estate.

(b)    A Claim against any one of the Debtors shall be treated as a Claim against the consolidated estate.

(c)    All intercompany claims between and among the Debtors are eliminated for plan purposes so that such claims will not be classified, will not vote and will not receive any distribution under a plan.

(d)    All duplicate claims filed by the same creditor in the same amount against more than one Debtor are eliminated.

(e)    The separate corporate structures of the Debtors shall continue unless otherwise deemed necessary or appropriate by Richmont after the occurrence of the Effective Date or as otherwise provided in the Plan.

(f)     The Debtors shall be treated as one entity for purposes of payment of quarterly fees to the U.S. Trustee's Office effective as of the quarter in which the Confirmation Order is entered.

Nothing contained in this Article VII, however, shall operate to transfer legal title to assets from one Debtor to another.

## ARTICLE VIII

## MEANS FOR IMPLEMENTATION OF PLAN

8.1     **Reorganized Debtors.** Upon the Effective Date of the Plan, all of the existing stock of the Debtors held by any non-debtor party other than Richmont will be canceled. The Reorganized International will be authorized to issue additional shares of Reorganized International's common stock, which shall represent all of the issued and outstanding stock of Reorganized International, to Richmont in exchange for Richmont's stock in Black Creek. The name of Reorganized International will be changed to "Nukote, Inc." Reorganized International will own all of the stock of ICMI ("**Reorganized ICMI**") and Envirosmart ("**Reorganized Envirosmart**") as each will exist after the Effective Date. Imperial will be dissolved effective on the Effective Date, and all of Imperial's intellectual property assets and other assets shall become the assets of Reorganized International. Black Creek will be dissolved and all assets of Black Creek other than the stock of International shall become the assets of Reorganized International; the stock of International previously held by Black Creek shall become an asset of Richmont. Richmont reserves the right to alter the structure of the Reorganized Debtors at any time before or after the Effective Date.

8.2     **Pursuit of the OD Causes of Action.** The key precipitating event that led to the filing of these Chapter 11 Cases was the egregious actions of, and the resulting deterioration and ultimate failure of its supplier relationship with, Nukote's biggest customer: Office Depot. From late 2008 through May 2009, OD, motivated by its own financial distress, concocted a scheme to fraudulently obtain from Nukote its most profitable product, private brand imaging supplies, with the smallest possible cash outlay. Through a series of fraudulent misrepresentations and omissions, Office Depot maintained a front of "business as usual" with the Debtors, thus inducing Nukote to continue shipping product for which Office Depot had no plans to pay. At the same time OD was preparing to breach the contracts with the Debtor. Also during this time, Office Depot was secretly negotiating with Nukote's largest competitor to replace Nukote as its primary vendor for the same or similar products. Nukote relied on these misrepresentations and omissions, orchestrated by Office Depot's senior management, by continuing to spend cash, manufacture goods and ship the product necessary to meet Office Depot's requirements, and by making important concessions requested by Office Depot on its obligations to Nukote. On May 8, 2009, Office Depot abruptly and without notice breached its agreements with the Debtors by moving the business to another vendor, Clover Technologies Group, LLC. The Debtors anticipated cash flow and borrowing capacity dropped dramatically, and Nukote was unable to survive without Chapter 11 protection. Office Depot's actions were intentional, malicious and taken without regard for the devastating damage they caused the Debtors. In the lawsuit filed against Office Depot for willful, malicious and fraudulent misrepresentations, breaches of contract, and violations of the Uniform Commercial Code, Nukote

seeks actual, incidental, consequential and exemplary damages of approximately $217,000,000.00. The vigorous pursuit of the lawsuit against Office Depot is the centerpiece of this Plan.

8.3 **Creation of the Trust.** Confirmation of the Plan shall effect the formation of the Trust. On the Effective Date, the Avoidance Actions shall be transferred to the Trust. The Trust Assets shall consist of (i) the Avoidance Actions; (ii) 17.5% of the OD Net Recoveries; and (iii) 5% of the Excess Cash Flow for 2010 through 2014 payable to Trade Creditors in Class 9 in accordance with the provisions of the Plan, to the extent the Debtors are entitled to receive Excess Cash Flow payments under the Exit Financing Agreement. The specific terms, conditions, and rules governing the Trust are contained in the Trust Agreement, a copy of which is attached hereto as Exhibit "A."

8.4 **Funding of the Trust.** The Reorganized Debtors will fund an initial sum of $50,000 from the cash infusion from Richmont to the Trust for the evaluation and pursuit of the Avoidance Actions. The Reorganized Debtors may advance additional sums to the Trust, but such additional advances shall only be in such amounts as the Reorganized Debtors, in their sole and absolute discretion, shall deem appropriate and reasonable. Any of such additional advances, if any, shall be reimbursed to the Reorganized Debtors, respectively, from the first recoveries on the Avoidance Actions prior to any distributions of the Net Recoveries.

8.5 **Payments Due to Creditors Under the Plan.** Payments to be made under the Plan to Creditors will come from (i) the Net Recoveries on the Avoidance Actions and the OD Causes of Action; (ii) the cash portion of the $500,000 new value from Richmont to the Reorganized Debtors on the Effective Date; (iii) cash on hand in the Reorganized Debtors; and (v) for those Trade Creditors in Class 9 who participate in the Credit Terms Initiative Program, also from Excess Cash Flow from future business operations if and to the extent the Debtors are entitled to receive Excess Cash Flow payments under the Exit Financing Agreement. The Net Recoveries on the OD Causes of Action and the Avoidance Actions, coupled with funds available from Richmont, funds available under the Exit Financing Agreement and, for Trade Creditors in Class 9, Excess Cash Flow from future business operations, will produce sufficient cash flow to make all payments due on the Effective Date and under the Plan, except for the final payment due to CIT as the Class 1 Claimant on the fifth anniversary of the effective date of the Exit Financing Agreement. By that time, however, the debt due to the Class 1 Claimant is projected to be dramatically reduced, and the Debtors will be able to refinance that debt and/or raise equity to pay this balance on or before its due date.

8.6 **Amendments to Organizational Documents.** The Reorganized Debtors' organizational documents shall be amended as necessary to satisfy any provisions of this Plan and Section 1123(a)(6) of the Bankruptcy Code. All amendments to the organizational documents of the Reorganized Debtors contemplated by this Plan shall be filed with the appropriate filing offices on the Effective Date or as soon thereafter as is reasonably practicable and shall become effective on the date so filed. On or after the Effective Date, the Reorganized Debtors' organizational documents may be amended and supplemented to include some or all of the following:

(a) Increase or decrease the number of authorized shares as necessary to effect the requirements of the Plan;

      **(b)**     Alter the number of directors on the Board of Directors;

      **(c)**     The entry of the Confirmation Order will be deemed to meet all necessary shareholder approval requirements under any applicable provisions of Delaware law necessary to take the corporate actions set forth in the Plan.

      **(d)**     The inclusion of a provision prohibiting the issuance of nonvoting equity securities.

8.7    **Retention of the Debtors' Property.**  On the Effective Date, unless otherwise noted herein, all property of each of the Debtors shall vest in that entity as a Reorganized Debtor, free and clear of all Liens, claims and encumbrances except for those Liens created or preserved as provided in the treatment of creditors under this Plan.

## ARTICLE IX

## THE TRUST

9.1    **Purposes for the Trust.**  The primary purposes of the Trust shall be:

      (a)     to own, hold, pursue, manage and dispose of the Avoidance Actions for the benefit of the creditors of the Estates.

      (b)     to litigate, prosecute, settle or otherwise resolve the Avoidance Actions;

      (c)     to defend any counterclaims relating to the Avoidance Actions;

      (d)     to make the payments to Creditors as set forth in this Plan; and

      (e)     to do anything necessary, related or incidental to the foregoing.

9.2    **Term.**  The Trust shall terminate upon the earliest to occur of: (a) the fulfillment of the Trust purpose by the conclusion of all of the Avoidance Actions and the distribution of the Net Recoveries or (b) the term of five (5) years from the Effective Date. The Trustee may apply to the Bankruptcy Court to terminate the Trust prior to the expiration of the five (5) year term in the event all activities of the Trust are completed or if all of the Causes of Action have been concluded and the Net Recoveries therefrom have been distributed in accordance with this Plan. The Trustee may extend the term of the Trust if the conclusion of the Avoidance Actions and distribution of the Net Recoveries therefrom has not been completed, or if other circumstances require such extension.

9.3    **Beneficiaries of the Trust.**  The beneficiaries of the Trust shall be the holders of Allowed Claims in Classes 6, 9 and 10 who shall receive the Trust Interest in accordance with their treatment under the terms of this Plan.

9.4 **Appointment of the Trustee.** The initial Trustee shall be selected by the Committee. The Trustee shall administer the Avoidance Actions and have the authority to initiate or continue all Avoidance Actions, and make the payments to Creditors as provided in this Plan and the Trust Agreement. Any successor trustee shall be selected by the Creditor Oversight Committee.

9.5 **Powers of Trustee.** Except as otherwise provided in this Plan, the Trustee shall have all of the following rights and powers:

(a) Receive and hold, to have exclusive possession and control thereof as permissible under applicable law, maintain and administer the Avoidance Actions;

(b) Employ, retain or replace professional persons, including attorneys, accountants, appraisers, investment advisors, expert witnesses, insurance adjustors, or other persons whose services may be necessary or advisable, in the judgment of the Trustee, to advise or assist him in the discharge of the duties of the Trustee, or otherwise in the exercise of any powers vested in the Trustee or as the Court may direct and, subject to the provisions of the Trust, to pay to such professionals reasonable compensation (in this regard, the Trustee may employ professionals employed by the Debtors);

(c) Collect, compromise, settle or discharge any claim of the Trust and pursue, in his discretion, on behalf of the Trust as the designated representative of the Debtors, to either judgment, order, compromise or settlement, any of the Avoidance Actions, except to the extent that any such claims have been specifically compromised, settled and released pursuant to the Plan or the Trust Agreement, and to defend any counterclaims, cross-actions or other offsets;

(d) Distribute the Net Recoveries from the settlement, prosecution or other disposition of the Avoidance Actions;

(e) Seek a determination from the Court of the Allowed Amount of any Claim or Interest against the Trust, including filing objections thereto and pursuing any contest or adversary proceedings with regard thereto and entering into any compromise or settlement thereof, and to execute any contract, including, without limitation, any release in connection with any such compromise or settlement. However, any Claim which is compromised, settled and/or released in connection with any such compromise or settlement agreement set forth in this Plan or the Trust Agreement is excluded;

(f) Maintain possession of the originals of any and all instruments and documents pertaining to the Avoidance Actions and any liabilities of the Trust;

(g) pay all expenses incurred in connection with the administration of the Trust;

(h) calculate and make distribution to holders of Allowed Claims all as set forth in this Plan;

(i)    With regard to the Avoidance Actions, sue and be sued, including filing and defending contested matters and adversary proceedings in the Court and actions or other proceedings in any other court or before any administrative agency and to pursue or defend any appeal from any judgment or order therefrom, including, without limitation, pursuing claims of the Trust, filing suit or adversary proceedings or contested matters in connection therewith and defending any counterclaims, cross-actions or other offsets in connection therewith and entering into any compromise, settlement, release, discharge or dismissal of any of the claims;

(j)    Enter into contracts binding upon the Trust (but not the Trustee) which are reasonably incident to the administration of the Trust and which the Trustee, in the exercise of his best judgment, believes to be in the best interests of the Trust;

(k)    Enter into real or personal property leases (for the leasing of office space and space for the storage of records) which are reasonably incident to the administration of the Trust and which, in the judgment of the Trustee, will be advantageous to the Trust and will assist the Trustee in the performance of his duties under the Trust Agreement;

(l)    Abandon and charge off as worthless, in whole or in part, those Avoidance Actions which in the judgment of the Trustee, are in whole or in part uncollectible;

(m)    Pay taxes and excises lawfully owing by or chargeable against the Trust or property in the possession or control of the Trustee and to take any action necessary or advisable to obtain the prompt determination of any such tax liability;

(n)    Procure and pay premiums on policies of insurance to protect the Trust, against liability for personal injuries or property damage or against loss or damage by reason of fire, windstorm, collision, theft, embezzlement, breach of fiduciary duty or other hazards against which insurance is normally carried in connection with the activities or on properties such as those with respect to which the Trustee procures such insurance;

(o)    Allocate items, receipts or disbursements either to corpus or income (or partially to corpus and partially to income) of the Trust as the Trustee, in the exercise of his best judgment and discretion, deems to be proper, without thereby doing violence to clearly established and generally recognized principles of accounting;

(p)    Deal with any governmental regulatory authority in obtaining such approvals or exemptions as may, in the opinion of the Trustee, be necessary or desirable with respect to the administration of the Trust; and

(q)    Exercise every power granted to a trustee under the Bankruptcy Code, including the rights and benefits afforded by §§ 108 and 546 of the Bankruptcy Code, which may increase the enumerated powers of the Trustee otherwise granted herein, and engage in any and all other activities, not in violation of any other terms of the Plan and Trust Agreement, which, in the judgment of the Trustee, are necessary or appropriate for the proper

liquidation, management, investment and distribution of the assets of the Trust in accordance with the provisions of the Trust Agreement, to effectuate the provisions of the Plan, and to perform such other tasks as the Bankruptcy Court may direct.

9.6 **Payment of Trust Fees and Expenses.** The Trustee may establish reserves and accounts at banks and other financial institutions, in a clearly specified fiduciary capacity, into which cash and property may be deposited and checks drawn or withdrawals made to pay or distribute such amounts as permitted or required for fees, expenses and Trust liabilities pursuant to this Plan and the Trust Agreement. Such funds shall not be subject to any claim by any entity except as provided under this Plan. All fees and expenses of the Trust, and its agents and employees incurred in connection with (i) the objection to, and settlement, liquidation and payment of claims and interests against the Debtors; (ii) the Avoidance Actions; or (iii) administering the Trust and completion of the Plan shall, subject to the review and approval of the Trustee, be paid.

9.7 **Compensation of Trustee and Persons Employed by the Trust.** The Trustee shall be paid in accordance with his customary hourly rate with respect to the administration of the Trust. All compensation paid to the Trustee shall be subject to the review and approval of the Creditors' Oversight Committee. All persons or entities employed by the Trustee shall be entitled to compensation from the Trust and such compensation shall be subject to the review and approval of the Trustee. In no event shall any court approval be required for payment of the compensation of the Trustee or his professionals.

9.8 **Authorization.** All Classes of creditors that vote to accept the Plan hereby authorize the Trustee to act on behalf and in place of such creditor to the extent provided herein and in any document and instrument delivered hereunder or in connection herewith and to take such other action as may be incidental thereto, including, without limitation, the exercise of any discretion in connection with any determination or decision required for the administration of this Plan and the granting of any waiver, consent, amendment, suspension, supplementation, extension, renewal or other modification with respect to any and all provisions of this Plan on a conditional or unconditional basis.

9.9 **Exculpation.** The Trustee shall be entitled to rely upon advice and opinions of counsel concerning legal matters, the authenticity of affidavits, letters, telegrams, cablegrams and other methods of communication in general use and usually accepted by businessmen as genuine and what they purport to be, and upon this Plan and any schedule, certificate, statement, report, notice or other writing which it believes to be genuine or to have been presented by a proper entity. Except for its or their own gross negligence or intentional misconduct, neither the Trustee, nor any of his employees or agents shall (a) be responsible for any recitals, representations or warranties contained in, or for the execution, validity, genuineness, effectiveness or enforceability of this Plan, (b) be under any duty to inquire into or pass upon any matter or to make any inquiry concerning the validity of any representation or warranty of the Debtors or the performance by the Debtors of their obligations or (c) in any event, be liable as such for any action taken or omitted by it or them. Each creditor agrees and acknowledges that the Trustee makes no representations or warranties with respect to the legality, validity, sufficiency or enforceability of this Plan.

9.10 **Liability of Trustee.** No recourse shall ever be had, directly or indirectly, against the Trustee by legal or equitable proceedings or by virtue of any statute or otherwise, or by virtue of any deed of trust, mortgage, pledge or note, or by virtue of any promises, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Trustee for any purposes authorized, it being expressly understood and agreed that all such liabilities, covenants and agreements of the Trustee, whether in writing or otherwise, shall be enforceable only against and be satisfied only by the Trust, and every undertaking, contract, covenant or agreement entered into in writing by the Trustee may provide expressly against the personal liability of the Trustee. The Trustee shall not be liable for any act he may do or admit to do as the Trustee hereunder while acting in good faith. The Trustee shall not be liable in any event except for his own gross negligence or willful fraud or misconduct. The Trustee shall be indemnified and held harmless by the Trust for any and all loss by reason of his acts or contracts for the Trust except for loss arising out of the Trustee's own gross negligence or wilful fraud or misconduct. This provision does not eliminate the Trustee's responsibilities and obligations regarding the filing of federal tax returns and the payment of any taxes that are due.

9.11 **Books and Records.** The Trustee shall keep or cause to be kept books containing a description of all Claims, assets, receipts, disbursements and escrows, which records shall be open to inspection at all reasonable times upon reasonable request of any beneficiary of the Trust.

9.12 **Delegation of Powers.** The Trustee shall be entitled to delegate such authority to his employees and agents as he shall reasonably deem necessary to perform his responsibilities under this Plan.

9.13 **Resignation, Death or Removal.** The Trustee or any successor trustee may resign upon (thirty) 30 days written notice. In that event, or in the event of the death of the Trustee or a successor trustee, Reorganized International will appoint a substitute or successor Trustee to perform the duties, functions and obligations and to exercise the rights and authority of the Trustee as described in the Plan. The Trustee may be removed with or without cause at any time as determined by Reorganized International in Reorganized International's sole discretion.

9.14 **Investment of Funds.** All proceeds and other cash (except for amounts which the Trustee determines, in his sole discretion, are needed for immediate payments and distributions) shall be invested and reinvested by the Trust in United States Treasury Bills or in certificates of deposits, demand deposit or interest-bearing accounts of banking institutions acceptable to the Trust or such other investments as shall be prudent and appropriate under the circumstances, in such amounts and upon such terms as a reasonable and prudent fiduciary would select and with a view toward sufficient liquidity to make the distributions contemplated by this Plan. All interest earned on such proceeds and other cash shall be retained by the Trust and distributed in accordance with this Plan.

9.15 **Reserves.** Prior to any distribution of any Net Recoveries, the Trustee shall establish adequate reserves for the operation of the Trust and Contested Claims that may become Allowed Claims after the Effective Date.

9.16 **Interim Distribution.** If and when, in the opinion of the Trustee, there is sufficient cash and proceeds to justify an interim distribution to beneficiaries of the Trust, he may make such interim distributions to holders of such Allowed Claims as he deems appropriate in his sole and absolute discretion; provided that he shall maintain sufficient reserves.

9.17 **Unclaimed Distributions.** Any proceeds or other cash held for the benefit of any holder of an Allowed Claim, if unclaimed by the distributee within three months after the distribution, shall be redeposited into the fund and made available for other Allowed Claims, and all liability and obligations of the Debtors and the Trust to such distributee with respect thereto shall thereupon cease.

9.18 **Termination.** Upon termination of the Trust, the powers and responsibilities of the Trustee and his representatives shall terminate.

9.19 **Appointment of the Creditors' Oversight Committee.** The Trustee of the Truste shall establish an oversight committee, consisting of no more than three (3) creditors from the existing Committee, to consult with the Trustee regarding the Trust Assets. The initial members of the Creditors' Oversight Committee shall be selected by the Committee. The Creditors' Oversight Committee shall only exist so long as there are two (2) creditors willing to serve. No compensation to the members of the Creditors' Oversight Committee shall be paid by the Trustee from the Trust Assets; provided, however, that reasonable expenses of the Creditors' Oversight Committee may be reimbursed by the Trustee at his discretion. The Creditors' Oversight Committee shall have standing as a party in interest to enforce the terms and provisions of the Trust Agreement. The Creditors' Oversight Committee shall have the authority to retain counsel if necessary to resolve a dispute with the Trustee and the reasonable fees and expenses of such counsel shall be a cost of administration of the Trust. The members of the Creditors' Oversight Committee shall not be liable for any act done or omitted to be done as a member of the Creditors' Oversight Committee while acting in good faith. The members of the Creditors' Oversight Committee shall not be liable in any event except for gross negligence or willful fraud or misconduct.

## ARTICLE X

## POST CONFIRMATION CORPORATE GOVERNANCE

10.1 **Amendments to Articles and Bylaws.** International's Articles of Incorporation and Bylaws will be amended and supplemented, as necessary, to provide for the inclusion of the following requirements:

(a) The decrease in the number of authorized shares as necessary to effect the requirements of the Plan;

(b) Any stock issued shall be in certificated form;

(c) The minimum number of directors on the Board of Directors shall be two (2);

(d)     The restrictions set forth in Section 1123 (a)(6) of the Bankruptcy Code as to preferred stock and non-voting equity shall be made a part of the Articles of Incorporation;

(e)     The entry of the Confirmation Order will be deemed to meet all necessary shareholder approval requirements under any applicable provisions of Delaware law necessary to take the corporate actions set forth in the Plan.

10.2    **Issuance of Shares.** All shares issued are not issued under §1145 (a)(1) and are subject to all securities laws and regulations relative to their transferability and their issuance. Such shares that are issued not on account of a claim or interest, will be issued pursuant to Section 4(2) of the Securities Act of 1933, as amended (the "Securities Act"). In this regard, Richmont has advised the Debtors that it acknowledges that such shares will not be registered pursuant to the Securities Act or any applicable state securities laws, that such shares will be characterized as "restricted securities" under federal securities laws, and that under such laws and applicable regulations such shares cannot be sold or otherwise disposed of without registration under the Securities Act or an exemption therefrom. In this regard, Richmont has represented to Debtors that it is familiar with Rule 144 promulgated under the Securities Act, as currently in effect, and understands the resale limitations imposed thereby and by the Securities Act.

10.3    **Officers and Directors.** The executive officers of the Reorganized Debtors will be as follows:

Reorganized International: John P. Rochon, Chief Executive Officer and Chairman; John Thomas, President; Michael Pajak, Chief Financial Officer; Alan S. Lockwood, Senior Vice President, General Counsel, Secretary; and Kelly Kittrell, Assistant Secretary.  The initial Directors of Reorganized International will be  John P. Rochon, William John Philip Rochon, Nick G. Bouras and Alan S. Lockwood.

Reorganized Envirosmart: John Thomas, President; Alan S. Lockwood, Senior Vice President, General Counsel and Secretary; and Kelly Kittrell, Assistant Secretary. The initial Directors of Reorganized Envirosmart will be William John Philip Rochon and Alan S. Lockwood.

Reorganized ICMI: William John Philip Rochon, Chairman; Robert Leonard, President; Alan S. Lockwood, Senior Vice President, General Counsel and Secretary; and Kelly Kittrell, Assistant Secretary. The initial Directors of Reorganized ICMI will be William John Philip Rochon, Robert Leonard and Alan S. Lockwood.

10.4    **Private Company.**  Reorganized International, Reorganized Envirosmart and Reorganized ICMI, upon entry of the Confirmation Order, will each continue to be a privately held company.  Nothing herein restricts any of the Reorganized Debtors from thereafter seeking to become a registered publicly traded company in accordance with any and all applicable statutory and regulatory requirements.

## ARTICLE XI

## TREATMENT OF EXECUTORY
## CONTRACTS AND UNEXPIRED LEASES

11.1 **General Rejection of Executory Contracts.** The Debtors have previously rejected various Executory Contracts. All Executory Contracts with the Debtors that have not, as of ten (10) days prior to the date set for the Confirmation Hearing, been specifically assumed either prior to or in connection with the Confirmation Hearing are rejected as of the Effective Date.

11.2 **Assumption of Executory Contracts.** The Debtors have previously assumed various Executory Contracts. The Debtors shall additionally assume as of the Effective Date those Executory Contracts set forth on the list to be filed with the Court within ten (10) days prior to the date set for the Confirmation Hearing.

11.3 **Cure of Defaults.** The Reorganized Debtors shall cure all defaults existing under any assumed Executory Contract pursuant to the provisions of §§ 1123(a)(5)(G) and 365(b) of the Code, by paying the amount, if any, determined by the Court required to be paid in order to assume such Executory Contract. Payment of such amounts shall be made by the Reorganized Debtors within ninety (90) days after the Effective Date.

11.4 **Claims for Damages.** Each person who is a party to an Executory Contract rejected pursuant to this Article shall be entitled to file, not later than thirty (30) days after the Confirmation Hearing, which is the deemed date of such rejection, a proof of claim for damages alleged to arise from the rejection of the Executory Contract to which such person is a party. The Court shall determine any such objections, unless they are otherwise resolved. All Allowed Claims for rejection damages shall be treated as Class 8 or Class 10 General Unsecured Claims, depending on the Allowed Amount of such Claim.

## ARTICLE XII

## PROVISIONS REGARDING
## DISTRIBUTIONS AND OBJECTIONS TO CLAIMS

12.1 **No Distributions Pending Allowance or Estimation of Claims.** No payments or distributions shall be made with respect to all or any portion of a Contested Claim unless and until such Claim becomes an Allowed Claim, or Allowed Interest, as determined by Final Order.

12.2 **Reserve for Certain Distributions.** The Trustee shall reserve funds adequate to properly treat Contested Claims pending the resolution of any objection to such Claim.

12.3 **Distributions After Disallowance.** In the event that any amounts held in such reserve remain after all objections to Contested Claims have been resolved, the Trustee shall make distributions of funds held in reserve on account of Claim objections on a Pro Rata basis pursuant to the terms of this Plan.

12.4 **Treatment of Contingent or Unliquidated Claims.** Until such time as a Contingent Claim becomes fixed and Allowed, such Claim shall be treated as a Contested Claim for purposes related to voting, allowance, and distributions under this Plan. The Bankruptcy Court upon request by the Debtors or, after the Effective Date, by the Reorganized Debtors or the Trustee, as the case may be, shall in a summary proceeding for each such contingent Claim or unliquidated Claim, by estimation determine the allowability of each such contingent or unliquidated Claim.

12.5 **Form of Payments.** Payments to be made by the Trustee pursuant to this Plan shall be made by check drawn on a domestic bank or by wire transfer from a domestic bank. The Trustee may disregard, and elect to not pay, Allowed Claims whose Pro Rata share of a proposed distribution is less than $100.00. In such case, the Allowed Amount of such Claims shall be reduced to zero and such funds shall be retained as part of the Trust.

## ARTICLE XIII

## PROVISIONS FOR THE DISCHARGE, SETTLEMENT, AND ADJUSTMENT OF CLAIMS

13.1 **Reservation of Claims and Causes of Action.** Causes of Action shall mean any and all claims, causes of action, cross claims or counterclaims held or assertable by the Debtors, including but not limited to: (i) the claims held, asserted, or assertable by the Debtors, as the OD Causes of Action; (ii) Avoidance Actions; (iii) any claim or cause of action arising from any payment made to any person or entity during the pendency of these cases; and (iv) any and all claims, causes of action, counterclaims, demands, controversies, against third parties on account of costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, liabilities, objections, and executions of any nature, type, or description which the Debtors have or may come to have, including, but not limited to, negligence, gross negligence, usury, fraud, deceit, misrepresentation, conspiracy, unconscionability, duress, economic duress, defamation, control, interference with contractual and business relationships, conflicts of interest, misuse of insider information, concealment, disclosure, secrecy, misuse of collateral, wrongful release of collateral, failure to inspect, environmental due diligence, negligent loan processing and administration, wrongful setoff, violations of statutes and regulations of governmental entities, instrumentalities and agencies (both civil and criminal), racketeering activities, securities and antitrust laws violations, tying arrangements, deceptive trade practices, breach or abuse of fiduciary duty, breach of any alleged special relationship, course of conduct or dealing, obligation of fair dealing, obligation of good faith, and obligation of good faith and fair dealing, whether or not in connection with or related to the loan papers and this Plan, at law or in equity, in contract in tort, or otherwise, known or unknown, suspected or unsuspected, *but excluding* any Claims or Causes of Action which are released in the Plan or the Confirmation Order, are hereby preserved and retained for enforcement by and for the benefit of the Reorganized Debtors and/or the Trust effective as of the Confirmation Date. It is the intent of the Plan Proponents that this reservation of claims, shall be as broad as permitted by applicable law and shall include all claims, whether or not disclosed in the Debtors' schedules, and shall include any claims discussed in the Disclosure Statement. On the Effective Date, the Avoidance Actions shall be transferred to the Trust.

13.2   **Funding of the Causes of Action (Non-Avoidance Actions)**.   The Reorganized Debtors will be responsible for evaluating, funding and pursuing any or none of the Causes of Action based on its reasonable business judgment for the benefit of the Reorganized Debtors. However, each Reorganized Debtor shall only be liable to fund such amounts as that Reorganized Debtor, in its sole and absolute discretion, shall deem appropriate and reasonable.

13.3   **Authority for Settlement of Causes of Action (Non-Avoidance Actions)**. After the Effective Date, each Reorganized Debtor shall, in its sole and absolute discretion, be authorized to compromise and settle any of the Causes of Action, including the OD Causes of Action but excluding the Avoidance Actions that will be transferred to the Trust under this Plan, without Court approval or notice to any party, at any time, and for any consideration that the Reorganized Debtor believes to be in its best interest (and not necessarily in the best interest of the Creditors) including, inter alia, the right to permit the Reorganized Debtor to accept zero-cash or non-cash benefits.

13.4   **Representative of Estates.**   To the extent necessary and appropriate, the Reorganized International is appointed as the representative of the estates pursuant to §1123(b)(3) of the Code to pursue the Causes of Action and shall be the only entity authorized to pursue the Causes of Action. Similarly, the Trustee of the Trust is appointed as the representative of the estates pursuant to §1123(b)(3) of the Code to pursue the Avoidance Actions and is the only entity authorized to recover preferences, fraudulent conveyances, and all other avoidance actions under Chapter 5 of the Bankruptcy Code. Unless the Reorganized International or the Trustee, as the case may be, consents, or unless otherwise ordered by the Bankruptcy Court, no other party shall have the right or obligation to pursue any Avoidance Actions or other Causes of Action.   Any creditor determined to have received a transfer that is avoidable pursuant to Sections 544, 547, 548, 549, and/or 550 of the Bankruptcy Code or any other applicable law shall be required to remit to the Trust the determined amount of the avoided transfer prior to receiving any distribution.

13.5   **Compromise and Settlement.**   Reorganized International or the Trustee, as the case may be, shall have the right to pursue, compromise or settle any claim or Cause of Action, including the OD Causes of Action and the Avoidance Actions, and the compromise and settlement by Reorganized International or the Trustee of any claim, Cause of Action, OD Cause of Action or Avoidance Action may be effected without the necessity of Bankruptcy Court proceedings under Bankruptcy Rule 9019 or otherwise.

## ARTICLE XIV

## EFFECT OF CONFIRMATION, DISCHARGE, RELEASES, AND INJUNCTION

14.1   **Vesting of Property.**   Except as otherwise provided in the Plan, Confirmation of the Plan shall vest all of the property of the Debtors in the Reorganized Debtors.

14.2   **Property Free and Clear.**   Except as otherwise provided in the Plan, all property dealt with by the Plan shall be free and clear of all claims, liens and interests of any party as of the Effective Date.  This Plan will evidence the release of any and all Liens or encumbrances against all property dealt with by the Plan, unless such Lien or encumbrance is specifically retained in the Plan.

14.3   **Legal Binding Effect; Discharge of Claims and Interests.** The provisions of this Plan shall: (i) bind all Claimants and Interest holders, whether or not they accept this Plan, and (ii) discharge the Debtors, jointly and severally, from all Claims, claims, debts and liabilities that arose before the Petition Date, and from any Claims, claims, debts and liabilities, including, without limitation, any Claims, claims, debts and liabilities of a kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, that arose, or have been asserted against, the Debtors, jointly or severally, at any time before the entry of the Confirmation Order or that arise from any pre-Confirmation conduct of the Debtors, jointly or severally, whether or not the Claims, claims, debts and liabilities are known or knowable by the Claimant or Interest holder. In addition, the distributions provided for under this Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims against and Interests in the Debtors or any of its assets or properties, including any Claim or Interest accruing after the Petition Date and prior to the Effective Date.

14.4   **Release of Claims Against the Nukote Affiliated Parties.** On the Effective Date, in exchange for and in consideration of the amounts payable by Richmont under this Plan, the Debtors will execute a broad and full release of all claims the estates may have against the Nukote Affiliated Parties. Such releases shall be effective on the Effective Date.

14.5   **Release of Claims Against CIT Parties.** On the Effective Date, in exchange for and in consideration of the DIP Facility, the Debtors will execute a broad and full release of all claims the estates may have against CIT. Such releases shall be effective on the Effective Date.

14.6   **Effect on Third Parties.** Except as specifically provided in this Plan or in the Confirmation Order, nothing contained in this Plan or in the documents to be executed in connection with the Plan shall affect any Creditors' rights as to any third party.

14.7   **Release and Discharge of Claims and Interests.** Except as otherwise provided by the Plan or the Confirmation Order, the consideration distributed under the Plan shall be in complete satisfaction, release and discharge of the Debtors and their assets from all Claims or Interests of any Creditor or holder of an Interest, including Claims or Interests arising prior to the Effective Date.

14.8   **Permanent Injunction.** Except as otherwise expressly provided in, or permitted under, this Plan, the Confirmation Order shall provide, among other things, that all Creditors and persons who have held, hold or may hold Claims or Interests that existed prior to the Effective Date, are permanently enjoined on and after the Effective Date against the: (i) commencement or continuation of any judicial, administrative, or other action or proceeding against the Debtors, Reorganized Debtors, Richmont, or the Nukote Affiliated Parties, as the case may be, on account of Claims against or Interests in the Debtors; (ii) enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree, or order against the Debtors, Reorganized Debtors, Richmont, or the Nukote Affiliated Parties, or any assets or property of same; or (iii) creation, perfection or enforcement of any encumbrance of any kind against the Debtors, Reorganized Debtors, Richmont, or the Nukote Affiliated Parties, as the case may be, arising from a Claim. This provision does not enjoin the prosecution of any claims that arise after the Effective Date nor does it enjoin the determination of the Allowed Amount of any Claims that arose prior to

the Effective Date by a court of competent jurisdiction. This provision does not enjoin the collection of any tax owing to any governmental entity, including the Internal Revenue Service, to the extent that such tax is created in any manner and over any period of time by the effectuation of the terms of the Plan once confirmed. Further, this provision does not enjoin the collection of any administrative tax claim by the Internal Revenue Service from any source allowed by law.

## ARTICLE XV

## RETENTION OF JURISDICTION

15.1    **Retention of Jurisdiction.** The Bankruptcy Court shall retain exclusive jurisdiction over these Cases after Confirmation, notwithstanding Consummation or substantial consummation, for the following purposes:

(a)    to consider and effect any modification of this Plan under Section 1127 of the Bankruptcy Code;

(b)    to hear and determine all controversies, suits and disputes that arise in connection with the interpretation, implementation, effectuation, consummation or enforcement of this Plan;

(c)    to hear and determine all requests for compensation and/or reimbursement of expenses for the period commencing on the Petition Date through the Confirmation Date;

(d)    to hear and determine all objections to Claims and Interests, and to determine the appropriate classification of any Claim or Interest, and other controversies, suits and disputes that may be pending at or initiated after the Confirmation Date, except as provided in the Confirmation Order;

(e)    to hear and determine all claims that the Debtors, as debtors in possession qua trustee or their affiliates, the Reorganized Debtors or their affiliates, as the successors and designated representatives of the Debtors and the Estates could assert under the Bankruptcy Code;

(f)    to consider and act on such other matters consistent with this Plan as may be provided in the Confirmation Order;

(g)    to make such orders as are necessary and appropriate to carry out and implement the provisions of this Plan;

(h)    to approve the reasonableness of any payments made or to be made, within the meaning of Section 1129(a)(4) of the Bankruptcy Code;

(i)      to exercise the jurisdiction granted pursuant to Section 505(a) and (b) of the Bankruptcy Code to determine any and all federal, state, Commonwealth, local and foreign tax liabilities of, and any and all refunds of such taxes paid by the Debtors;

(j)      to hear and determine any issues or matters in connection with any property not timely claimed as provided in this Plan;

(k)      to hear and determine any controversies with respect to any settlements approved by the Court;

(l)      to determine any and all motions, applications, adversary proceedings and contested matters whether pending in the Case as of the Effective Date or brought subsequently by the Reorganized Debtors;

(m)      to hear, determine and preside over the Causes of Action;

(n)      to hear, determine and preside over the OD Causes of Action; and

(o)      to hear, determine and preside over the Avoidance Actions.

15.2      **No Limitation.** Nothing contained in this Article XV shall be construed so as to limit the rights of Reorganized Debtors or their affiliates to commence or prosecute any claim in any court of competent jurisdiction.

## ARTICLE XVI

## MISCELLANEOUS PROVISIONS

16.1      **Request for Relief under Section 1129(b).**  In the event any Impaired Class of Interests shall fail to accept this Plan in accordance with Section 1129(a) of the Bankruptcy Code, the Plan Proponents request the Bankruptcy Court to confirm this Plan in accordance with the provisions of Section 1129(b) of the Bankruptcy Code.

16.2      **Modification.**  This Plan shall not be modified except upon the written agreement of the Plan Proponents.

16.3      **Headings.**  All headings utilized in this Plan are for convenience and reference only, and shall not constitute a part of this Plan for any other purpose.

16.4      **Securities-Related Claims Based on Common Stock.**  All Interests or Claims asserted based upon or related to ownership of the common stock of any of the Debtors, or Claims relating to damages attributable to or arising from any purchase or sale thereof, shall be treated in Class 11.

16.5 **Due Authorization.** Each and every Claimant and Interest holder who elects to participate in the distributions provided for herein warrants that such Claimant or Interest holder is authorized to accept, in consideration of such Claim against or Interest in the Debtors, the distributions provided for in this Plan and that there are not outstanding commitments, agreements, or understandings, expressed or implied, that may or can in any way defeat or modify the rights conveyed or obligations undertaken by such Claimant or Interest holder under this Plan.

16.6 **Authorization of Corporate Action.** All matters and actions provided for under this Plan involving the corporate structure of the Debtors or corporate action to be taken by or required of the Debtors, Reorganized Debtors, or their affiliates shall be deemed to have occurred and be effective as provided herein, and shall be deemed to be authorized and approved in all respects without any requirement for further action by the stockholders or directors of the Debtors. Specifically, all amendments to the certificate of incorporation and By-laws of the Debtors pursuant to this Plan and all other corporate action on behalf of the Debtors or their affiliates, Reorganized Debtors or their affiliates, as may be necessary to put into effect or carry out the terms and intent of this Plan and the orders and decrees of the Bankruptcy Court entered in the Case, may be affected, exercised and taken without further action by the directors or stockholders of the Debtors, as applicable, with like effect as if effected, exercised and taken by unanimous action of the directors and stockholders of the Debtors, as applicable, as contemplated by Section 303 of the Delaware General Corporation Law or any similar law.

16.7 **Further Assurances and Authorizations.** The Debtors or their affiliates, Reorganized Debtors or their affiliates, if and to the extent necessary, shall seek such orders, judgments, injunctions, and rulings that may be required to carry out further the intentions and purposes, and to give full effect to the provisions, of this Plan. All terms and provisions of this Plan shall be construed in favor of the Plan Proponents.

16.8 **Additional Acts or Actions.** The Plan Proponents may, but shall not be obligated to, take any action or commit any act that any of them determine to be necessary to facilitate the consummation, implementation, effectuation and execution of this Plan. No act committed or action taken by Richmont under this Plan shall be used, construed, or deemed to create any liability of Richmont or to hold Richmont to be participating in management or the governance, management or operations of the Debtors or the Reorganized Debtors, or to be acting as a "responsible person" or "owner or operator", or person that did "participate in management", or a person in "control" with respect to the governance, management or operation of the Debtors' estates or their businesses (as such terms, or any similar terms, are used in the Bankruptcy Code, or the Internal Revenue Code, Comprehensive Environmental Response, Compensation and Liability Act, each as may be amended from time to time, or any other federal or state statute, at law, in equity, or otherwise) by virtue of the interests, rights, and remedies granted to or conferred upon Richmont under this Plan. Richmont shall be entitled to the fullest protection afforded under such statutes and laws and shall incur no liability under such statutes or laws as a result of this Plan and the negotiation, consummation and effectuation of same per the terms hereof.

16.9 **Applicable Law.** Except to the extent that the Bankruptcy Code or other federal law is applicable, the rights, duties and obligations arising under this Plan shall be governed by and construed and enforced in accordance with the internal laws of the State of Texas without reference to the laws of other jurisdictions.

16.10 **Privileged Communications; Work Product.** For purposes of any proprietary, confidential or privileged information or communication, including attorney-client privileged communications, and documents that would otherwise constitute attorney work product, the Reorganized Debtors and, to the extent necessary to prosecute the Avoidance Actions, the Trust, shall succeed to the interest of the Debtors and the Estates, to the extent provided by applicable law.

16.11 **No Interest.** Except as expressly stated in this Plan, or allowed by the Court, no interest, penalty or late charge is to be Allowed on any Claim subsequent to the Filing Date.

16.12 **No Attorneys' Fees.** No attorneys' fees will be paid with respect to any Claim, other than Claims of professionals employed by the Debtors or the Committees, except as specified herein or as allowed by a prior order of the Court.

16.13 **Post-Confirmation Actions.** After Confirmation, the Reorganized Debtors may, with the approval of the Court, and so long as it does not materially or adversely affect the interest of Creditors, remedy any defect or omission, or reconcile any inconsistencies in the Plan or in the Order of Confirmation, in such manner as may be necessary to carry out the purposes and effect of the Plan.

16.14 **Setoff.** Except as specifically provided in the Plan, no Creditor shall retain any contractual or statutory right to set off any asset in which the Debtors or Reorganized Debtor has an interest in satisfaction of that Creditor's pre-petition Claim. Any right to set off a claim against an asset of Debtors or Reorganized Debtor which is not specifically retained is waived.

16.15 **Notice of Default.** In the event of any alleged default under the Plan, any Creditor or party-in-interest must give a written default notice to the Reorganized Debtors, with copies to counsel of record for the Reorganized Debtors, as applicable, specifying the nature of the default. Upon receipt of the default notice, the Reorganized Debtor shall have ten (10) days to cure such default from the time of receipt of the default notice. If such default has not been cured within the applicable time period, the default may be brought to the attention of the Court or any other court of competent jurisdiction.

16.16 **Notices.** All notices, requests, elections or demands in connection with the Plan shall be in writing and shall be deemed to have been given when received or, if mailed, five (5) days after the date of mailing provided such writing shall have been sent by registered or certified mail, postage prepaid, return receipt requested.

16.17 **Payment Dates.** Whenever any payment or distribution to be made under the Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made,

without interest, on the next Business day, except as may be provided in negotiable instruments requiring such payments.

   16.18 **Termination of the Committees.** On the Effective Date, all Committees appointed by the United States Trustee shall cease to exist and have no further status as a party in interest except for the purpose of prosecuting any applications for Fee Claims and of participating in any appeal of the Confirmation Order, in which events the Committees shall cease to exist immediately after the resolution of such matters.

   16.19 **Consummation.** For all purposes, Consummation (and substantial consummation of this Plan) shall occur the instant upon which the Exit Financing Agreement for the Exit Facility with CIT has been executed, the Trust has been formed and the Avoidance Actions have been transferred to the Trust, all payments required to be made by Richmont on the Effective Date have been made, and the new stock of International has been issued to Richmont, at which time this Plan shall be deemed fully consummated and on which date this Plan shall be fully effective. Consummation shall occur on or promptly following the Effective Date.

**DATED: November 12, 2009**          Respectfully submitted,

                                      **WRIGHT GINSBERG BRUSILOW P.C.**

                                      By:   _/s/ Frank J. Wright_
                                            Frank J. Wright
                                            Texas Bar No. 22028800
                                            C. Ashley Ellis
                                            Texas Bar No. 00794824

                                            600 Signature Place
                                            14755 Preston Road
                                            Dallas, TX 75254
                                            (972) 788-1600
                                            (972) 239-0138 (fax)

                                                   and

                                            Craig V. Gabbert, Jr.
                                            Barbara D. Holmes
                                            HARWELL HOWARD HYNE
                                             GABBERT & MANNER, P.C.
                                            315 Deaderick Street, Suite 1800
                                            Nashville, TN 37238-1800
                                            (615) 256-0500
                                            (615) 251-1059 (fax)

                                      **ATTORNEYS FOR DEBTORS**

Case 3:09-bk-06240   Doc 404   Filed 11/12/09   Entered 11/12/09 10:44:39   Desc Main
                       Document       Page 37 of 50

# TRUST AGREEMENT AND DECLARATION OF TRUST
## FOR THE NI CREDITORS' TRUST

This Trust Agreement and Declaration of Trust ("Agreement") is made and entered into as of the ___ day of _____, 2009 ("Effective Date"), by and among Nukote International, Inc., Nukote Imperial, Ltd., International Communication Materials, Inc. Envirosmart, Inc., and Black Creek Holdings Ltd., debtors and debtors-in-possession in jointly administered bankruptcy cases under Case No. 09-06240 (the "Debtors" or "Nukote") and Christopher J. Tierney (the "Trustee").

WHEREAS, Nukote filed bankruptcy petitions under Chapter 11 of the United States Code (the "Bankruptcy Code") on June 3, 2009 ("Petition Date") commencing the case of *Nukote International, Inc., et al*, Case No. 09-06240 (the "Bankruptcy Case"), in the United States Bankruptcy Court for the Middle District of Tennessee, Nashville Division ("Bankruptcy Court").

WHEREAS, on or about June 12, 2009, the United States Trustee's Office formed the Official Committee of Unsecured Creditors (the "Committee");

WHEREAS, the Bankruptcy Court entered an order confirming the First Amended Joint Plan of Reorganization for the Debtors Proposed by the Debtors together with any amendments thereto (the "Plan") on _____, 2009 in the Bankruptcy Case;

WHEREAS, the Plan provides for the creation of a Trust to hold certain assets defined by the Plan as the "Trust Assets" for the benefit of certain holders of Unsecured Claims against the Debtors ("Trust Beneficiaries");

NOW, THEREFORE, in order to effectuate and comply with the terms and conditions of the Plan, the parties hereto agree as follows:

1. **Creation of the Trust.**

   1.1 Appointment of the Trustee. In accordance with the provisions of the Plan, Christpher J. Tierney of Hays Financial Consulting, LLC is hereby named as the Trustee to hold, manage, and distribute the Trust Assets for the benefit of the Trust Beneficiaries pursuant to the terms of this Agreement and the Plan.

   1.2 Acceptance by the Trustee. The Trustee is willing and does hereby accept the appointment to serve as trustee and hereby agrees to administer the Trust Assets pursuant to the terms of this Agreement and the Plan.

   1.3 Name of the Trust. The Trust established hereby shall bear the name "NI Creditors' Trust." In connection with the exercise of his powers as trustee, the Trustee may use such name or such variation thereon as he sees fit, or may use his own name, as Trustee, or otherwise.



EXHIBIT
"A"

1.4    Appointment of Creditors' Oversight Committee. On the Effective Date, the Trustee shall establish a committee ("Creditors' Oversight Committee"), consisting of no more than three (3) creditors, to consult with the Trustee regarding the Trust Assets. The initial members of the Creditors' Oversight Committee shall be selected by the Committee. The Creditors' Oversight Committee shall only exist so long as there are two (2) creditors willing to serve. No compensation to the members of the Creditors' Oversight Committee shall be paid by the Trustee from the Trust Assets; provided, however, that reasonable expenses of the Creditors' Oversight Committee may be reimbursed by the Trustee at his discretion. The Creditors' Oversight Committee shall have standing as a party in interest to enforce the terms and provisions of the Trust Agreement. The Creditors' Oversight Committee shall have the authority to retain counsel if necessary to resolve a dispute with the Trustee and the reasonable fees and expenses of such counsel shall be a cost of administration of the Trust and any disagreements will be resolved by the Bankruptcy Court. The following rules also apply to the Creditors' Oversight Committee:

i.      A member of the Creditors' Oversight Committee may vote by written proxy, and such proxy shall be counted for the purpose of establishing a quorum. The proxy shall specify the particular issue or issues to which it pertains or may be general in nature. Voting by designated Representative or Alternate shall be deemed a vote by a member and shall be deemed voting by proxy.

ii.     A quorum shall exist when at least a simple majority of the members are present in person or by telephone. A meeting at which a quorum was initially present may continue to transact business notwithstanding the withdrawal of members.

iii.    Meetings may be held in person or by telephone, and shall require a quorum to conduct business at each meeting, except as expressly provided for in paragraph 1.4(vi) hereof.

iv.     Special meetings may be called by the Chairperson on notice by telephone or electronic mail to each member. If such notice is by telephone, it shall, if practical be confirmed by electronic mail, or similar written medium. The primary purpose for the special meeting shall be set forth in the notice. The Chairperson shall call special meetings whenever it deems it appropriate or whenever requested to do so by a simple majority of the voting members.

v.      Action by the Creditors' Oversight Committee, shall require the affirmative vote of the majority of the voting members attending the meeting except as otherwise provided in this Agreement. Each voting member shall have one (1) vote. In the event that any voting Member abstains from voting, the requirement of a majority of member votes for Creditors' Oversight Committee action shall be reduced by one (1) vote for each member who abstains from voting; provided, however, that in the event that a majority of

members abstain from voting, no Creditors' Oversight Committee action shall be taken regarding the matter under consideration. In the event of a voting tie, ties shall be broken by the Chairperson.

vi.   Action may be taken without a meeting if a majority of the Oversight Committee determines that urgent action is required. A record of the vote of the members shall be kept. Such a vote shall be effective if:

i.   a good faith effort is made to reach each Member, either personally, through a designated Representative, or through an Alternate; and

ii.   at least a majority of members have voted in the affirmative. The vote and action shall be confirmed in writing to all members.

vii.   The members of the Creditors' Oversight Committee shall elect the Chairperson. In the absence of the Chairperson, the remaining members are authorized to perform the duties and obligations of the Chairperson on a meeting-by-meeting basis.

1.5   <u>Beneficiaries of the Trust</u>. The Trust Beneficiaries shall be the holders of Allowed Claims in Classes 6, 9 and 10 who shall receive a beneficial interest in the Trust in accordance with their treatment under the terms of the Plan and this Agreement, but only to the extent provided in the Plan.

1.6   <u>The Assets of the Trust</u>. The "Trust Assets" are defined in the Plan and that definition is incorporated herein by reference.

1.7   <u>Transfer of the Trust Assets to the Trust</u>. In accordance with the provisions of the Plan, right, title and interest in and to the Trust Assets are hereby vested in the Trust and preserved for the benefit of the Trust Beneficiaries. From and after the Effective Date of this Agreement, the Trust Assets shall be administered by the Trustee on behalf of the Trust Beneficiaries. Prior to or contemporaneously with the execution of this Agreement, the Debtor shall have executed and delivered to, or to the order of, the Trustee any and all documents and other instruments as may be necessary or useful to conform title to the Trust Assets, including the Debtor's books and records relating to the Trust Assets.

1.8   <u>Funding of the Trust</u>. The activities of the Trust will be funded in accordance with the Plan and, at the discretion of the Trustee, by the cash generated from the Trust Assets and/or the proceeds of the disposition thereof.

1.9   <u>Resolution of the Causes of Action</u>. Subject to the terms of the Plan, the Trustee shall pursue, in his discretion, on behalf of the Trust as the designated representative of the Debtors, to either judgment, order, compromise or settlement, the Causes of Action transferred to the Trust pursuant to the Plan, resolution of which shall be effected in a manner reasonably calculated under

the then existing circumstances to maximize the proceeds of the Causes of Action within the period necessary to fund timely the payments contemplated under the Plan.

1.10 Cooperation by Debtors. The Debtors agree to cooperate with the Trustee in connection with objections to Claims and pursuit of Avoidance Actions transferred to the Trust by providing the Trustee with both documents and testimony reasonably necessary to such objections and Avoidance Actions. The Debtors agree to provide the Trustee with the same reports provided to CIT in connection with the calculation of Excess Cash Flow and access to the supporting books and records of the Debtors with respect to such calculations upon reasonable notice. Upon request and subject to an appropriate confidentiality agreement as and if deemed necessary by the Debtors, the Debtors agree to provide the Trustee a list of Trade Creditors participating in the Trade Credit Initiative Program.

1.11 Reserves. Prior to any distribution of cash or proceeds, the Trustee shall establish adequate reserves for the operation of the Trust and Contested Claims that may become Allowed Claims after the Effective Date.

1.12 Interim Distribution. If and when, in the opinion of the Trustee, there are sufficient cash and proceeds to justify an interim distribution to creditors holding Allowed Claims, he may make such interim distributions to holders of such Allowed Claims as he deems appropriate in his sole and absolute discretion; provided that the Trustee shall maintain an amount deemed necessary by the Trustee to be a sufficient reserve as required in this Section.

1.13 Unclaimed Distributions. Any proceeds or other cash held for the benefit of any holder of an Allowed Claim, if unclaimed by the distributee within three months after the distribution, shall be redeposited into the fund and made available for other Allowed Claims and Allowed Interests, and such holder's Claim will no longer be deemed to be Allowed, and such holder will not participate in any further distributions.

2. Beneficial Interest of the Trust Beneficiaries.

2.1 Interests Beneficial Only. The Trust Beneficiaries shall have a beneficial interest in the Trust Assets only to the extent specified under the Plan. The Trust Beneficiaries' proportionate beneficial interest in the Trust Assets as thus determined shall not be transferable, except pursuant to the laws of descent and distribution or otherwise by operation of law. The beneficial interests held by the Trust Beneficiaries hereunder shall not entitle any Trust Beneficiary to any title or direct ownership interest in or to any of the Trust Assets as such, or to any right to call for a partition or division of the same, or to require an accounting except as specially required by the terms hereof.

2.2 Evidence of Beneficial Interest. Ownership of a beneficial interest in the Trust Assets hereunder shall not be evidenced by any certificate, security, or receipt or in any other form or manner whatsoever.

**TRUST AGREEMENT AND DECLARATION OF TRUST**
**NI CREDITORS' TRUST - Page 4**

2.3     Relationship Creates No Partnership or the Like. The only relationship created by this Agreement is the trustee-beneficiary relationship between the Trustee and the Trust Beneficiaries. No other relationship or liability is created. This Agreement is not intended to create and shall not be interpreted as creating an association, partnership or joint venture of any kind.

2.4     Effect of Death, Incapacity or Bankruptcy. The death, incapacity or bankruptcy of any of the Trust Beneficiaries during the terms of this Trust shall not operate to terminate the Trust, nor shall it entitle the representatives or creditors of the deceased to an accounting, or to take any action in the Bankruptcy Court or elsewhere for the distribution of the Trust Assets or for a partition thereof, nor shall it otherwise affect the rights and obligations of any of the other Trust Beneficiaries under the Trust.

3.     Rights, Powers and Duties of Trustee.

3.1     Powers of Trustee. Except as otherwise provided in the Plan, the Trustee shall have all of the following rights and powers to:

   (a)     Receive and hold, to have exclusive possession and control thereof as permissible under applicable law, to maintain and to administer the Trust Assets;

   (b)     Employ, retain or replace professional Persons, including attorneys, accountants, appraisers, investment advisors, expert witnesses, insurance adjustors, or other Persons whose services may be necessary or advisable, in the judgment of the Trustee, to advise or assist him in the discharge of the duties of the Trustee, or otherwise in the exercise of any powers vested in the Trustee or as the Court may direct and, subject to the provisions of the Trust, to pay to such professionals reasonable compensation (in this regard, the Trustee may employ professionals employed by the Debtors or the Committee);

   (c)     Collect, compromise, settle or discharge any Cause of Action transferred to the Trust under the Plan and held by the Trust and pursue, in his discretion, on behalf of the Trust as the designated representative of the Debtors, to either judgment, order, compromise or settlement, any of such Causes of Action, and to defend any counterclaims, cross-actions or other offsets;

   (d)     Distribute the cash and proceeds from the sale, liquidation, settlement, prosecution or other distribution of the Trust Assets;

   (e)     Seek a determination from the Court of the Allowed Amount of any Claim or Interest against the Trust, including filing objections thereto and pursuing any contest or adversary proceedings with regard thereto and entering into any

compromise or settlement thereof, and to execute any contract, including, without limitation, any release in connection with any such compromise or settlement. However, any Claim which is compromised, settled and/or released in connection with any such compromise or settlement agreement set forth in this Plan or the Trust Agreement is excluded;

(f)    Maintain possession of the originals of any and all instruments and documents pertaining to the Trust Assets and any liabilities of the Trust;

(g)    Pay all reasonable expenses incurred in connection with the administration of the Trust including any Trustee fees and fees of any retained professionals as they are earned;

(h)    Calculate and make distribution to holders of Allowed Claims all as set forth in this Plan;

(i)    Sue and be sued, including filing and defending contested matters and adversary proceedings in the Court and actions or other proceedings in any other court or before any administrative agency and to pursue or defend any appeal from any judgment or order therefrom, including, without limitation, pursuing claims of the Trust, filing suit or adversary proceedings or contested matters in connection therewith and defending any counterclaims, cross-actions or other offsets in connection therewith and entering into any compromise, settlement, release, discharge or dismissal of any of the claims;

(j)    Release, convey or assign any right, title or interest in or about the Trust Assets;

(k)    Enter into contracts binding upon the Trust (but not the Trustee) which are reasonably incident to the administration of the Trust and which the Trustee, in the exercise of his best judgment, believes to be in the best interests of the Trust;

(l)    Enter into real or personal property leases (for the leasing of office space and space for the storage of records) which are reasonably incidental to the administration of the Trust and which, in the judgment of the Trustee, will be advantageous to the Trust and will assist the Trustee in the performance of his duties under the Trust Agreement;

(m)    Abandon and charge off as worthless, in whole or in part, those actions which in the judgment of the Trustee, are in whole or in part uncollectible;

(n)     Pay taxes and excises lawfully owing by or chargeable against the Trust or property in the possession or control of the Trustee and to take any action necessary or advisable to obtain the prompt determination of any such tax liability;

(o)     Procure and pay premiums on policies of insurance to protect the Trust, or the Trust Assets, against liability for personal injuries or property damage or against loss or damage by reason of fire, windstorm, collision, theft, embezzlement, breach of fiduciary duty or other hazards against which insurance is normally carried in connection with the activities or on properties such as those with respect to which the Trustee procures such insurance;

(p)     Allocate items, receipts or disbursements either to corpus or income (or partially to corpus and partially to income) of the Trust as the Trustee, in the exercise of his best judgment and discretion, deems to be proper, without thereby doing violence to clearly established and generally recognized principles of accounting;

(q)     Deal with any governmental regulatory authority in obtaining such approvals or exemptions as may, in the opinion of the Trustee, be necessary or desirable with respect to the administration of the Trust;

(r)     Borrow funds from any Person, subject to reasonable commercial terms as agreed upon by the Trustee and prospective lender, with the advice and counsel of the Creditors' Oversight Committee;

(s)     Open any bank accounts which may be necessary to operate the Trust and distribute cash to the Beneficiaries;

(t)     Send annually to each Beneficiary upon written request a separate statement stating the Beneficiary's share of income, gain, loss, deduction or credit and a statement of receipts and disbursements of the Trust;

(u)     Seek the cash value of up to 17.5% of any OD Net Recoveries from the Debtors to the extent such settlement involves non-cash consideration; and

(v)     Exercise every power granted to a trustee under the Bankruptcy Code, including the rights and benefits afforded by §§ 108 and 546 of the Bankruptcy Code, which may increase the enumerated powers of the Trustee otherwise granted herein, and engage in any and all other activities, not in violation of any other terms of the Plan and Trust Agreement, which, in the judgment of the Trustee, are necessary or appropriate for the proper liquidation, management, investment and distribution of the assets of the

Trust in accordance with the provisions of the Trust Agreement, to effectuate the provisions of the Plan, and to perform such other tasks as the Bankruptcy Court may direct.

3.2    Representative of Estates. The Trustee is appointed as the representative of the Estate pursuant to section 1123(b)(3) of the Bankruptcy Code to pursue the Causes of Action transferred to the Trust pursuant to the Plan and shall be the only entity authorized to pursue the Causes of Action transferred to the Trust. Unless the Trustee consents, or unless otherwise ordered by the Bankruptcy Court, no other party shall have the right or obligation to pursue any such actions.

3.3    Compromise and Settlement. The Trustee shall, in his sole and absolute discretion, be authorized to compromise and settle any of the Causes of Action transferred to the Trust pursuant to the Plan, without Court approval, at any time, and for any consideration that he believes to be reasonable and in the Creditors' best interest subject to the consent of the Creditors' Oversight Committee.

3.4    Payment of Trust Fees and Expenses. The Trustee may establish reserves and accounts at banks and other financial institutions, in a clearly specified fiduciary capacity, into which cash and property may be deposited and checks drawn or withdrawals made to pay or distribute such amounts as permitted or required for fees, expenses and other liabilities of the trust, pursuant to the Plan and this Agreement. Such funds shall not be subject to any claim by any entity except as provided under the Plan. All reasonable fees and expenses of the Trust and its agents, professionals and employees incurred in connection with (i) the objection to, and settlement, liquidation and payment of claims and interest against the Debtor; (ii) the liquidation or disposition of the Trust Assets; or (iii) administering the Trust shall, subject to the review and approval of the Trustee, be paid.

3.5    Compensation of Trustee and Persons Employed by the Trust. All Persons or entities employed by the Trustee shall be entitled to reasonable compensation from the Trust and such compensation shall be subject to the review and approval of the Trustee and the Creditors' Oversight Committee. Any unresolved disputes shall be decided by a court of competent jurisdiction. The Trustee and his professionals shall be compensated as follows:

    (a)    All Hays Financial Consulting (HFC) professionals may charge the following rates, which may be subject to adjustment from time to time, typically on January 1 of each year:

        i.    Administrative staff shall charge from $50-75.00;

        ii.   Senior Associate/Associate shall charge from $75-150.00;

        iii.  Manager shall charge from $100-250.00;

iv.      Director shall charge from $200-300.00; and

v.      Managing Principal/Director shall charge from $300-375.00;

(b)      The Trustee shall cap the blended rate of all HFC professionals at $275.00/hour (the "Capped Rate"). The actual blended rate will be calculated by dividing the amount of monthly professional fees by the total number of hours expended on the Trust's behalf. If the actual blended rate is higher than the Capped Rate, the Trustee agrees to reduce the monthly invoice by the amount necessary to equal the Capped Rate. If the actual blended rate is lower than the Capped Rate, the Trustee shall charge the actual blended rate.

(c)      The Trustee shall receive a retainer in the amount of $25,000.00 for his services to the Trust;

(d)      The Trustee shall be reimbursed for all out of pocket expenses;

(e)      The Trustee shall earn a fee of:

i.      2.0% of all recoveries received by the Trust within the first 12 months of the engagement; and

ii.      1.0 % of all recoveries received by the Trust thereafter.

(f)      The Trustee shall employ MGLAW, PLLC as counsel. In the event of any conflict that disqualifies MGLAW, PLLC from representing the Trustee on a matter, the Trustee may hire counsel of his choosing for such matters, in consultation with the Creditors' Oversight Committee.

     3.6     Authorization. The Trust Beneficiaries hereby authorize the Trustee to act on behalf and in place of such Beneficiaries to the extent provided herein and in any document and instrument delivered hereunder or in connection herewith and to take such other action as may be incidental thereto, including, without limitation, the exercise of any discretion in connection with any determination or decision required for the administration of the Plan and the granting of any waiver, consent, amendment, suspension, supplementation, extension, renewal or other modification with respect to any and all provisions of the Plan on a conditional or unconditional basis.

     3.7     Exculpation. The Trustee shall be entitled to rely upon advice and opinions of counsel concerning legal matters, the authenticity of affidavits, letters, telegrams, cablegrams and other methods of communication in general use and usually accepted by businessmen as genuine and what they purport to be, and upon the Plan and any schedule, certificate, statement, report, notice or other writing which it believes to be genuine or to have been presented by a proper entity. Except for its or their own gross negligence or willful fraud or intentional misconduct, neither the Trustee, nor any of

his employees or agents, shall (a) be responsible for any recitals, representations or warranties contained in, or for the execution, validity, genuineness, effectiveness or enforceability of the Plan, (b) be under any duty to inquire into or pass upon any matter or to make any inquiry concerning the validity of any representation or warranty of the Debtors or the performance by the Debtors of its obligations or (c) in any event, be liable as such for any action taken or omitted by it or them. Each Trust Beneficiary agrees and acknowledges that the Trustee makes no representations or warranties with respect to the legality, validity, sufficiency or enforceability of the Plan.

3.8     Liability of Trustee/Creditors' Oversight Committee. No recourse shall ever be had, directly or indirectly, against the Trustee by legal or equitable proceedings or by virtue of any statute or otherwise, or by virtue of any deed of trust, mortgage, pledge or note, or by virtue of any promises, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Trustee for any purposes authorized, it being expressly understood and agreed that all such liabilities, covenants and agreements of the Trustee, whether in writing or otherwise, shall be enforceable only against and be satisfied only by the Trust, and every undertaking, contract, covenant or agreement entered into in writing by the Trustee may provide expressly against the personal liability of the Trustee. The Trustee shall not be liable for any act he may do or admit to do as the Trustee hereunder while acting in good faith. The Trustee shall not be liable in any event except for his own gross negligence or willful fraud or intentional misconduct. The Trustee shall be indemnified and held harmless by the Trust for any and all loss by reason of his acts or contracts for the Trust except for loss arising out of the Trustee's own gross negligence or willful fraud or intentional misconduct. The members of the Creditors' Oversight Committee shall not be liable for any act done or omitted to be done as a member of the Creditors' Oversight Committee while acting in good faith. The members of the Creditors' Oversight Committee shall not be liable in any event except for gross negligence or willful fraud or intentional misconduct.

3.9     No Personal Obligation for Trust Liabilities. Persons dealing with the Trustee, or seeking to assert claims against the Debtors, shall look only to the Trust Assets to satisfy any liability incurred by the Trustee or the Debtors to such person in carrying out the terms of this Trust, and the Trustee shall not have any personal, individual obligation to satisfy any such liability.

3.10     No Liability for Acts of Predecessors. No successor trustee shall be in any way responsible for the acts or omissions of any trustee in office prior to the date on which he becomes a trustee, unless a successor trustee expressly assumes such responsibility.

3.11     Delegation of Powers. The Trustee shall be entitled to delegate such authority to his employees and agents as he shall reasonably deem necessary to perform his responsibilities under the Plan and this Agreement.

3.12     Resignation, Death or Removal. The Trustee or any successor trustee may resign upon (thirty) 30 days written notice to the Creditors' Oversight Committee and the Debtors. The Trustee or any successor trustee may be removed by the Creditors' Oversight Committee at any time with or without cause, provided that no member of the Creditors' Oversight Committee shall participate in a

vote to remove the Trustee if that member has an actual conflict of interest. In the event of the resignation or removal of the Trustee or any successor trustee, or in the event of the death of the Trustee or a successor trustee, the Creditors' Oversight Committee, upon motion of any party, will appoint a substitute or successor Trustee to perform the duties, functions and obligations and to exercise the rights and authority of the Trustee as described in the Plan.

3.13    Investment of Funds. All proceeds and other cash (except for amounts which the Trustee determines, in his sole discretion, are needed for immediate payments and distributions) shall be invested and reinvested by the Trust in United States Treasury Bills or in certificates of deposits, demand deposit or interest-bearing accounts of banking institutions acceptable under the Bankruptcy Code, or such other investments as shall be prudent and appropriate under the circumstances, in such amounts and upon such terms as a reasonable and prudent fiduciary would select and with a view toward sufficient liquidity to make the distributions contemplated by the Plan. All interest earned on such proceeds and other cash shall be retained by the Trust and distributed in accordance with the Plan.

3.14    Tax Treatment. The Trust shall be treated as a grantor trust in accordance with the provisions of the Internal Revenue Code. The Trust Beneficiaries will be treated as the grantors of the Trust Assets to the Trust and deemed the owners of such Trust. Any valuation of the Trust Assets by the Trust Beneficiaries shall be consistent with the valuation of Trust Assets used by the Trust.

3.15    Termination. The Trust shall terminate upon the earliest to occur of: (a) the fulfillment of the Trust purpose by the prosecution or other resolution of all of the transferred Causes of Action and the collection and disposition of the other Trust Assets, and the distribution of the Net Recoveries or (b) the term of five (5) years from the Effective Date. The Trustee may apply to the Bankruptcy Court to terminate the Trust prior to the expiration of the five (5) year term in the event all activities of the Trust are completed. The Trustee may, with the consent of the Bankruptcy Court, extend the term of the Trust if the conclusion of the Causes of Action transferred to the Trust pursuant to the Plan, the collection and disposition of the other Trust Assets and distribution of the Net Recoveries therefrom has not been completed, or if other circumstances require such extension. All fees earned by the Trustee up to and including the date of Termination shall be paid.

4.       **Construction of this Instrument**.

4.1    Applicable Law. The Trust created herein shall be construed, regulated and administered under the laws of the State of Texas and the United States of America. The Trustee agrees and consents that the Bankruptcy Court shall retain jurisdiction to enforce this Agreement in order to effectuate the provisions of the Plan.

4.2    Amendment of Trust Agreement.  This Agreement may be amended, modified, terminated, revoked or altered only upon consent of the Trustee or as otherwise ordered by the Bankruptcy Court.

4.3    Interpretation and Capitalized Terms.  The enumeration and headings contained in this Agreement are for convenience of reference only and are not intended to have any substantive significance in interpreting the same. Unless the context otherwise requires, whenever used in this Agreement the singular shall include the plural and the plural shall include the singular. Capitalized terms herein are ascribed the meanings assigned to them in the Plan unless otherwise specifically defined herein.

4.4    Severability. If any provision of this Agreement shall for any reason be held invalid or unenforceable by any court, governmental agency or arbitrator of competent jurisdiction, such invalidity or unenforceability shall not affect any other provision hereof, but this Agreement shall be construed as if such invalid or unenforceable provision had never been contained herein.

4.5    Entire Agreement.  This Agreement (including the recitals) constitutes the entire agreement by and among the parties and there are no representations, warranties, covenants or obligations except as set forth herein.  This Agreement supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions, written or oral, of the parties hereto, relating to any transaction contemplated hereunder. Except as otherwise specifically provided herein and in the Plan, nothing in this Agreement is intended or shall be construed to confer upon or to give any person other than the parties hereto and the Trust Beneficiaries any rights or remedies against the Trust, the Trustee or the Trust Assets.

4.6    Notices.  Any notice or other communication by the Trustee to any of the Trust Beneficiaries shall be deemed to have been sufficiently given, for all purposes, when mailed by first class mail, postage prepaid, and addressed to such Beneficiary at its address as shown in the records of the Trustee which records shall be initially based upon the Beneficiary's proof of claim, or if none, records provided by the Debtor. Any notice or other communication which may be or is required to be given, served or sent to the Trustee shall be in writing and shall be mailed by registered or certified mail, return receipt requested, postage prepaid, or transmitted by hand delivery, addressed to the Trustee at his address set forth on the signature page hereof. A Trust Beneficiary may designate by notice in writing a new address to which any distribution notice, demand, request, or communication shall be mailed or delivered in the manner described above and such change shall be effective from and after receipt by the Trustee.

4.7    Court Supervision. Notwithstanding any provision in the Plan or this Agreement to the contrary, the Bankruptcy Court shall retain jurisdiction of, and shall be the sole arbiter of, the following matters: (i) disputes regarding interpretation of the Plan or this Agreement; (ii) disputes regarding the settlement of any Cause of Action transferred to the Trust pursuant to the Plan; and (iii) such other and further matters relating to the Trust that are necessary and appropriate to effectuate the provisions of the Plan and protect the interests of all Creditors.

IN WITNESS WHEREOF, the undersigned have caused this instrument to be executed as of the day and year first above written.

**DEBTORS:**

NUKOTE INTERNATIONAL, INC.

By: _____

NUKOTE IMPERIAL, LTD.

By: _____

INTERNATIONAL COMMUNICATION MATERIALS, INC.

By: _____

ENVIROSMART, INC.

By: _____

BLACK CREEK HOLDINGS, LTD.

By: _____

**TRUSTEE:**

By: _____
    Christopher J. Tierney, Managing Director
    Hays Financial Consulting, LLC